**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE ASHLEY MADISON CUSTOMER | ) |
| DATA SECURITY BREACH LITIGATION | ) |
| | )     MDL No. 2669 |
| This Document Relates to: | ) |
| | )     Case No. 4:15-MD-02669-JAR |
| ALL CASES | ) |
| | ) |

**AVID'S MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION TO DISMISS OR STAY AND TO COMPEL ARBITRATION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 2

    A.    The Parties ....................................................................................... 2

    B.    The Ashley Madison Website .......................................................... 3

    C.    The Ashley Madison Terms and Conditions ...................................10

ARGUMENT ............................................................................................................... 14

I.     Federal Law and Policy Strongly Favor Arbitration ...................................... 14

II.    The Arbitration Clause Here is Valid and Enforceable ................................ 17
A.    The Ashley Madison Terms

    and Conditions Constitute a Valid and Enforceable Agreement .......................17

    B.    Plaintiffs All Agreed to Arbitrate Their Claims ..............................22

III.   Plaintiffs' Claims All Fall Within the Scope of the Arbitration Agreement ................... 26

    A.    The Arbitration Agreement Covers All of Plaintiffs' Claims ..............................26

    B.    The Arbitration Agreement Covers Plaintiffs' Claims Against Both Avid Dating Life and Avid Life Media .........................................................................27

    C.    Any Dispute About the Scope or Enforceability of the Terms and Conditions or Arbitration Clause Must Be Submitted to Arbitration ...................29

CONCLUSION ............................................................................................................ 30

i

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Appistry, Inc.* v. *Amazon.com, Inc.*,
  No. 4:13-cv-2547 (HEA), 2015 WL 881507 (E.D. Mo. Mar. 1, 2015) ......................17, 18, 21

*Arnold* v. *DirecTV, Inc.*,
  No. 4:10-cv-00352 (JAR), 2013 WL 6159456 (E.D. Mo. Nov. 25, 2013) ...........................28

*Arthur Andersen LLP* v. *Carlisle*,
  556 U.S. 624 (2009) ..................................................................................................27

*AT&T Mobility LLC* v. *Concepcion*,
  563 U.S. 333 (2011) ...............................................................................................15, 21

*Bergenstock* v. *Legalzoom, Inc.*,
  No. 13-cv-15686, 2015 WL 3866703 (Sup. Ct. N.C. June 23, 2015) ...................................20

*Bernal* v. *Sw. & Pac. Specialty Fin., Inc.*,
  No. 4:12-cv-05797 (SBA), 2014 WL 1868787 (N.D. Cal. May 7, 2014) ..............................22

*Burcham* v. *Expedia, Inc.*,
  No. 4:07-cv-1963 (CDP), 2009 WL 586513 (E.D. Mo. Mar. 6, 2009) ......................... *passim*

*Caspi* v. *Microsoft Network, LLC*,
  732 A.2d 528 (N.J. App. Div. 1999) .................................................................................20

*CD Partners, LLC* v. *Grizzle*,
  424 F.3d 795 (8th Cir. 2005) ...............................................................................16, 27, 28

*Centrifugal Force, Inc.* v. *Softnet Commc'n, Inc.*,
  No. 08–cv-5463 (CM), 2011 WL 744732 (S.D.N.Y. Mar. 1, 2011) ...................................20

*Citizens Bank* v. *Alafabco, Inc.*,
  539 U.S. 52 (2003) ........................................................................................................14

*Cline* v. *Etsy, Inc.*,
  No. 15-cv-2115, 2016 WL 3002369 (JCM) (D. Nev. May 23, 2016) ...................................20

*Davidson & Assocs.* v. *Internet Gateway*,
  334 F. Supp. 2d 1164 (E.D. Mo. 2004) ............................................................................17

*Dean Witter Reynolds, Inc.* v. *Byrd*,
  470 U.S. 213 (1985) ...............................................................................................15, 27

*Donaldson Co., Inc.* v. *Burroughs Diesel, Inc.*,
    581 F.3d 726 (8th Cir. 2009) ...............................................................................27

*Donaldson Int'l Livestock Ltd.* v. *Znamensky Selekcionno-Gibridny Ctr. LLC*,
    2008 CarswellOnt 7827 (Can. Ont. Ct. App. 2008)............................................29

*E.E.O.C.* v. *Waffle House, Inc.*,
    534 U.S. 279 (2002)............................................................................................16

*Faber* v. *Menard, Inc.*,
    367 F.3d 1048 (8th Cir. 2004) ...........................................................................16

*Fallo* v. *High-Tech Inst.*,
    559 F.3d 874 (8th Cir. 2009) .............................................................................30

*FreeLife Int'l, Inc.* v. *Am. Ed. Music Pub. Inc.*,
    No. 07-cv-2210 (DGC), 2009 WL 3241795 (D. Ariz. Oct. 1, 2009) ...................20

*Fteja* v. *Facebook Inc.*,
    841 F. Supp. 2d 829 (S.D.N.Y. 2012)................................................................22

*Gannon* v. *Circuit City Stores, Inc.*,
    262 F.3d 677 (8th Cir. 2001) .............................................................................27

*Gov't Emps. Ins. Co.* v. *Grand Med. Supply, Inc.*,
    No. 11-cv-5339 (BMC), 2012 WL 2577577 (E.D.N.Y. July 4, 2012) .................28

*Goza* v. *Multi-Purpose Civic Ctr. Facilities Bd. for Pulaski Cty.*,
    No. 12--cv-6125 (SOH), 2014 WL 3672128 (W.D. Ark. July 23, 2014)........20, 22

*Green* v. *SuperShuttle Int'l, Inc.*,
    653 F.3d 766 (8th Cir. 2011) ........................................................................15, 16

*Hancock* v. *Am. Tel. & Tel. Co. Inc.*,
    701 F.3d 1248 (10th Cir. 2012) .........................................................................17

*Hill* v. *Hornbeck Offshore Servs.*,
    799 F. Supp. 2d 658 (E.D. La. 2011) ................................................................20

*Hopkins* v. *Trans Union*,
    No. 03-cv-5433 (ADM), 2004 WL 1854191 (D. Minn. Aug. 19, 2004)...............21

*Hubbert* v. *Dell Corp.*,
    835 N.E.2d 113 (App. Ct. Ill. 2005) ..................................................................20

*In re s 2703(d) Order*,
    787 F. Supp. 2d 430 (E.D. Va. 2011) ...............................................................20

*Indus. Wire Prods., Inc.* v. *Costco Wholesale Corp.*,
    576 F.3d 516 (8th Cir. 2009) ........................................................15, 16

*Kanitz* v. *Rodgers Cable Inc.*,
    2002 CarswellOnt 628 (Can. Ont. Sup. Ct. 2002) ..........................................25, 26

*LDM Grp.* v. *Akers*,
    No. 4:12-cv-812 (JAR), 2013 WL 1316420 (E.D. Mo. Mar. 29, 2013) ..............................26

*Leatherwood* v. *Cardservice Int'l, Inc.*,
    929 So.2d 616 (Fla. Ct. App. 2006) ..............................................20

*Lebowitz* v. *Dow Jones & Co.*,
    508 F. App'x 83 (2d Cir. 2013) ..............................................26

*LTVN Holdings LLC* v. *Odeh*,
    No. 09-cv-0789 (CCB), 2009 WL 3736526 (D. Md. Nov. 5, 2009) ...........................20

*M.A. Mortenson Co.* v. *Saunders Concrete Co., Inc.*,
    676 F.3d 1153 (8th Cir. 2012) ..............................................15, 16

*Magill* v. *Expedia Inc.*,
    2014 ONSC 2073 (Can. Ont. Sup. Ct. 2014) ..............................................20, 22

*Major* v. *McCallister*,
    302 S.W.3d 227 (Mo. Ct. App. 2009) ..............................................20, 22

*Owen* v. *Bristol Care, Inc.*,
    702 F.3d 1050 (8th Cir. 2013) ..............................................15

*Panzer* v. *Cont'l Airlines*,
    398 F. Supp. 2d 529 (S.D. Miss. 2005) ..............................................20

*Peters* v. *Amazon Servs. LLC*,
    2 F. Supp. 3d 1165 (W.D. Wash. 2013) ..............................................20

*Pleasants* v. *Am. Exp. Co.*,
    541 F.3d 853 (8th Cir. 2008) ..............................................15

*PRM Energy Sys., Inc.* v. *Primenergy, LLC*,
    592 F.3d 830 (8th Cir. 2010) ..............................................28

*Rasschaert* v. *Frontier Commc'ns Corp.*,
    No. 12-cv-3108 (DWF), 2013 WL 1149549 (D. Minn. Mar. 19, 2013)................................20

*Rent-A-Ctr., W., Inc.* v. *Jackson*,
    561 U.S. 63 (2010)..............................................29

*Rudder* v. *Microsoft Corp.*,
  1999 CarswellOnt 3195 (Can. Ont. Sup. Ct. 1999) ............................................20

*Shearson/Am. Exp., Inc.* v. *McMahon*,
  482 U.S. 220 (1987)...............................................................................................27

*Siebert* v. *Amateur Athletic Union of U.S., Inc.*,
  422 F. Supp. 2d 1033 (D. Minn. 2006)..............................................................20, 21

*Stomp, Inc.* v. *NeatO, LLC*,
  61 F. Supp. 2d 1074 (C.D. Cal. 1999) .................................................................18

*Swift* v. *Zynga Game Network, Inc.*,
  805 F. Supp. 2d 904 (N.D. Cal. 2011) .................................................................20

*Telectronics Pacing Sys.* v. *Guidant Corp.*,
  143 F.3d 428 (8th Cir. 1998) .................................................................................16

*Torres* v. *Simpatico, Inc.*,
  781 F.3d 963 (8th Cir. 2015) .................................................................................16

*Tyus* v. *Va. College*,
  No. 15-cv-211 (WKW), 2015 WL 4645513 (M.D. Ala. Aug. 4, 2015) ................20

*Unison Co., Ltd.* v. *Juhl Energy Dev., Inc.*,
  789 F.3d 816 (8th Cir. 2015) .................................................................................16

*United States* v. *Trotter*,
  478 F.3d 918 (8th Cir. 2007) .................................................................................15

*Vernon* v. *Qwest Commc'ns Int'l, Inc.*,
  857 F. Supp. 2d 1135 (D. Col. 2013).....................................................................20

*Victorio* v. *Sammy's Fishbox Realty Co., LLC*,
  No. 14-cv-8678 (CM), 2015 WL 2152703 (S.D.N.Y. May 6, 2015) .....................28

*Winco Window Co., Inc.* v. *G & S Glass & Supply, Inc.*,
  No. 4:15-cv-309 (RLW), 2015 WL 3604072 (E.D. Mo. June 5, 2015) ................30

*Xerox Can. Ltd.* v. *MPI Techs., Inc.*,
  2006 CarswellOnt 7850 (Can. Ont. Super. Ct. 2006) ...........................................29

**Statutes**

Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*...................................................... *passim*

**Other Authorities**

Nancy Kim, *Internet Challenges to Business Innovation*, 12 J. INTERNET L. 3
  (2008) .................................................................................................................18

Ronald J. Mann & Travis Siebeneicher, *Just One Click: The Reality of Internet
  Retail Contracting*, 108 COLUM. L. REV. 984 (2008) ...........................................22

J.H. Reichman & Jonathan A. Franklin, *Privately Legislated Intellectual Property
  Rights: Reconciling Freedom of Contract with Public Good Uses of
  Information*, 147 U. PA. L. REV. 875 (1999) .........................................................18

Andrew L. Shapiro, *The "Principles in Context" Approach to Internet
  Policymaking*, 1 COLUM. SCI. & TECH. L. REV. 1 (2000) ......................................18

BARRY B. SOOKMAN, COMPUTER, INTERNET AND ELECTRONIC COMMERCE LAW,
  Chapter 10.4 – Enforceability of Online Agreements (2016) .................................25

Defendants Avid Dating Life Inc. ("Avid Dating Life") and Avid Life Media Inc. ("Avid Life Media") (together, "Avid") respectfully submit this Memorandum in support of their motion seeking an order (i) dismissing Plaintiffs' claims or, in the alternative, staying any further litigation of Plaintiffs' claims in this Court; and (ii) compelling Plaintiffs to arbitrate their claims.[1]

## INTRODUCTION

Plaintiffs each agreed when they created Ashley Madison accounts to be bound by the Terms and Conditions of the website. Those Terms and Conditions require Plaintiffs to arbitrate their claims and prohibit Plaintiffs from proceeding by class action.

The method by which Plaintiffs agreed to this online contract with Avid is familiar to, and has been enforced consistently by, this District Court. As a condition of opening one or more of their Ashley Madison accounts, Plaintiffs were presented with the Terms and Conditions in an active hyperlink and were required to click an online button confirming that they assented to those Terms and Conditions. Each of the named Plaintiffs clicked that button and thus agreed to the Terms and Conditions before registering their most recent accounts. And nearly half of them have already admitted that they read or looked at the Terms and Conditions.

The arbitration clause was included in the Terms and Conditions beginning in March 2011. Of the 18 Plaintiffs, 15 opened accounts after that date or affirmatively agreed to those Terms and Conditions after that date. The 3 other Plaintiffs, who opened accounts only before March 2011, are bound by the arbitration clause because they expressly agreed that they

---

[1]   Defendants make this motion subject to and without waiver of the defenses they may raise in response to Plaintiffs' Amended Consolidated Class Action Complaint, including defenses related to personal jurisdiction and forum selection.

would be bound by changes to the Terms and Conditions if they continued to use the website after such changes were made, which they did.

The Federal Arbitration Act, Supreme Court precedent and the law of this Circuit strongly favor the enforcement of arbitration agreements -- including online agreements.  On this motion, the Court's role is limited to determining whether a valid agreement to arbitrate exists and covers Plaintiffs' claims.  Because Plaintiffs agreed to a broad arbitration clause that makes arbitration mandatory, and covers all of their claims, Avid respectfully requests that this Court issue an order dismissing this action, or staying further proceedings, and compelling arbitration.

## FACTUAL BACKGROUND

### A.    The Parties

Avid Dating Life is a wholly owned subsidiary of Avid Life Media.[2]  Jiwan Decl. ¶ 3.  Both Avid Dating Life and Avid Life Media are organized under Canadian law and have headquarters and principal places of business in Toronto, Canada.  *Id.*  Since 2007, Avid Dating Life has operated AshleyMadison.com, an online dating website ("Ashley Madison").  *Id.*

Plaintiffs are 18 individuals who registered as members of Ashley Madison between 2005 and 2015. *Id.* ¶ 5.  Many opened and used multiple accounts.  The dates on which Plaintiffs created their most recent Ashley Madison accounts, the user names they chose, the last date they used these accounts, and the form of the registration page used during the period when Plaintiffs created their accounts, are set forth in Appendix A.

This action arises as a result of an unauthorized intrusion of Avid's computer network by hackers, which Avid announced on July 20, 2015.  Plaintiffs allege that this hack

---

[2]   On July 12, 2016, Avid Life Media announced that it would be renamed Ruby Corp. To avoid confusion, we refer to Avid Life Media and Avid Dating Life herein.

resulted in the "compromised security" of their financial and personal information.  First Am.

Consolidated Class Action Compl. ¶ 1.  Plaintiffs further allege that the hack revealed that

Defendants had deceived customers through their marketing of a "paid delete" service and use of

"fake profiles" or "bots" on the website.  *Id.* ¶¶ 8-9.  Plaintiffs assert the following causes of

action:  violation of the Racketeer Influenced and Corrupt Organizations Act; violation of the

Federal Stored Communications Act; negligence and negligence *per se*; breach of implied

contract; breach of contract; unjust enrichment; negligent misrepresentation; violation of 17

states' consumer fraud and protection statutes; violation of the California Customer Records Act;

and violation of 15 states' data breach notice statutes.  *Id.* ¶¶ 132-283.

### B.     The Ashley Madison Website

Each of the Plaintiffs was required to agree to the Terms and Conditions before

registering one or more accounts on the website.  And it was not possible for Plaintiffs to create

these accounts and use the website without first agreeing to the Terms and Conditions.  Jiwan

Decl. ¶ 6.  In fact, 8 of the 18 Plaintiffs admit to having read or seen the Ashley Madison Terms

and Conditions.[3]

Here is how the website works -- and how it worked during the time period that

Plaintiffs created their most recent accounts.  New visitors to the website were directed by the

---

[3]    These 8 are: Gustavo Alfaro, Marvin Cabiness, Byron Goetting, Anthony Imbarrato, Paul Jack, Christopher Russell, James Shows, and David Yagel.  *See* Cassetta Decl. Exs. F to M (Alfaro Answers & Objs. to Defs.' Interrogs. at Resps. 9-10; Cabiness Answers & Objs. to Defs.' Interrogs. at Resps. 9-10; Goetting Answers & Objs. to Defs.' Interrogs. at Resps. 9-10; Imbarrato Answers & Objs. to Defs.' Interrogs. at Resp. 9; Jack Answers & Objs. to Defs.' Interrogs. at Resps. 9-10; Russell Answers & Objs. to Defs.' Interrogs. at Resps. 9-10; Shows Answers & Objs. to Defs.' Interrogs. at Resps. 9-10; Yagel Answers & Objs. to Defs.' Interrogs. at Resps. 9-10); *see also id.* Ex. N (Macomber Answers & Objs. to Defs.' Interrogs. at Resps. 9-10 (responding that he "probably did" see and read the terms)).

3

Ashley Madison homepage to identify their relationship status using a drop down menu.  This is an example of the drop down menu as it appeared on July 20, 2015:



Jiwan Decl. ¶ 6, Ex. B.  Similar menus appeared throughout the relevant period.  *Id.* ¶ 6.

Next, visitors like Plaintiffs were taken to the registration page, which contained a registration form.  To proceed any further, they were required to register by creating a user profile with such information as a username, password, and zip code.  Visitors were not asked and were not required to provide their real names.  *Id.* ¶ 7.  For example, from April 2013 to July 2015, the registration form appeared in this or a substantially similar form.

## You're almost done!

Please take 30 seconds to complete your profile and start searching

| | |
|---|---|
| Username | |
| Password | |
| Country | United States ▾ |
| Zip/Postal Code | |
| Greeting | |
| Date of Birth | |
| Limits | Please Select ▾ |
| Height | Please Select ▾ |
| Weight | Please Select ▾ |
| Body Type | Please Select ▾ |
| Ethnicity | Please Select ▾ |
| Email | |

I acknowledge that by choosing to continue and search now, I certify
I am at least 18 years old and have read and agree to the Ashley
Madison Privacy Policy and Terms and Conditions.

**I Agree**

To help you have a successful affair, AshleyMadison.com and its affiliated entities will
periodically notify you of potential matches in your area, new matches you've
received, changes to the service and other services that may be of interest to you. We
will never share or sell your email address with any other organization or individual.

*Id.* ¶ 14, Ex. I; *see also id.* ¶ 15, Ex. J.

Finally, to complete the registration process and use Ashley Madison's services, visitors were required to click a button confirming that they read and agreed to the Ashley Madison Terms and Conditions.  *Id.* ¶ 8.  Specifically, as shown above and excerpted below, to become a user of the website from April 2013 to July 2015, visitors were required to click a button that said, "I Agree," located below this text:  "I acknowledge that by choosing to continue and search now, I certify I am at least 18 years old and have read and agree to the Ashley Madison **Privacy Policy** and **Terms and Conditions**."



*Id.* ¶ 14, Ex. I.

The phrase "Terms and Conditions" is an active hyperlink highlighted in blue which, if clicked, takes visitors and users directly to the text of the Terms and Conditions.  This is an excerpted image of the webpage with the Terms and Conditions as it appeared in July 2015:

*Id.* ¶ 17, Ex. K at AVID 00000437 (highlighting added).   The Terms and Conditions were available to visitors and users, including Plaintiffs, in a similar form during the entire period Plaintiffs used the website.  *Id.* ¶ 17.

        With the variations in form and wording discussed below, the Ashley Madison registration page has contained what courts call a "clickwrap agreement" since at least September 24, 2008.  As shown in <u>Appendix A</u>, each of the Plaintiffs created an account using one of these registration pages:

-    From April 2013 to July 2015, the version of the registration form shown above on p. 5, or a substantially similar version, was in place.  *Id.* ¶¶ 14-15 Ex. I and Ex. J.

-    From October 2012 to April 2013, the registration form looked very similar, but the click button was labeled "Search Now."  *Id.* ¶ 12, Ex. F.

> I acknowledge that by choosing to continue and search now, I certify I am at least 18 years old and have read and agree to the Ashley Madison <u>Privacy Policy</u> and <u>Terms and Conditions</u>.

> **Search Now**

-    From November 2012 to March 2013, Avid also used two other versions of the registration form with the "Search now" click button, but each version contained the following statement: "I acknowledge that by clicking search now, I certify I am at least 18 years old and have read and agree to the Ashley Madison **privacy policy** and **terms and conditions**."  *Id.* ¶ 13, Ex. G and Ex. H.

7



- From November 2011 to October 2012, the registration form also contained a click button labeled "Search now" and was located below the following statement: "I have read and accepted the **Terms and Conditions**." *Id.* ¶ 11, Ex. E. Visitors during this time confirmed their agreement to the Terms and Conditions, which were provided by hyperlink, by clicking the button; they could also affirmatively decline to agree by un-checking the box next to the Terms and Conditions, which would prevent the user from completing the registration process and setting up an account. *Id.* ¶ 16.



- As of January 2010, the registration form contained a click button labeled "Search Now" located next to the following statement:  "I have read and accepted the **Terms and Conditions**." *Id.* ¶ 10, Ex. D.  Here too, visitors confirmed their agreement to the Terms and Conditions, which were provided by hyperlink, by clicking the button; they could also affirmatively decline to agree by un-checking the box next to the Terms and Conditions, which would prevent the user from completing the registration process and setting up an account. *Id.* ¶ 16.



8

- As of September 24, 2008, the registration form had a click button next to the words: "I have read and accepted the **Terms and Conditions**." *Id.* ¶ 9, Ex. C.  Here too, the Terms and Conditions were provided by hyperlink and visitors confirmed their agreement to the Terms and Conditions by clicking the button.  Visitors also had the option of unchecking the box next to the Terms and Conditions, which would prevent them from completing registration.



In addition to providing the Terms and Conditions at the time users (including Plaintiffs) registered and created accounts, the most current version of the Terms and Conditions was made available to users on almost every page of the website.  A hyperlink directing users to the text of the Terms and Conditions appears at the footer of the Ashley Madison website.  An image of this link as it appeared on the homepage on July 20, 2015 is shown below:



*Id.* ¶ 23, Ex. P (circling added).  A similar link to the Terms and Conditions appeared at the footer of almost every Ashley Madison webpage during the entire period that Plaintiffs used the website.  *Id.* ¶ 23.

Users also were sent a link to the updated Terms and Conditions when they made purchases on the website during certain periods.  *Id.* ¶ 25.  These purchase receipts sent by Avid via email contained a hyperlink to the then-current Terms and Conditions.  *Id.*  This is an

example of a purchase confirmation sent to Plaintiff ████████ on January 23, 2014, which he

retained and produced in discovery:

> Your payment in the amount of $19.99 for the Member Initiated Contact has been
> confirmed and your account has been updated. If you have any questions, please
> contact Customer Service by replying to this email or by sending an email to
> customerservice@ashleymadison.com.
>
> This feature will give you access to read and respond to unsolicited member
> initiated communication for 30 days. To change or cancel your subscription go to
> your Credit History. See our Terms for full details.

Cassetta Decl. ¶ 16, Ex. O at ████████_000020 (highlighting added).

> ### C.     The Ashley Madison Terms and Conditions

The Ashley Madison Terms and Conditions contain the contractual undertakings

of each user with respect to use of and conduct on the website; payment obligations; Avid's

termination rights; and the law and procedures governing any disputes.   The Terms and

Conditions are, in effect, the ground rules for how to use -- and not to use -- the website in order

to find and communicate with other users interested in dating or chatting online.  The Terms and

Conditions set forth prohibited conduct on the website, such as "'stalk[ing]' or harass[ing]" other

users, or using the website for illegal purposes such as "prostitution and/or solicitation."  Jiwan

Decl. ¶ 21, Ex. O at AVID 00000261.  They also list the different services offered on the site,

including those services requiring payment, and what methods of payment may be used; how

users may remove their profiles from the website; and various other disclosures, representations,

and warranties related to use of the website.  *See id.* at AVID 00000263-65, 269-70.

At the top of the Terms and Conditions, the first paragraph informs users that the

Terms and Conditions "FORM AN AGREEMENT . . . THAT GOVERNS YOUR USE OF THE

SERVICE," and that "BY USING OR ACCESSING THE SERVICE, YOU . . . AGREE TO BE

10

BOUND BY" the Terms and Conditions.  *Id.* at AVID 00000260 (capitalization in original).

Since March 2011, the very first paragraph has alerted users to the arbitration clause:

> PLEASE READ THESE TERMS CAREFULLY BEFORE USING THIS SITE INCLUDING THE SECTIONS ***RELATING TO TERMINATION, ARBITRATION AND CLASS ACTION WAIVER***.  IF YOU DO NOT AGREE WITH THE TERMS OR PRIVACY POLICY, DO NOT ACCESS OR OTHERWISE USE THE SITE OR ANY INFORMATION CONTAINED HEREIN.

*Id.* ¶ 19, Ex. M at AVID 00000076 (capitalization in original, emphasis added).

### 1.     The Arbitration Clause and Class Action Waiver

Since March 17, 2011, the Terms and Conditions have contained an arbitration clause and a class action waiver, as well as an alert similar to the one quoted above.  *Id*.  The arbitration clause in the Terms and Conditions from March 17, 2011 to April 18, 2013 appeared in a separate section under the heading, "Arbitration and Class Actions Waiver," and stated:

> Any Dispute arising out of or relating to these Terms and Conditions may be resolved through binding arbitration in accordance with the terms of this Arbitration Provision at either your or Ashley Madison's election, unless otherwise prohibited by law.

*Id.* at AVID 00000080.  Those Terms and Conditions also contained a class action waiver.  *Id.* at AVID 00000081.

The arbitration clause included in the Terms and Conditions since April 18, 2013 also appears in its own section under the heading (in all capitals) "ARBITRATION AND CLASS ACTION WAIVER."  It reads:

> All disputes, controversies, causes of action (in tort, contract, by statute or otherwise) ("Disputes"), including, without limitation, Disputes arising from or relating to this Arbitration Provision (including the interpretation, breach, termination and invalidity thereof) or the relationship that results from this Agreement ***shall be resolved by binding arbitration*** by a single independent and impartial arbitrator under the applicable Commercial Dispute Resolution Procedures and Supplementary Procedures for Consumer-Related Disputes of the American Arbitration Association . . . .  ***Arbitration replaces the right to go to***

11

*court, and therefore the parties waive any right that you or Ashley Madison might otherwise have had to a jury trial or the opportunity to litigate any claims in court before either a judge or jury.*

*Id.* ¶ 20, Ex. N at AVID 00000178 (emphasis added).   In addition, the class action waiver included since April 18, 2013 reads: "It is agreed that **neither party shall have the right to participate as a class representative or class member** with respect to any Disputes subject to arbitration under this Agreement or any Dispute between the parties. *Id.* at AVID 00000179 (emphasis added).

### 2.   Plaintiffs' Agreement to be Bound by Changes Made by Avid to the Terms and Conditions

The Terms and Conditions expressly provided -- and Plaintiffs expressly agreed -- that Avid could change the Terms and Conditions at any time *and* that Plaintiffs' continued use of the website would constitute binding acceptance of such changes.  From September 5, 2008 until March 17, 2011, the Terms and Conditions stated:

> WE RESERVE THE RIGHT TO MAKE CHANGES TO THESE TERMS AT ANY TIME. YOUR CONTINUED USE OF OUR SERVICE CONSTITUTES YOUR ACCEPTANCE OF SUCH CHANGES.   ACCORDINGLY, YOU SHOULD REVIEW THESE TERMS FROM TIME TO TIME FOR SUCH CHANGES.

*Id.* ¶ 18, Ex. L at AVID 00000022 (capitalization in original).  Starting on March 17, 2011, the Terms and Conditions provided:

> WE RESERVE THE RIGHT, AT OUR DISCRETION, TO MODIFY THESE TERMS AT ANY TIME.  PLEASE CHECK THESE TERMS PERIODICALLY FOR CHANGES.  YOUR CONTINUED USE OF THIS SITE FOLLOWING THE POSTING OF CHANGES TO THESE TERMS WILL MEAN YOU ACCEPT THOSE CHANGES.

*Id.* ¶ 19, Ex. M at AVID 00000076 (capitalization in original).

During certain periods, when users first logged onto the website after changes were made to the Terms and Conditions, they were presented with a "dialog box" notifying them

12

that the Terms and Conditions had been "updated," providing them with a copy of the updated Terms and Conditions, and enabling them to agree to the updated Terms and Conditions before continuing to use the website. *Id.* ¶ 24. As shown below, the dialog box stated, "We have updated our Terms and Conditions," and directed users to "Please read and scroll to the bottom to accept our new terms."



*Id.* ¶ 24, Ex. Q (highlighting added).

As highlighted above, the dialog box was in use during a period in 2011 after the arbitration clause and class action waiver were added to the Terms and Conditions. As described further below, certain Plaintiffs who had opened Ashley Madison accounts before March 17, 2011, *infra* pp. 23-24, clicked the "I Agree" button in the dialog box after the arbitration clause was included. *Id.* ¶ 24.

### 3. The Parties' Choice of Law

Since at least September 5, 2008, the Terms and Conditions have contained an Ontario choice of law provision. As of September 5, 2008, they stated: "These terms shall be interpreted in accordance with the laws of the Province of Ontario without reference to conflict of laws principles." *Id.* ¶ 18, Ex. L at AVID 00000026. On March 17, 2011, the choice of law

provision was amended to state:  "You agree that . . . the Terms, and your relationship with Ashley Madison under the Terms shall be governed by the internal substantive laws of the Province of Ontario, without respect to its conflict of laws principles.  These Terms shall be interpreted in accordance with the laws of the Province of Ontario without reference to conflict of law principles."  *Id.* ¶ 19, Ex. M at AVID 00000081.[4]

**4.       Forum Selection: Plaintiffs Agreed to Exclusive Jurisdiction in the Courts in Ontario, Canada**

Every version of the Terms and Conditions in effect when Plaintiffs registered and agreed to be bound by the Terms and Conditions provided for jurisdiction in the courts of Ontario, Canada.  For example, from September 5, 2008 until March 17, 2011 the Terms and Conditions stated in the "Dispute Resolution" section: "All disputes arising out of or relating to these Terms or your use of our Service will be exclusively resolved in courts located in Toronto, Ontario . . . ."  *Id.* ¶ 18, Ex. L at AVID 00000026.  Thus, the claims of any Plaintiffs who are not compelled to arbitrate would have to be dismissed and brought in Ontario.

**ARGUMENT**

## I.       Federal Law and Policy Strongly Favor Arbitration

The arbitration clause in the Ashley Madison Terms and Conditions is governed by the Federal Arbitration Act ("FAA").  The Supreme Court has held that the FAA applies to contracts "affecting commerce," which "ordinarily signal[s] the broadest permissible exercise of Congress' Commerce Clause power."  *Citizens Bank* v. *Alafabco, Inc.*, 539 U.S. 52, 56 (2003).

---

[4]     On April 18, 2013, the choice of law provision was further amended to state that it applied "except as provided in the arbitration provisions of these Terms applicable to United States residents."  *See* Jiwan Decl. ¶ 20, Ex. N at AVID 00000180.  The arbitration provision in this version of the Terms and Conditions provided that for United States residents, the FAA and the substantive laws of the State of New York will govern.  *See id.* at AVID 00000178-179.

14

Commercial transactions over the Internet constitute interstate commerce covered by the FAA. *See generally United States* v. *Trotter*, 478 F.3d 918, 921 (8th Cir. 2007).

The FAA provides that contractual agreements "to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Section 4 of the FAA provides that a party may petition a court to compel arbitration, and if the suit is arbitrable, the court *must* order that arbitration proceed in accordance with the written agreement. *See* 9 U.S.C. § 4. Section 3 provides that if arbitration is required, the court must, at a minimum, stay the case upon application. *See* 9 U.S.C. § 3.

The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that the district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc.* v. *Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original); *M.A. Mortenson Co.* v. *Saunders Concrete Co., Inc.*, 676 F.3d 1153, 1156-57 (8th Cir. 2012) ("A motion to compel arbitration must be granted 'if a valid arbitration clause exists which encompasses the dispute between the parties.'") (quoting *3M Co.* v. *Amtex Sec., Inc.*, 542 F.3d 1193, 1198 (8th Cir. 2008)). Consistent with that mandate, if a court denies a motion to stay and compel arbitration under the FAA, the movant may immediately appeal.[5] *See Indus. Wire Prods., Inc.* v. *Costco Wholesale Corp.*, 576 F.3d 516, 518 (8th Cir. 2009).

The controlling sections of the FAA "provide[] for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration, and for orders

---

[5]   Class action waivers are likewise lawful and enforceable in the federal courts. *See, e.g.*, *AT&T Mobility LLC* v. *Concepcion*, 563 U.S. 333, 348 (2011); *Owen* v. *Bristol Care, Inc.*, 702 F.3d 1050, 1055 (8th Cir. 2013); *Green* v. *SuperShuttle Int'l, Inc.*, 653 F.3d 766, 769 (8th Cir. 2011); *Pleasants* v. *Am. Exp. Co.*, 541 F.3d 853, 859 (8th Cir. 2008).

compelling arbitration when one party has failed or refused to comply with an arbitration agreement." *E.E.O.C.* v. *Waffle House, Inc.*, 534 U.S. 279, 289 (2002) (citing 9 U.S.C. §§ 3 and 4). "The FAA generally requires a federal district court to stay an action pending an arbitration, rather than to dismiss it." *See Green* v. *SuperShuttle Int'l, Inc.*, 653 F.3d 766, 769 (8th Cir. 2011). However, the Eighth Circuit recognizes an exception to that rule permitting dismissal in the court's discretion "where it is clear the entire controversy between the parties will be resolved by arbitration." *Id.* at 769-70; *see also Unison Co., Ltd.* v. *Juhl Energy Dev., Inc.*, 789 F.3d 816, 821 (8th Cir. 2015).

The Eighth Circuit has been unwavering in its recognition of the federal policy favoring arbitration.[6] When deciding a motion to compel arbitration, courts in the Eighth Circuit consider only two questions: "[1] whether the arbitration agreement is valid and [2] whether the dispute falls within the terms of that agreement." *Torres* v. *Simpatico, Inc.*, 781 F.3d 963, 968 (8th Cir. 2015); *see also Costco Wholesale*, 576 F.3d at 520. The court undertakes a "narrow scope of review" limited to considering "only such issues as are essential to defining the nature of the forum in which a dispute will be decided." *Faber* v. *Menard, Inc.*, 367 F.3d 1048, 1052 (8th Cir. 2004) (quoting *Larry's United Super, Inc.* v. *Werries*, 253 F.3d 1083, 1085 (8th Cir. 2001)). Here, because all of Plaintiffs' claims are arbitrable, dismissal is appropriate.

---

[6]   *See, e.g., Torres* v. *Simpatico, Inc.*, 781 F.3d 963, 968 (8th Cir. 2015) (affirming order to compel individual arbitration and noting that the "'principal purpose' of the [FAA] is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'") (quoting *Concepcion*, 563 U.S. at 3430; *M.A. Mortenson*, 676 F.3d at 1156 ("The FAA establishes a liberal federal policy favoring arbitration agreements.") (quoting *Lenz* v. *Yellow Transp., Inc.*, 431 F.3d 348, 351 (8th Cir. 2005); *CD Partners, LLC* v. *Grizzle*, 424 F.3d 795, 800 (8th Cir. 2005) ("There is a strong national policy in favor of arbitration."); *Telectronics Pacing Sys.* v. *Guidant Corp.*, 143 F.3d 428, 432 (8th Cir. 1998) (noting federal policy favoring "rapid and unobstructed enforcement of arbitration agreements.") (quoting *Moses H. Cone Mem'l Hosp.* v. *Mercury Constr. Corp.*, 460 U.S. 1, 23 (1983)).

## II.     The Arbitration Clause Here is Valid and Enforceable

### A.     The Ashley Madison Terms and Conditions Constitute a Valid and Enforceable Agreement

As established above, in order to create and use their most recent Ashley Madison accounts, each of the 18 Plaintiffs was required to actively agree to the Terms and Conditions -- and did, in fact, agree to the Terms and Conditions -- by clicking the "I Agree," "Search Now," or another similar button on the registration page.  *See* Jiwan Decl. ¶¶ 8-16.  Indeed, similar online or "clickwrap" agreements have been enforceable in this Court for more than a decade -- before any of the Plaintiffs registered to use the Ashley Madison website.  This District Court explained in 2004:

> A clickwrap agreement appears when a user . . . attempts to conduct an Internet transaction involving the agreement and purports to condition further access to the [] transaction on the user's consent to certain conditions there specified; the user consents to these conditions by clicking on a dialog box on the screen, which then proceeds with the remainder of the software installation or Internet transaction.

*Davidson & Assocs.* v. *Internet Gateway*, 334 F. Supp. 2d 1164, 1176 (E.D. Mo. 2004) (internal quotation marks and citation omitted), *aff'd on other grounds*, 422 F.3d 630 (8th Cir. 2005); *see also Appistry, Inc.* v. *Amazon.com, Inc.*, No. 4:13-cv-2547 (HEA), 2015 WL 881507, at *3 (E.D. Mo. Mar. 1, 2015); *Burcham* v. *Expedia, Inc.*, No. 4:07-cv-1963 (CDP), 2009 WL 586513, at *3 (E.D. Mo. Mar. 6, 2009).   As Judge Perry found in *Burcham*, "Such agreements have been routinely upheld by circuit and district courts."   *Burcham*, 2009 WL 586513, at *2; *see also Hancock* v. *Am. Tel. & Tel. Co. Inc.*, 701 F.3d 1248, 1256 (10th Cir. 2012) (noting that such agreements "have routinely been upheld" by courts as valid and enforceable contracts) (internal quotation marks and citation omitted).

17

In fact, by the time Plaintiffs began using the Ashley Madison website, clickwrap agreements had become commonplace in Internet commerce.[7]  Such agreements have long been considered "ubiquitous" in this context.[8]

Clickwrap agreements like Ashley Madison's have been enforced by this District Court, including in cases involving the Expedia and Amazon websites.  In *Appistry*, the Court enforced the forum selection clause in Amazon's clickwrap agreement.  2015 WL 881507, at *3-5.  Judge Autrey found that "courts usually enforce a clickwrap agreement because it requires users to take affirmative action to manifest assent by clicking a button or a checkbox which accompanies a statement instructing users that their click would constitute their assent to the terms at issue."  *Id.* at *3.  The test applied in *Appistry* to determine whether there is a valid clickwrap agreement is whether the users "(i) had reasonable notice of the terms of the clickwrap agreement and (ii) manifested assent to the agreement."  *Id.* (citing *Specht* v. *Netscape Commc'ns Corp.*, 306 F.3d 17, 28-30 (2d Cir. 2002)).  The clickwrap agreement in *Appistry* was found to be valid because it was "formed when website users click a button that indicates that users 'agree or accept' to terms of an agreement upon viewing its terms posted on the website."  *Id*.  Where, like the Ashley Madison clickwrap agreement, the terms are provided in an

---

[7]   *See Stomp, Inc.* v. *NeatO, LLC*, 61 F. Supp. 2d 1074, 1080 n.11 (C.D. Cal. 1999) (describing clickwrap agreements as "common" on software websites in 1999); J.H. Reichman & Jonathan A. Franklin, *Privately Legislated Intellectual Property Rights: Reconciling Freedom of Contract with Public Good Uses of Information*, 147 U. PA. L. REV. 875, 970 (1999) (predicting in 1999 that clickwrap licenses were "likely to become omnipresent in the brave new world of cyberspace transactions.").

[8]   *See* Nancy Kim, *Internet Challenges to Business Innovation*, 12 J. INTERNET L. 3, 4 (2008) ("[C]lickwrap . . . agreements are ubiquitous and their use is no longer limited to the software industry."); Andrew L. Shapiro, *The "Principles in Context" Approach to Internet Policymaking*, 1 COLUM. SCI. & TECH. L. REV. 1, 38 n.14 (2000) (describing "clickwrap contracts" as "ubiquitous computerized form agreements" in 2000).

accessible hyperlink, a user's alleged "failure to read or understand a contract before signing it does not invalidate assent." *See id.*

Applying the same notice and assent test in *Burcham*, the Court enforced the forum selection clause in Expedia's clickwrap agreement.  2009 WL 586513, at *2-4.  Similar to Ashley Madison, Expedia required users to "affirmatively click a box on the website acknowledging receipt of and assent to the contract terms before he or she is allowed to proceed using the website."  *Id.* at *2.  One of the Expedia clickwrap agreements the Court found enforceable included a box stating "I agree to the terms and conditions," which could be reviewed via a hyperlink.  *Id.* at *1.  Also like the Ashley Madison website, "a link to the [Expedia] terms and conditions appears at the bottom of the page where a user searches for hotels."  *Id.* at *1 n.3.

Accordingly, the court in *Burcham* concluded that even if the plaintiff had not actually read the agreement, it was enforceable:

> Expedia offers its services on condition that the user agrees to Expedia's terms. The undisputed facts show that Burcham used the website, and he did so using an account that bore his own name.  ***Expedia is not required to prove anything more to show that Burcham assented to the terms of the website.  That Burcham either didn't read the agreement or didn't see it may be unfortunate for him, but it does not change the outcome.  Burcham is bound by the terms of the website's user agreement.***

*Id.* at *4 (emphasis added).

Consistent with the decisions of courts across the country, the laws of all of Plaintiffs' domicile states recognize the enforceability of clickwrap or similar agreements.[9]   In addition, the jurisdictions whose substantive law the parties have chosen to govern the Terms and Conditions -- Ontario[10] and New York[11] -- also enforce clickwrap agreements.

District courts in this Circuit also have routinely enforced clickwrap agreements containing arbitration clauses, including those containing class action waivers. *See, e.g.*, *Goza* v. *Multi-Purpose Civic Ctr. Facilities Bd. for Pulaski Cty.*, No. 12-cv-6125 (SOH), 2014 WL 3672128, at *2-3 (W.D. Ark. July 23, 2014) (enforcing Ticketmaster.com's arbitration clause where users could not buy tickets "without clicking on the 'Submit Order' button next to the language stating that by doing so, the customer manifests assent [to the Terms of Use]"); *Rasschaert* v. *Frontier Commc'ns Corp.*, No. 12-cv-3108 (DWF), 2013 WL 1149549, at *1-2, 6 (D. Minn. Mar. 19, 2013) (enforcing arbitration agreement that contained class waiver, and

---

[9]    *See, e.g.*, *Tyus* v. *Va. College*, No. 15-cv-211 (WKW), 2015 WL 4645513 at *2 (M.D. Ala. Aug. 4, 2015); *FreeLife Int'l, Inc.* v. *Am. Ed. Music Pub. Inc.*, No. 07-cv-2210 (DGC), 2009 WL 3241795, at *3-5 (D. Ariz. Oct. 1, 2009); *Goza* v. *Multi-Purpose Civic Ctr. Facilities Bd. for Pulaski Cty.*, No. 12-
-cv-6125 (SOH), 2014 WL 3672128, at *2-3 (W.D. Ark. July 23, 2014); *Swift* v. *Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 912 (N.D. Cal. 2011); *Vernon* v. *Qwest Commc'ns Int'l, Inc.*, 857 F. Supp. 2d 1135, 1191 (D. Col. 2013); *Leatherwood* v. *Cardservice Int'l, Inc.*, 929 So.2d 616, 617 (Fla. Ct. App. 2006) (per curiam); *Hubbert* v. *Dell Corp.*, 835 N.E.2d 113, 120-22 (App. Ct. Ill. 2005), *appeal denied*, 844 N.E.2d 965 (Ill. 2006); *Hill* v. *Hornbeck Offshore Servs.*, 799 F. Supp. 2d 658, 661 (E.D. La. 2011); *LTVN Holdings LLC* v. *Odeh*, No. 09-cv-0789 (CCB), 2009 WL 3736526, at *3-4 (D. Md. Nov. 5, 2009); *Siebert* v. *Amateur Athletic Union of U.S., Inc.*, 422 F. Supp. 2d 1033, 1039-40 (D. Minn. 2006); *Major* v. *McCallister*, 302 S.W.3d 227, 229 (Mo. Ct. App. 2009); *Cline* v. *Etsy, Inc.*, No. 15-cv-2115, 2016 WL 3002369 (JCM), at *8-9 (D. Nev. May 23, 2016); *Caspi* v. *Microsoft Network, LLC*, 732 A.2d 528, 532 (N.J. App. Div. 1999), *certification denied*, 743 A.2d 851 (N.J. 1999); *Bergenstock* v. *Legalzoom, Inc.*, No. 13-cv-15686, 2015 WL 3866703, at *7 (Sup. Ct. N.C. June 23, 2015); *In re s 2703(d) Order*, 787 F. Supp. 2d 430, 440 n.6 (E.D. Va. 2011); *Peters* v. *Amazon Servs. LLC*, 2 F. Supp. 3d 1165, 1168-69, 1170 (W.D. Wash. 2013); *see also Panzer* v. *Cont'l Airlines*, 398 F. Supp. 2d 529, 532 (S.D. Miss. 2005) (alternative finding that plaintiffs who bought airline tickets online had actual notice of airline's terms because plaintiffs received e-ticket that included link to the terms).

[10]    *See Magill* v. *Expedia Inc.*, 2014 ONSC 2073, ¶¶ 15, 24-26, 72 (Can. Ont. Sup. Ct. 2014); *Rudder* v. *Microsoft Corp.*, 1999 CarswellOnt 3195, ¶¶ 12, 18 (Can. Ont. Sup. Ct. 1999).

[11]    "In New York, clickwrap agreements are valid and enforceable contracts." *Centrifugal Force, Inc.* v. *Softnet Commc'n, Inc.*, No. 08-cv-5463 (CM), 2011 WL 744732, at *7 (S.D.N.Y. Mar. 1, 2011).

observing, "most courts that have considered the issue have upheld arbitration and forum selection clauses in so-called 'clickwrap' [] contracts.") (internal quotation marks omitted); *Siebert* v. *Amateur Athletic Union of U.S.*, 422 F. Supp. 2d 1033, 1039-40 (D. Minn. 2006) ("[T]he 'click' represents assent to the contract, including the arbitration clause."); *see also Hopkins* v. *Trans Union*, No. 03-cv-5433 (ADM), 2004 WL 1854191, at *1-2 (D. Minn. Aug. 19, 2004) ("Numerous courts have found that forum selection clauses contained within so-called 'clickwrap' agreements [] are valid.").  Clickwrap agreements are not subject to a higher standard of enforceability merely because they contain an arbitration clause.  The Supreme Court has made clear that "courts must place arbitration agreements on an equal footing with other contracts."  *AT&T Mobility, LLC* v. *Concepcion*, 563 U.S. 333, 339 (2011); 9 U.S.C. § 2 (written arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of *any contract*.") (emphasis added).

> Finally, each version of the registration form used on the website since September 2008, and described in detail *supra* pp. 4-9, constitutes a valid and enforceable clickwrap agreement.  As required by the courts in this District, each version of the page (1) gave users "reasonable notice of the terms" through a hyperlink adjacent to a click button stating "I Agree," "Search Now," or another similar phrase, and (2) users "manifested assent to the agreement" by clicking one of these buttons, which was also adjacent to a statement that they had "read and accepted" or "read and agree to" the Terms and Conditions.  *See Appistry*, 2015 WL 881507, at *3.  The clickwrap button need not be labeled with any particular words, and these or other

words manifesting assent are more than sufficient to form a binding agreement.[12]  Furthermore, the checkbox that appeared on some of the registration pages from September 2008 to March 2013 next to the statement "I have read and accepted the **Terms and Conditions**," gave Plaintiffs further notice that proceeding with registration would constitute assent to the hyperlinked terms.[13]  *See* Jiwan Decl. ¶¶ 9-11, 16, Ex. C, Ex. D, and Ex. E.

## B.    Plaintiffs All Agreed to Arbitrate Their Claims

Each of the 18 Plaintiffs assented to be bound by the Terms and Conditions, including the arbitration clause.  We address them in two groups: (i) the 15 Plaintiffs who opened accounts *after* the arbitration clause was added to the Terms and Conditions in March 2011 or otherwise affirmatively agreed to those updated Terms and Conditions; and (ii) the 3 Plaintiffs who only opened accounts before March 2011, but agreed that they would be bound by changes to the Terms and Conditions by continuing to use the website and, in fact, continued to use the website after the arbitration clause was added.

---

[12]  *See, e.g., Goza*, 2014 WL 3672128 at *3 (enforcing terms with "Submit Order" button next to statement that clicking manifested assent); *Fteja* v. *Facebook, Inc.*, 841 F. Supp. 2d 829, 834-41 (S.D.N.Y. 2012) (enforcing terms with "Sign Up" button above statement that click meant agreement to hyperlinked terms); *Major* v. *McCallister*, 302 S.W.3d 227, 229 (Mo. Ct. App. 2009) (enforcing terms where users clicked button "Submit for Matching Pros" next to hyperlink to terms and notice that stated "[b]y submitting you agree to the Terms of Use."); *Burcham*, 2009 WL 586513, at *1 (enforcing terms where users creating accounts had to click "continue" button next to notice that stated "[b]y continuing on you agree to the following terms and conditions"); *see also Magill*, 2014 ONSC 2073, ¶ 24 ("Complete this booking" button next to alert that clicking manifested assent to hyperlinked terms).  Notably, many of these and other cases involve clickwrap mechanisms that employ hyperlinks to the governing terms.  *See, e.g., Fteja*, 841 F. Supp. 2d at 834-41; *Major*, 302 S.W.3d at 229; *Magill*, 2014 ONSC 2073, ¶¶ 23-24.

[13]  *See* Ronald J. Mann & Travis Siebeneicher, *Just One Click: The Reality of Internet Retail Contracting*, 108 COLUM. L. REV. 984, 990 (2008) (noting that courts would likely treat a "pre-checked radio button . . . as adequate, on the theory that the consumer will have received adequate notice of the terms"); *see also Bernal* v. *Sw. & Pac. Specialty Fin., Inc.*, No. 4:12-cv-05797 (SBA), 2014 WL 1868787, at *3 n.4 (N.D. Cal. May 7, 2014) (granting defendant's motion to compel arbitration where plaintiff "did not elect to reject either of [two] arbitration agreements," one of which used a pre-checked box); *id.* Pl.'s Mem. in Opp. to Def.'s Mot. to Compel Arbitration, ECF No. 61 at 4 (noting that "the check box signifying the consumer has 'read, understand, and accept the terms of the Arbitration Agreement' is already pre-checked").

22

### 1.    The 15 Plaintiffs

As shown in Appendix A, 13 Plaintiffs created Ashley Madison accounts after March 17, 2011 and, in so doing, agreed at the time they registered to Terms and Conditions containing an arbitration clause.[14]   Jiwan Decl. ¶ 6, Ex. A.  Among those Plaintiffs, Alfaro, Goetting, Imbarrato, Jack, Shows and Yagel admit to having seen or read the Terms and Conditions.  *See supra* note 3.

Two other Plaintiffs -- Lisuzzo and Coward -- created accounts prior to March 17, 2011, but affirmatively assented to Terms and Conditions containing an arbitration clause through the dialog box described *supra* pp. 12-13.  They were notified on April 29, 2011 and May 1, 2011, respectively, that the Terms and Conditions had been updated.  Jiwan Decl. ¶ 24.  They each were presented with the text of the updated Terms and Conditions and clicked a button stating "**I Agree**" in order to accept the updated Terms and Conditions.  *Id*.  As shown *supra* p. 13, the first paragraph of the Terms and Conditions presented to them at this time warned: "PLEASE READ THESE TERMS CAREFULLY BEFORE USING THIS SITE *INCLUDING THE SECTIONS RELATING TO TERMINATION, ARBITRATION AND CLASS ACTION WAIVER*."  *Id.* Ex. Q (capitalization in original, emphasis added).  Lisuzzo and Coward thus agreed to updated Terms and Conditions containing an arbitration clause, and then continued to use the website afterward, ███████████████

---

[14]   These 13 Plaintiffs are: Gustavo Alfaro, Marc Benefield, Brian Farr, Britt Garrett, Byron Goetting, John Hiles III, Anthony Imbarrato, Paul Jack, Keith Macomber, David Miller, James Mike Shows, Nhung Truong, and David Yagel.  Jiwan Decl. Ex. A.  Of these 13 Plaintiffs, 8 -- Alfaro, Benefield, Farr, Goetting, Hiles, Jack, Miller, and Yagel -- created an Ashley Madison account after April 18, 2013 and therefore, at the time of registration, agreed to Terms and Conditions containing a mandatory arbitration clause.  *Id.* ¶ 20, Ex. N at AVID 00000178.  The other 5 Plaintiffs -- Garrett, Imbarrato, Macomber, Shows, and Truong -- created accounts before April 18, 2013 but after March 17, 2011, and therefore, at the time of registration, agreed to Terms and Conditions which provided that their claims would be "resolved through binding arbitration" at either party's election.  *Id.* ¶ 19, Ex. M at AVID 00000080.  Avid has long put these Plaintiffs on notice that it has elected to arbitrate their claims.

using it for years after agreeing to these updated Terms and Conditions.  *Id.* ¶¶ 24, 27; *see also* Appendix A.

### 2.      The 3 Other Plaintiffs

The three other Plaintiffs -- Cabiness, Russell and Witengier -- created Ashley Madison accounts only before March 17, 2011, but agreed to arbitrate their claims because they continued using the website after the arbitration clause was added to the Terms and Conditions.

As shown in <u>Appendix A</u>, these three Plaintiffs opened their only Ashley Madison accounts prior to March 17, 2011.  The evidence shows, however, that they each continued to use their accounts *after* March 17, 2011:

- ██████████████████████████████████████████████████

  ████████████████████████████████ Cabiness also admits that he read the Terms and Conditions around September 1, 2009 -- *i.e.*, the Terms and Conditions stating that his continued use of Ashley Madison would constitute his acceptance of any changes to the Terms and Conditions.  Cassetta Decl., Ex. G at No. 10.  He then continued using the site until April 18, 2015, four years after the arbitration clause was added.   Jiwan Decl. Ex. A.  ████████████ ███████████████████████████████████████████████████████ ██████████████████████████████████████████

- Russell states in his interrogatory responses that he logged on to his account as late as July 2011.  Cassetta Decl., Ex. K at No. 6(k).  He also admits that he "brows[ed] the terms and conditions in July 2011."  *Id.* at No. 10.

- ██████████████████████████████████████████████████ ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

        The Terms and Conditions that each of these three Plaintiffs agreed to when they registered provided that Avid "RESERVE[D] THE RIGHT TO MAKE CHANGES TO THESE TERMS AT ANY TIME" and that Plaintiffs' "CONTINUED USE OF OUR SERVICE CONSTITUTES YOUR ACCEPTANCE OF SUCH CHANGES."   Jiwan Decl. ¶ 18, Ex. L at AVID 00000022 (capitalization in original)).   Courts in both Ontario (the choice of law at the time these Plaintiffs registered) and New York (the choice of law later selected) have enforced change-in-terms provisions.

        *Kanitz* v. *Rodgers Cable Inc.*, 2002 CarswellOnt 628 (Can. Ont. Sup. Ct. 2002), has been described as "[t]he leading Canadian case" on this subject.[15]   *See* BARRY B. SOOKMAN, COMPUTER, INTERNET AND ELECTRONIC COMMERCE LAW, Chapter 10.4 – Enforceability of Online Agreements (2016).   In *Kanitz*, the Ontario Superior Court of Justice granted a cable provider's motion to compel arbitration based on an arbitration clause that was added to the applicable user agreements *after* plaintiffs signed up for the service.   As here, the change-in-terms provisions in these agreements permitted defendants to "change, modify, add or remove portions" of the agreements and "provided that continued use of the service by a customer would constitute acceptance of any such amendments." *Kanitz*, ¶¶ 18, 26.   The change-in-terms provision "place[d] an obligation on the customer, who is interested in any amendments that the

---

[15]   The Ontario cases cited herein are attached as Exhibits A to E to the Declaration of Richard P. Cassetta.

defendant may choose to make to the user agreement, to check the web site from time to time to determine if such amendments have been made." *Id.* ¶ 24.[16]

Thus, through their continued and active use of their Ashley Madison accounts, these three Plaintiffs "were each deemed to have accepted the amendments" containing the arbitration clause and class action waiver. *Kanitz* ¶ 26.[17]

## III. Plaintiffs' Claims All Fall Within the Scope of the Arbitration Agreement

### A. The Arbitration Agreement Covers All of Plaintiffs' Claims

The arbitration clauses in the Terms and Conditions cover all the claims asserted by Plaintiffs:  "All disputes, controversies, causes of action (in tort, contract, by statute or otherwise)[,] including, without limitation . . . the relationship that results from this Agreement . . . ." Jiwan Decl. ¶ 20, Ex. N at AVID 00000178.  *See also id.* ¶ 19, Ex. M at AVID 00000080 (arbitration clause applies to "Any Dispute arising out of or relating to these Terms and Conditions"); *id.* (defining "Dispute" to include "any dispute, claim or controversy regarding any aspect of your relationship with Ashley Madison that has accrued or may hereafter accrue, whether based in contract, statute, regulation, tort (including without limitation claims arising from or pertaining to misrepresentation or negligence) . . . .").

Federal courts have held that broadly worded arbitration clauses like these must be interpreted to cover claims that "aris[e] from the same set of operative facts covered by a contract between the parties."  *See LDM Grp.* v. *Akers*, No. 4:12-cv-812 (JAR), 2013 WL

---

[16]   The New York choice of law provision for U.S. residents was not added to the Terms and Conditions until 2013 and at that time the Terms and Conditions also contained an arbitration clause. Nonetheless, note that New York courts have enforced contractual provisions that "give discretion to one party to the contract." *Lebowitz* v. *Dow Jones & Co.*, 508 F. App'x 83, 84 (2d Cir. 2013).

[17]   For the same reasons, the five Plaintiffs who created accounts after March 17, 2011, but continued using the site after April 18, 2013 (Britt Garrett, Anthony Imbarrato, Keith Macomber, James Mike Shows, and Nhung Truong), are bound by the later arbitration provision.

1316420, at *6, 8 (E.D. Mo. Mar. 29, 2013) (finding similarly worded clause that covered "Any and all controversies or claims between the parties arising out of or related to this Agreement, or any alleged breach thereof" to extend to tort claims); *see also CD Partners, LLC* v. *Grizzle*, 424 F.3d 795, 800-01 (8th Cir. 2005).  The Supreme Court has also held that statutory claims such as civil RICO claims may be subject to arbitration.  *See, e.g.*, *Shearson/Am. Exp., Inc.* v. *McMahon*, 482 U.S. 220, 242 (1987).

Plaintiffs' claims all arise from their use of Ashley Madison.  *See* First Am. Consolidated Class Action Compl. ¶¶ 1-2 ("Plaintiffs bring this class action as a result of a breach of the security system of Defendants' AshleyMadison.com website . . . . Plaintiffs also bring this class action because Defendants and others were engaged in a wire fraud conspiracy to employ the 'Ashley Madison' website[.]").   Thus, this Court must compel arbitration of Plaintiffs' claims.  *Dean Witter*, 470 U.S. at 218 ("The FAA mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.") (emphasis in original); *Gannon* v. *Circuit City Stores, Inc.*, 262 F.3d 677, 680 (8th Cir. 2001) ("Once we conclude that the parties have reached [a valid agreement to arbitrate], the [FAA] compels judicial enforcement of the arbitration agreement.").

### B.   The Arbitration Agreement Covers Plaintiffs' Claims Against Both Avid Dating Life and Avid Life Media

Under well-established law, the arbitration clause should be enforced as to all the Defendants named in the consolidated complaint, including both Avid Dating Life (the operator of the website) and Avid Life Media (the 100% parent of Avid Dating Life).  Whether a nonparty can enforce an arbitration agreement under the FAA is typically governed by state law.  *See, e.g.*, *Arthur Andersen LLP* v. *Carlisle*, 556 U.S. 624, 630-32 (2009); *Donaldson Co., Inc.* v. *Burroughs Diesel, Inc.*, 581 F.3d 726, 732 (8th Cir. 2009).  As relevant here, New York courts

27

have "recognized that arbitration need not always involve parties to the agreement." *See Gov't Emps. Ins. Co.* v. *Grand Med. Supply, Inc.*, No. 11-cv-5339 (BMC), 2012 WL 2577577, at \*3 (E.D.N.Y. July 4, 2012).  In *Grand Med. Supply*, the District Court considered:  (1) whether the dispute was intertwined with the arbitration contract, and (2) whether the movant had a sufficiently close relationship with the signatory.  *Id.* at \*4.  Applying New York law, the court held that a non-signatory had standing to enforce the arbitration agreement.  *Id.*

Here, the relationship between Avid Dating Life and Avid Life Media is "sufficiently close" to justify enforcement by Avid Life Media, particularly because Plaintiffs' claims against Defendants all arise out of similar facts, Plaintiffs treat Avid Dating Life and Avid Life Media interchangeably as a single entity, and the allegations against Avid Life Media result exclusively from its status as Avid Dating Life's parent.  *See Victorio* v. *Sammy's Fishbox Realty Co., LLC*, No. 14-cv-8678 (CM), 2015 WL 2152703 at \*18 (S.D.N.Y. May 6, 2015) ("By treating all the Defendants as a single unit, Plaintiffs themselves have demonstrated the level of 'intertwined-ness' needed to force arbitration of any claims Plaintiffs may have against these non-signatory corporations."); *see also PRM Energy Sys., Inc.* v. *Primenergy, LLC*, 592 F.3d 830, 836 (8th Cir. 2010) (permitting nonsignatory to enforce arbitration agreement where nonsignatory was not "a complete stranger" to the contract and instead plaintiff had claimed "substantially interdependent and concerted misconduct" by the nonsignatory and signatory defendants); *Grizzle*, 424 F.3d at 798 (applying federal common law to hold that a nonsignatory could enforce arbitration "when 'the relationship between the signatory and nonsignatory defendants is sufficiently close that only by permitting the nonsignatory to invoke arbitration may evisceration of the underlying arbitration agreement between the signatories be avoided.'"); *Arnold* v. *DirecTV, Inc.*, No. 4:10-cv-00352 (JAR), 2013 WL 6159456, at \*4 (E.D. Mo. Nov. 25,

2013) (applying federal common law in permitting nonsignatory to enforce arbitration agreement where parties had "close relationship" and plaintiffs alleged "joint employment and conduct").[18]

### C.     Any Dispute About the Scope or Enforceability of the Terms and Conditions or Arbitration Clause Must Be Submitted to Arbitration

Any disputes or uncertainty regarding the scope or enforceability of the Terms and Conditions or arbitration clause must be resolved by the arbitrator because the parties have agreed to arbitrate the question of arbitrability.  *See, e.g.*, *Rent-A-Ctr., W., Inc.* v. *Jackson,* 561 U.S. 63, 68-69 (2010).   Since April 18, 2013, the Terms and Conditions have provided that "[d]isputes arising from or relating to this Arbitration Provision (***including the interpretation, breach, termination and invalidity thereof***) or the relationship that results from this Agreement shall be resolved by binding arbitration[.]"  Jiwan Decl. ¶ 20, Ex. N at AVID 00000178 (emphasis added); *see also id.* ¶ 19, Ex. M at AVID 00000080 (defining arbitrable disputes to include those about "the validity and enforceability of this Arbitration Provision").

Since April 18, 2013, the arbitration clause in the Terms and Conditions also incorporated the American Arbitration Association's ("AAA") Commercial Dispute Resolution Procedures and Supplementary Procedures for Consumer-Related Disputes, *id.* ¶ 20, Ex. N at AVID 00000178, which empower the arbitrator "to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim," *see* Cassetta Decl., Ex. P at R-14(a).  Courts have

---

[18]     As discussed above, beginning on April 18, 2013, the Terms and Conditions provided for the application of New York law as to U.S. residents.  *See supra* note 4.  Prior to that date, the Terms and Conditions had an Ontario choice-of-law provision that applied to all users.  *See supra* pp. 13-14. Ontario courts have similarly permitted nonparties to an arbitration agreement to join the arbitration. *See Donaldson Int'l Livestock Ltd.* v. *Znamensky Selekcionno-Gibridny Ctr. LLC*, 2008 CarswellOnt 7827, ¶ 36, (Can. Ont. Ct. App. 2008) ("The fact that one of the claims is against a non-party . . . is not sufficient to oust the [arbitration court] from hearing these matters when the entire focus of the action relates to issues arising out of the contractual relations of the principal parties."); *Xerox Can. Ltd.* v. *MPI Techs., Inc.*, 2006 CarswellOnt 7850, ¶¶ 46-50 (Can. Ont. Super. Ct. 2006) (upholding decision to add non-signatory corporate parent to arbitration).

held that incorporation of the AAA rules delegates threshold issues of arbitrability to the arbitrator. *Fallo* v. *High-Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009) ("[W]e conclude that the arbitration provision's incorporation of the AAA Rules . . . constitute[] a clear and unmistakable expression of the parties' intent to leave the question of arbitrability to an arbitrator."); *Winco Window Co., Inc.* v. *G & S Glass & Supply, Inc.*, No. 4:15-cv-309 (RLW), 2015 WL 3604072 at *4 (E.D. Mo. June 5, 2015) (holding same). Thus, Plaintiffs should be compelled to arbitrate their claims and any disputes regarding the arbitrability of those claims should be decided by the arbitrator.

## CONCLUSION

For the foregoing reasons, Avid respectfully requests that the Court enter an order (i) dismissing Plaintiffs' claims, or in the alternative, staying any further litigation of Plaintiffs' claims in this Court; and (ii) compelling Plaintiffs to arbitrate their claims.

Dated: August 29, 2016
     St. Louis, Missouri

Respectfully Submitted,

By:    /s/ Richard Cassetta

Richard P. Cassetta (MO #43821)
Helen C. Looney  (MO #67029)
Bryan Cave LLP
One Metropolitan Square
211 North Broadway, Suite 3600
St. Louis, MO  63102-2750
Telephone: (314) 259-2000
Facsimile: (314) 259-2020
richard.cassetta@bryancave.com
helen.looney@bryancave.com

- and -

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Robert A. Atkins (NY #2210771)
Yahonnes Cleary (NY #4802492)
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3183
Facsimile: (212) 492-0183
ratkins@paulweiss.com
ycleary@paulweiss.com

*Attorneys for Avid Dating Life Inc. and Avid Life Media Inc.*

**APPENDIX A**

| Plaintiff | Account Number | Username | Last Account Created | Form of Registration Page | Last Login |
|---|---|---|---|---|---|
| Gustavo Alfaro | | | 8/25/2013 | Jiwan Decl. Ex. I | 3/7/2014 |
| Marc Benefield | | | 4/18/2015 | Jiwan Decl. Ex. I | 4/22/2015 |
| Marvin Cabiness | | | 6/28/2009 | Jiwan Decl. Ex. C | 4/18/2015 |
| Steven Coward | | | 3/6/2011 | Jiwan Decl. Ex. D | 4/29/2013 |
| Brian Farr[1] | | | 7/20/2013 | Jiwan Decl. Ex. I | 8/24/2015 |
| Britt Garrett | | | 2/25/2013 | Jiwan Decl. Ex. G | 8/24/2015 |
| Byron Goetting | | | 3/18/2014 | Jiwan Decl. Ex. I | 3/18/2014 |
| John Hiles | | | 12/12/2013 | Jiwan Decl. Ex. I | 12/3/2014 |
| Anthony Imbarrato | | | 10/10/2011 | Jiwan Decl. Ex. D | 11/18/2015 |
| Paul Jack | | | 3/24/2015 | Jiwan Decl. Ex. I | 8/30/2015 |
| Matthew Lisuzzo | | | 3/3/2009 | Jiwan Decl. Ex. C | 2/18/2015 |
| Keith Macomber | | | 3/7/2012 | Jiwan Decl. Ex. E | 6/2/2016 |
| David Miller | | | 1/10/2015 | Jiwan Decl. Ex. I | 8/20/2015 |
| Christopher Russell | | | 3/3/2010 | Jiwan Decl. Ex. D | 8/10/2010 |
| James Shows | | | 1/14/2013 | Jiwan Decl. Ex. G | 7/20/2016 |
| Nhung Truong | | | 8/22/2012 | Jiwan Decl. Ex. E | 9/16/2014 |
| Todd Witengier | | | 12/17/2010 | Jiwan Decl. Ex. D | 8/1/2014 |
| David Yagel[2] | | | 1/6/2015 | Jiwan Decl. Ex. I | 4/1/2015 |

---

[1] ████████████████████████████████████████████

[2] ████████████████████████████████████████████

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that copies of the foregoing were served upon the

attorneys of record via the Court's electronic delivery system on the 29th day of August, 2016, to

the following:

DOWD & DOWD, P.C.
Douglas P. Dowd (29240MO)
William T. Dowd (39648MO)
Alex R. Lumaghi (56569MO)
211 North Broadway, Suite 4050
St. Louis, Missouri   63102
Tel.: (314) 621-2500
Fax: (314) 621-2503
doug@dowdlaw.net
bill@dowdlaw.net
alex@dowdlaw.net

*Plaintiffs' Interim Liaison Counsel*

THE DRISCOLL FIRM, P.C.
John J. Driscoll (54729MO)
Christopher J. Quinn (41883MO)
Gregory G. Pals (48820MO)
211 N. Broadway, 40th Floor
St. Louis, Missouri  63102
Tel.: (314) 932-3232
Fax: (314) 932-3233
john@thedriscollfirm.com
chris@thedriscollfirm.com
greg@thedriscollfirm.com

*Plaintiffs' Interim Co-Lead Counsel*

HENINGER GARRISON DAVIS, LLC
W. Lewis Garrison, Jr.
Christopher B. Hood
Taylor C. Bartlett
2224 1st Avenue North
Birmingham, Alabama  35203
Tel.: (205) 326-3336
Fax: (205) 326-3332
wlgarrison@hgdlawfirm.com
chood@hgdlawfirm.com
taylor@hgdlawfirm.com

*Plaintiffs' Interim Co-Lead Counsel*

/s/ Richard P. Cassetta