**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: ASHLEY MADISON CUSTOMER | ) | |
| DATA SECURITY BREACH LITIGATION | ) | |
| | ) | MDL No. 2669 |
| This Document Relates to: | ) | |
| | ) | Case No. 4:15MD2669 JAR |
| ALL CASES | ) | |
| | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO**
**DEFENDANTS' MOTIONS TO DISMISS OR STAY**
**AND COMPEL ARBITRATION**[1]

---

[1] This Memorandum serves as Plaintiffs' opposition to the separate Motions to Dismiss or Stay and Compel Arbitration of the Avid Defendants and Defendant Biderman (Doc. Nos. 229 and 233).  While Defendant Biderman has filed a separate motion, it is entirely derivative of Avid's motion.  Because Avid's motion should be denied, Defendant Biderman's motion should be denied as well.

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................... 2

II.   LEGAL STANDARD GOVERNING THIS DISPUTE........................................ 3

    A.   THE FAA'S POLICY OF FAVORING ARBITRATION DOES NOT APPLY WHEN THE ALLEGED AGREEMENT TO ARBITRATE ITSELF IS CHALLENGED................................................... 3

    B.   DEFENDANTS BEAR THE BURDEN OF PROVING THE EXISTENCE OF A BINDING AND VALID ARBITRATION AGREEMENT....................................................................................... 5

III.  DEFENDANTS HAVE FAILED IN THEIR BURDEN TO PROVE THAT PLAINTIFFS AGREED TO ARBITRATE........................................................................................... 5

    A.   THE JIWAN DECLARATION IS BASED ON SPECULATION AND INADEQUATE INVESTIGATION AND AS A RESULT IT IS IMPOSSIBLE FOR DEFENDANTS TO PROVE THAT THE SUPPOSED "LAST CREATED ACCOUNTS" WERE IN FACT ASSOCIATED WITH ANY INDIVIDUAL PLAINTIFF. ........... 6

    B.   PLAINTIFFS WHO CREATED THEIR ACCOUNTS BEFORE THE EXISTENCE OF AN ARBITRATION PROVISION DID NOT UNAMBIGUOUSLY MANIFEST ASSENT TO ARBITRATION AND ARE NOT BOUND BY SUBSEQUENT UNILATERAL CHANGES TO THE TERMS AND CONDITIONS MADE BY AVID. ............................................................................................ 11

    C.   THE DESIGN OF AVID'S ASHLEY MADISON WEBSITE DID NOT REQUIRE UNAMBIGUOUS MANIFESTATION OF ASSENT FROM THE PLAINTIFFS. ................................................. 15

        1.   Defendants cannot say how the Ashley Madison sign-on process appeared or functioned for users who created accounts prior to 2010. .................................................. 18

        2.   Avid cannot prove unambiguous assent to the terms prior to 2010 because the signup process was deceptive and Avid cannot show that its checkbox was a required field. ........ 19

        3.   Avid cannot show unambiguous assent to the terms based on Ashley Madison's signup process during the "Search Now" time period from 2010 until April 2013 ............ 23

        4.   Avid cannot show unambiguous assent because its checkbox was checked by default. 25

        5.   Avid cannot show unambiguous assent based on Ashley Madison's signup process between April, 2013 and the data breach. ........................................................................... 26

        6.   The cases Avid cites do not support its claims. ........................................................ 29

IV.   AVID'S ARBITRATION PROVISION IS UNCONSCIONABLE ................................. 30

    A.   THE ARBITRATION PROVISIONS ARE PROCEDURALLY UNCONSCIONABLE ..................... 31

    B.   THE ARBITRATION PROVISIONS ARE SUBSTANTIVELY UNCONSCIONABLE...................... 32

## I.      INTRODUCTION

Some fifteen years before this nation ratified the Seventh Amendment to our Constitution, we declared our independence from Great Britain because the King's "repeated injuries and usurpations, all having in direct object the establishment of an absolute Tyranny over these States" included "depriving us in many cases, of the benefit of Trial by Jury." THE DECLARATION OF INDEPENDENCE (U.S. 1776).  Courts have long held that "[t]his most precious and fundamental right can be waived only if the waiver is knowing and voluntary, with the courts 'indulg[ing] every reasonable presumption against waiver.'" Meyer v. Kalanick, 2016 WL 4073012, at *1 (S.D.N.Y. July 29, 2016) (quoting Aetna Ins. Co. v. Kennedy to Use of Bogash, 301 U.S. 389, 393 (1937)).

Given this history, it is remarkable that corporations now argue that consumers "are deemed to have regularly waived this right, and, indeed, to have given up their access to the courts altogether, because they supposedly agreed to lengthy 'terms and conditions' that they had no realistic power to negotiate or contest and often were not even aware of." Meyer, 2016 WL 4073012, at *1.  Indeed, as comedian John Oliver astutely quipped, "If Apple put the entire text of Mein Kampf in their user agreement, you'd still click agree." Berkson v. Gogo LLC, 97 F. Supp. 3d 359, 381 (E.D.N.Y. 2015).

This disturbing development is sometimes justified, as Defendants attempt to do here, by the Federal Arbitration Act's policy favoring arbitration. See Doc. No. 230, at p. 16.  But no such federal policy favoring arbitration applies to the threshold issue of whether the parties formed an agreement to arbitrate in the first instance.

As set forth in their sworn declarations, Plaintiffs did not agree to arbitrate their dispute, and Defendants cannot prove they assented to arbitration. First, Defendants are not in possession of signed contracts or even computer records of any arbitration agreements.  Nor can Defendants prove what the sign-up screens looked like at the time Plaintiffs signed up for Ashley Madison, or even whether the "terms and conditions" then contained an arbitration provision.  Second, Plaintiffs who signed up for Ashley Madison prior to the existence of an arbitration provision are

not bound by Defendants' unilateral addition of material terms without proper notice. Third, Defendants' website design did not provide Plaintiffs reasonably conspicuous notice of the existence of terms or require Plaintiffs' unambiguous assent, and as such Defendants have failed to show that Plaintiffs agreed to arbitrate their claims.   Finally, even if any Plaintiff is deemed to have agreed to Avid's arbitration provision, its procedural and substantive unconscionability makes it unenforceable.

## II.   LEGAL STANDARD GOVERNING THIS DISPUTE

### A.   THE FAA'S POLICY OF FAVORING ARBITRATION DOES NOT APPLY WHEN THE ALLEGED AGREEMENT TO ARBITRATE ITSELF IS CHALLENGED.

The FAA embodies "the basic precept that arbitration 'is a matter of consent, not coercion.'" Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp., 130 S.Ct. 1758, 1773 (2010) (quoting Volt Info. Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ., 489 U.S. 468, 479 (1989)).  Arbitration is a matter of contract, and the FAA places arbitration agreements "upon the same footing as other contracts." Volt, 489 U.S. at 478.  Thus, "the first task of a court asked to compel arbitration of a dispute is to determine whether the parties agreed to arbitrate that dispute." Mitsubishi Motors Corp. v. Soler Chrysler—Plymouth, Inc., 473 US. 614, 626 (1985); see also MedCam, Inc. v. MCNC, 414 F.3d 972, 974 (8th Cir. 2005) ("[O]ur Circuit has refined this inquiry to asking 1) *whether the agreement for arbitration was validly made* and 2) whether the arbitration agreement applies to the dispute at hand, i.e., whether the dispute falls within the scope of the arbitration agreement.") (emphasis added).  Although there is a federal policy in favor of arbitration, *"when the dispute is whether there is a valid and enforceable arbitration agreement in the first place, the presumption of arbitrability falls away."* Riley Mfg. Co., Inc. v. Anchor Glass Container Corp., 157 F.3d 775, 779 (10th Cir.1998) (citing First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944–45 (1995)) (emphasis added).

Although the arbitration provision that Defendants seek to enforce currently contains a New York choice-of-law provision for American consumers (and previously contained an Ontario law provision), Avid's choice-of-law provision is invalid and unenforceable because the

entire agreement is invalid and unenforceable.  Plaintiffs have simply not agreed to it.  To enforce a choice-of-law provision the Plaintiffs have not agreed to is to assume the very point in question.  See Schnabel v. Trilegiant Corp., 697 F.3d 110, 119, 126–27 (2d Cir. 2012) ("Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established.").  Thus, this dispute should be analyzed as if no choice-of-law provision exists.

To the contrary, the question of whether an arbitration agreement was formed in the first instance is governed by state law. Lyster v. Ryan's Family Steak Houses, Inc., 239 F.3d 943, 946 (8th Cir. 2001); see also First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter ..., courts should apply ordinary state law principles that govern the formation of contracts."); accord AgGrow Oils, L.L.C. v. National Union Fire Ins. Co., 242 F.3d 777, 780 (8th Cir. 2001).  Under universal state law principles, "an offeree cannot actually assent to an offer unless he knows of its existence." Samuel Williston, WILLISTON ON CONTRACTS Williston, § 4:13, at 365 (Richard A. Lord 4th Ed. 1990).  Moreover, "it is essential to a bargain that each party manifest assent with reference to the manifestation of the other." RESTATEMENT (SECOND) OF CONTRACTS § 23.  The state laws of the Plaintiffs in this case[2] are in accord and require the party seeking to enforce an arbitration agreement to prove the existence of that agreement, including mutual assent to each of its terms.[3]

---

[2] In this case, the primary facts relating to the issue of contract formation, i.e. whether the Plaintiffs in fact assented to arbitration, will be those concerning the Plaintiffs' conduct in their home states: i.e., whether their conduct was sufficient to establish a meeting of the minds between Plaintiffs and Defendants with regard to the arbitration provision. Plaintiffs have attached their Declarations setting forth these material facts, which all relate to their conduct in their own states.  Application of the law of the Plaintiffs' forum states is for this reason consistent with Missouri choice of law principles, including the "most significant relationship" test. See Sturgeon v. Allied Professionals Ins. Co., 344 S.W.3d 205 (Mo.App. 2011).

[3] See Moore-Dennis v. Franklin, 2016 LEXIS 25, at *35 (Ala. Sup. Ct. Feb. 26, 2016); Valdiviezo v. Phelps Dodge Hidalgo Smelter, Inc., 995 F. Supp. 1060, 1064 (D. Ariz. 1997); Bank of the Ozarks, Inc. v. Walker, 434 S.W.3d 357, 360 (Ark. 2014) Specht v. Netscape Communs. Corp., 306 F.3d 17, 29 (2d Cir. 2002) (Sotomayor, J.) (applying California law); JD Parker Const., Inc. v. E. Equity Partners, L.L.C., 2009 WL 151491, at *4 (D. Colo. Jan. 22, 2009); All-S. Subcontractors, Inc. v. Amerigas Propane, Inc., 41 Fla. L. Weekly 1859 (Fla. Dist.Ct.App. 2016); Sgouros., 817 F.3d 1029, 1034 (7th Cir. 2016) (Applying Illinois law); NCO Portfolio Mgmt. v. Gougisha, 985 So. 2d 731, 734 (La. App. 5 Cir. 2008);

**B.    DEFENDANTS BEAR THE BURDEN OF PROVING THE EXISTENCE OF A BINDING AND VALID ARBITRATION AGREEMENT**

Because under general principles of contract law the party seeking to enforce a contract bears the burden of proving its existence, similarly a party seeking to compel arbitration bears the burden of proving, by a preponderance of the evidence, the existence of a valid and binding agreement to arbitrate. See Acher v. Fujitsu Network Commc'ns, Inc., 354 F. Supp. 2d 26, 36 (D. Mass. 2005); InterGen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir.2003); Johnson v. Long John Silver's Restaurants, Inc., 320 F. Supp. 2d 656, 664 (M.D. Tenn. 2004), aff'd, 414 F.3d 583 (6th Cir. 2005).   "The district court, when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made by the parties, should give to the opposing party the benefit of all reasonable doubts and inferences that may arise."  Par–Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 54 (3rd Cir.1980).  Indeed, courts have routinely denied motions to compel arbitration where the facts demonstrate no meeting of the minds, and/or where factual disputes exist as to the existence of an agreement and mutual assent by the parties.[4]

## III.    DEFENDANTS HAVE FAILED IN THEIR BURDEN TO PROVE THAT PLAINTIFFS AGREED TO ARBITRATE

The AshleyMadison.com website is unlike most commercial websites on the Internet. When a new user created an account, Avid collected username, password, email address, sex, location, sexual preferences, and various physical characteristics.  See Deposition transcript of Rizwan Jiwan, dated October 14, 2016, at 74:8-22, attached as Exhibit 1 ("Jiwan Tr.").   Users were not asked to provide name, address, or telephone number.  Jiwan Tr., at 96:4-14; 117:3-

---

DIRECTV, Inc. v. Mattingly, 829 A.2d 626, 638 (Md. 2003); Grenada Living Ctr., LLC v. Coleman, 961 So. 2d 33, 37 (Miss. 2007); Baier v. Darden Rests., 420 S.W.3d 733, 740-41 (Mo.App. 2014); Roth v. Scott, 921 P.2d 1262, 1265 (Nev. 1996); Discover Bank, 827 A.2d at 362; Parson v. Oasis Legal Fin., LLC, 715 S.E.2d 240, 242 (N. C. App. 2011); Va. Power Energy Mktg. v. EQT Energy, LLC, 2012 U.S. Dist. LEXIS 98553, at *10 (E.D. Va. July 15, 2012); Nicosia v. Amazon.com, Inc., 834 F.3d 220, 232 (2d Cir. 2016) (applying Washington law).

[4] See, e.g., Ossola v. Am. Exp. Co., 2015 WL 545508, at *1 (N.D. Ill. Feb. 6, 2015) (declaration of plaintiff created factual dispute as to the existence of an enforceable arbitration agreement); David v. KBR Tech. Servs., Inc., 2006 WL 1350291, at *4 (S.D. Tex. May 17, 2006) (fact issue existed concerning existence of agreement to arbitrate); see also cases cited in Section III.C., infra.

119:17; Ex. 4.  And while virtually all websites verify the email addresses of new users to the site by sending an email requesting that they confirm ownership of the email address by clicking a link in the email, Avid deliberately chose not to verify the identities of its users in this manner. Jiwan Tr., at 116:7-117:2, 119:3-17.  Indeed, when Avid determined that the email address provided by a user was fake or was otherwise "invalid," Avid did not terminate the user's account, but simply stopped sending emails to that address. Jiwan Tr., at 118:15-119:9. Because Avid did not verify any information entered when an account was created—not even an email address—it cannot determine who actually opened any particular account, exactly when any Plaintiff opened his or her account, how the sign-up process appeared and functioned at the time, or what version of the site's terms and conditions (arbitration clause or not) were behind the sign-up page's hyperlink at the time.

### A. THE JIWAN DECLARATION IS BASED ON SPECULATION AND INADEQUATE INVESTIGATION AND AS A RESULT IT IS IMPOSSIBLE FOR DEFENDANTS TO PROVE THAT THE SUPPOSED "LAST CREATED ACCOUNTS" WERE IN FACT ASSOCIATED WITH ANY INDIVIDUAL PLAINTIFF.

In an attempt to overcome this fatal lack of proof, Avid asked its declarant, Rizwan Jiwan, to play detective.  Jiwan is a former employee who held marketing positions during most of his tenure with Avid from November of 2009 through May of 2016.  See Jiwan Tr., at 32:6-35:22.  He is a contractor paid to support Avid's legal efforts in this litigation, including by testifying in support of Avid's motion. See Jiwan Tr., at 14:2-21; 16:21-17:4.

In its interrogatories, Avid requested that Plaintiffs provide, among other things, the email addresses used to open their Ashley Madison accounts, the approximate dates they created their accounts, their profile numbers, usernames, nicknames, and profile greetings, the geographic location (including ZIP code) listed in their accounts, and their relationship statuses. Using bits and pieces of this information, Jiwan made various "judgment calls" about whether the information contained in Avid's database was sufficiently similar to some of the information

a plaintiff supplied to consider the account a match.  Jiwan Tr., at 102:5-18, 113:4-114:8.  These judgment calls culminated in Exhibit A to Jiwan's declaration.  The accounts listed in Exhibit A are the accounts Avid relies on to claim that Plaintiffs agreed to arbitration.  In other words, Defendants' entire motion hinges on this exhibit.

Weeks after his deposition on October 14, 2016, Jiwan supplied an errata sheet and "amended" declaration by which he attempted to substantively change his prior interrogatory answers, declaration, and deposition testimony.  Regardless, in both versions of his declaration, Jiwan states that the chart attached to his declaration as Exhibit A "identifies each plaintiff's most recent account by account number, username, the date the account was created, the form of the registration page used during the timer when the account was created, and the date the account was last logged into."  Declaration of Rizwan Jiwan, dated August 29, 2016, ¶ 5 (Doc. No. 229-1) ("Jiwan Decl."); Amended Declaration of Rizwan Jiwan, dated November 3, 2016, ¶ 5 (Doc. No. 258-2) ("Amd. Jiwan Decl."), ¶ 5.  This statement is, at best, incredibly misleading.

Although Jiwan does not explain this in his declaration, Exhibit A is actually a distillation of a chart accompanying Avid's answer to plaintiffs' interrogatories.  Jiwan Tr., at 86:19-87:12, 120:19-121:13;  Jiwan Decl. Ex. A;  Avid's Supplemented Responses to Plaintiffs' Interrogatories, attached as Exhibit 3 ("Avid's Supp. Resp. Int."), at pp. 7-11.  The chart contained in Avid's answer to Plaintiffs' Interrogatory No. 2 listed *fifty-three (53)* separate Ashley Madison accounts Jiwan somehow attributed to the 18 plaintiffs.  In preparing Exhibit A, Jiwan selected the *last-created* account for all but two plaintiffs in a transparent attempt to maximize the number of plaintiffs Avid contends created accounts after March 17, 2011, the date

on which Avid's terms and conditions first contained an arbitration clause.  Jiwan Dep., at 86:19-87:12, 120:19-121:13; Jiwan Dec. Ex. A, n.1, n.2.[5]

Seventeen (17) of the fifty-three (53) accounts Jiwan attributed to plaintiffs in Avid's interrogatory answers are marked with an asterisk (*).  Supp. Resp. Int., at 7-11.  Jiwan considers it "questionable" whether any Plaintiff actually opened these accounts. Jiwan Tr., at 113:4-17.  In fact, Jiwan has so little confidence that these accounts were created by any Plaintiff that Avid refused to produce "CSV" files containing profile information for those accounts so as to not "risk exposing the information to [sic] a third party that's not in this case."  *Id.*  This, of course, begs the question of why Jiwan chose to list them in the first place.

The most Jiwan can say about the remaining 36 non-asterisked accounts is that he is "fairly certain" – "80 to 90 percent sure" – that the accounts he declared to be "each plaintiff's most recent account" were actually opened by any plaintiff.  Jiwan Dep., at 125:25-126. Jiwan testified that for some of these ***there could "easily" be a 10 to 20% chance that he was wrong.*** Jiwan Dep., at 126:11-15.  And it is difficult to understand how Jiwan even arrived at his 80 to 90% estimate.

For many of the accounts listed on Jiwan's charts, the email address, account number, and/or user name were different from any email address, account number, and/or user name the Plaintiffs supplied in their interrogatory answers.  Jiwan Tr., at 91:16-92:3, 97:18-98:1, 99:21-100:16, 104:8-14, 105:10-106:6.  The fact that an account's email address did not match a Plaintiff's email address was apparently not a disqualifying factor.  Jiwan Tr., at 99:10-100:16, 104:8-14.  In the end, Jiwan did not know how many accounts listed on his charts contain this

---

[5] Jiwan chose to attribute slightly earlier accounts to the remaining plaintiffs because the last-created accounts were created after Avid announced the breach and, in one case, by someone whose female username and gender did not match the plaintiff's username and male gender. Jiwan Decl. Ex. A, n.1, n.2.

contradictory data nor could he even estimate whether it is more or less than half.  Jiwan Tr., at 97:18-98:1, 99:22-100:16, 107:20-108:13; 122:8-123:2.

For instance, one of the two accounts Jiwan attributed to Plaintiff Hiles, who lives in Florida, did not match Hiles' username and contained profile information describing an Hispanic woman from Ohio who has a different birthday than his own. [6]  Compare Decl. of John Hiles, dated November 10, 2016, at ¶ 8 (attached as Ex. 30), to Avid's Supp. Resp. Int., at 9; see also Ex. 12, at 6-8; Ex. 41.  As another example, Jiwan identified an account he linked to Plaintiff Benefield in which the user is described as being from Illinois with a birthdate of ████. ████.  Avid's Supp. Resp. Int., at 7; Ex. 43.  Benefield is a man from Arkansas who was born in ████ and he never created an account where he set his location as Illinois or claimed to be born in ████  See Decl. of Marc Benefield, dated November 10, 2016, at ¶ 8 (attached as Ex. 24).  As a final example, Jiwan attributed eight accounts opened between 2007 and 2015 to Brian Farr.  Avid's Supp. Resp. Int., at 8.  The profile for one of the accounts described a female who selected the username ████  Id.; Ex. 42.

Indeed, it appears that Avid intentionally put Plaintiffs in a position where they would be unable to investigate the process Jiwan used to "link" post-arbitration clause accounts with Plaintiffs who created accounts before the terms contained such a clause.  During his deposition, Jiwan could not answer questions about how he linked particular accounts to Plaintiffs and *could not say which accounts he is confident were actually created by one of the Plaintiffs*.  Jiwan Tr., at 97:18-98; 107:10-108:13; 122:8-14; 124:23-125:6; 126:16-21.  Jiwan claimed that he would need to look at notes he decided not to bring to his deposition to answer those questions

---

[6] Although Jiwan apparently reviewed user profile pictures in preparing his declarations, Avid chose not to produce any profile pictures in response to plaintiffs' discovery requests.  See Jiwan Tr., at 102:25-103:19.

and to explain exactly what information caused him to conclude that any particular account listed on his charts was opened by any Plaintiff. [7] Jiwan Dep., at 91:16-92:3, 97:18-98:1, 99:21-100:16; 107:20-108:13; 122:8-123:2. And Jiwan admits it is possible that accounts he listed on his declaration chart were not actually created by any Plaintiff. Jiwan Dep., at 127:8-13.

The speculative nature of Avid's arguments is further highlighted by Avid's recent attempt to change Jiwan's testimony days before this opposition was originally due. *See* Doc. Nos. 258, at ¶6, 258-1 to 258-3. In Jiwan's amended declaration and testimony, he changes his prior testimony that, the checkboxes on the sign up page (which Avid alleges evinces assent to the terms and conditions) were always checked by default. Compare Amd. Jiwan Dec. to Jiwan Tr. 150:8-12; 171:11-18; 186:6-22. Avid further attempts to use an errata sheet to "correct" certain testimony and to "strike" the testimony that directly contradicts that "corrected" testimony.[8] See Errata Sheet for Rizwan Jiwan's October 14, 2016 Deposition, pp. 1-3, attached as Ex. 44. Even in Jiwan's amended declaration, he does not claim to have undertaken an exhaustive review (or even a reasonable investigation) into Avid's systems to determine that no similar issues with his prior testimony exist. *See, generally,* Jiwan Decl. and Amd. Jiwan Decl.

---

[7] Other evidence that could have legitimized this otherwise mysterious process are bank records that Jiwan claims he relied upon in linking accounts to Plaintiffs. Jiwan Tr., at 95:5-96:25. However, just like with the "notes," Avid failed to produce these bank records.

[8] In its Motion to Amend, Avid stated that "the additional information was obtained in direct response to questions raised at the deposition of Jiwan[.]" Doc. No. 258, ¶ 6. This new information was not obtained in "direct response" to questions at that deposition. Jiwan confidently ***answered*** each of these questions and did not indicate that he needed to review other information. See Jiwan Tr. 150:8-12; 202:1-8. The errata "corrections" represent a complete reversal of testimony. Avid's attempt to change sworn testimony in an attempt to avoid its Motion being denied is improper. C.f., Popoalii v. Corr. Med. Servs., 512 F.3d 488, 498 (8th Cir.2008); Webb v. Garelick Mfg. Co., 94 F.3d 484, 488 (8th Cir.1996). And it certainly cannot do so through the use of an errata sheet. Cole v. Homier Distributing Co., Inc., 2009 WL 775627, at *5 (E.D. Mo. March 20, 2009) (J. Hamilton) ("barr[ing] . . . evidence in the form of . . . deposition errata sheets that contradicts their deposition testimony"). "A party's own failure to examine available documents cannot justify a subsequent contradiction of prior testimony." Cole v. Homier Distributing Co., Inc., 599 F.3d 856 (8th Cir. 2010). Avid's amended declaration and testimony should be disregarded.

All of this shows that Avid did not conduct a proper investigation prior to providing sworn declarations to this Court.  As a result of Avid's sole reliance on this declaration, Avid cannot meet its burden to show an agreement to arbitrate existed as to any Plaintiff.  Avid's motion should be denied.

      **B.**      **PLAINTIFFS WHO CREATED THEIR ACCOUNTS BEFORE THE EXISTENCE OF AN ARBITRATION PROVISION DID NOT UNAMBIGUOUSLY MANIFEST ASSENT TO ARBITRATION AND ARE NOT BOUND BY SUBSEQUENT UNILATERAL CHANGES TO THE TERMS AND CONDITIONS MADE BY AVID.**

Nine plaintiffs believe they created their Ashley Madison accounts before the terms and conditions contained an arbitration provision.[9]  Thus, even if they had "agreed" to Avid's terms, they did not agree to arbitrate their claims.  Defendants concede that at least three of these plaintiffs, Cabiness, Witengier and Russell, all signed up for an Ashley Madison account prior to the existence of an arbitration provision and never created an account during the arbitration period. Doc. No. 230, pp. 24-25.  Nevertheless, Defendants contend that all pre-arbitration Plaintiffs agreed to arbitrate because the Terms and Conditions at the time provided vaguely that Avid "RESERVE[D] THE RIGHT TO MAKE CHANGES TO THESE TERMS AT ANY TIME" and that Plaintiffs' "CONTINUED USE OF OUR SERVICE CONSTITUTES YOUR ACCEPTANCE OF SUCH CHANGES." Id., p. 25.  Defendants did not ever send any user an email, letter, or other notice of any changes in the terms, including upon addition of any arbitration provision.  Jiwan Tr., at 230:2-8.  Instead they assert only that these Plaintiffs "continued using the website after the arbitration clause was added to the Terms and Conditions." Id. at p. 25.

Courts have rejected the position that an arbitration provision can be added to terms and conditions under a modification provision without actual notice and affirmative assent,

---

[9] Plaintiffs Yagel (2006), Lisuzzo (August 2007), Truong (May 1, 2008), Cabiness (May 2008), Macomber (May 2008), Shows (July 2008), Coward (2010), Russell (March 2010), Witengier (December 17, 2010). See McDonough Decl., at Appendix A ("Appendix A"). Except for James Shows, Jiwan also associated accounts created during this period with these plaintiffs. See Supp. Resp. Int., at 7-11.  Two additional plaintiffs, Goetting and Imbarrato, believe they created accounts in either 2011 or 2012. Appendix A.

particularly where the original agreement did not contemplate arbitration or waiver of a jury trial. To the contrary, a modification provision to a contract is illusory where it permits a party "to exercise its unilateral rights under the change of terms provision, without any limitation on the substantive nature of the change permitted[.]"  Badie v. Bank of Am., 67 Cal. App. 4th 779, 797, 79 Cal. Rptr. 2d 273, 284–85 (1998).

In Badie, a highly-cited case on this question, consumers brought an action against a bank challenging the validity of an arbitration clause which the bank sought to add to existing account agreements by sending its customers a "bill stuffer" insert with their monthly account statements. At the time the accounts had been opened, a change of terms provision had been in included in the various account initiating materials. Among other things, the account agreement and disclosure statement provided that "We may change any term, condition, service or feature of your Account at any time. We will provide you with notice of the change to the extent required by law." Id. at 786.  The court noted that a modification provision which permits a party to "change" its terms is not the same thing as permitting a party to *add* additional, material terms. Id. at 797.  The court held "***there is nothing about the original terms that would have alerted a customer to the possibility that the Bank might one day in the future invoke the change of terms provision to add a clause that would allow it to impose ADR on the customer***." Id. at 801. The court therefore "conclude[d] that when the account agreements were entered into, the parties did not intend that the change of terms provision should allow the Bank to add completely new terms such as an ADR clause simply by sending out a notice." Id. at 803.  The court found "***no unambiguous and unequivocal waiver of the right to a jury trial either in the language of the change of terms provision or in any other part of the original account agreements***." Id. at 805. Avid similarly had nothing in its terms that would have alerted Plaintiffs of the possibility that it could one day attempt to impose arbitration on them.

Courts have found similar principles applicable to websites who provide no notice of changes in terms other than posting those changes on the website.  In Douglas v. U.S. Dist. Court for Cent. Dist. of California, a consumer filed a class action against a long distance telephone

service provider, alleging violations of Federal Communications Act (FCA) and various state law consumer protection statutes.  495 F.3d 1062 (9th Cir. 2007).  The Ninth Circuit rejected the argument, which Avid makes here, that continued use after terms and conditions had been altered indicated consent to the changed terms, noting that "[e]ven if [plaintiff's] continued use of [the] service could be considered assent, such assent can only be inferred after he received proper notice of the proposed changes." Id. at 1066.  The Douglas court pointed out that, without notice, the consumer would have to check the terms and conditions every day and "[*p]arties to a contract have no obligation to check the terms on a periodic basis to learn whether they have been changed by the other side.*" Id. The situation here is even worse. Jiwan admitted that the "last updated" date printed on the Ashley Madison terms pages was often *wrong*.  Jiwan Tr., at 234:13-236:9.  As a result, an Ashley Madison user would have to read through the lengthy terms on a daily basis, and could *still* be misled by the inaccurate "last updated" dates as to whether new terms had been added.

Defendants argue that the pre-arbitration Plaintiffs are bound by the choice of law provision found in the terms and conditions, and therefore the law of Ontario should apply and the laws of their home states should not apply.  Doc. No. 230, at p. 25.  Of course, this is immaterial because a choice of law provision in a contract cannot apply unless a contract was formed in the first instance, and it was not formed.  Insofar as choice of law is concerned, the law of each Plaintiffs' state applies because there was no agreement to arbitrate in the first instance.[10]

---

[10] If the Court disagrees with Plaintiffs on this point, New York law would apply because under the recent version of the terms and conditions, which is the one that would be applicable under Avid's "continued use" theory, the law of New York, not Ontario, would apply to Plaintiffs' claims.  See Doc. No. 230, fn. 4. Defendants do not cite a single case applying New York law in support of their argument that an arbitration provision can be added, without notice, to the terms and conditions of a website so long as the terms originally provided that "changes" could later be made.  The only New York case cited, Lebowitz v. Dow Jones & Co., 508 F. App'x 83, 84 (2d Cir. 2013) is offered for the proposition that New York courts have enforced contractual provisions that "give discretion to one party to the contract." Doc. 230 at 26.  Lebowitz had nothing to do with arbitration and involved a subscriber agreement where the publisher altered some of the content being provided under users' digital subscriptions. See Id. Courts applying New York law have emphasized that actual notice and affirmative agreement to an arbitration provision are crucial. See Brennan v. Bally Total Fitness, 198 F. Supp. 2d 377, 384 (S.D.N.Y. 2002); Nguyen v. Barnes & Noble Inc., 763 F.3d 1171, 1175 (9th Cir. 2014) (applying New York law).

The laws of the forum states of Plaintiffs Cabiness (New Jersey), Witengier (Missouri), and Russell (Maryland), who Defendants admit are pre-arbitration Plaintiffs, are in accord regarding the impermissibility of unilateral additions of arbitration provisions without providing actual notice. See Discover Bank v. Shea, 827 A.2d 358 (N.J. Law.Div. 2001) (adopting Badie under similar facts and holding that "New Jersey courts do not permit unilateral amendments to existing agreements to change material terms"); Baker v. Bristol Care, Inc., 450 S.W.3d 770, 776 (Mo. 2014), reh'g denied (Oct. 28, 2014) (holding that an employer's unilateral "right to amend, modify or revoke this agreement upon thirty (30) days' prior written notice to the Employee" rendered an arbitration provision illusory and unenforceable); Cheek v. United Healthcare of Mid-Atl., Inc., 378 Md. 139, 835 A.2d 656 (Md. 2003) (party's unilateral right to "to alter, amend, modify, or revoke the [Arbitration] Policy at its sole and absolute discretion at any time with or without notice" creates no real promise, and therefore will not support an enforceable agreement to arbitrate).

Moreover, an arbitration provision which can be applied retroactively is illusory as a matter of law. See Carey v. 24 Hour Fitness, USA, Inc., 669 F.3d 202, 207 (5th Cir. 2012) (provision permitting unilateral amendment to arbitration agreement by employer is an illusory promise; reasonable advance notice **and language denoting prospective application of amendments are required**); Baker., 450 S.W.3d at 777 ("Contracts, like the arbitration agreement in this case, that permit unilateral, retroactive amendment are deemed illusory and do not constitute consideration to create an enforceable contract."). Defendants' modification provision and arbitration provision do not contain language limiting modifications to prospective application, Doc. No. 230, at pp. 11-12, 25, and as a result, they are illusory and cannot be enforced against the pre-arbitration plaintiffs.

Even if these Plaintiffs had assented to the terms when they signed up, they did **not** thereby agree to a binding arbitration provision because none existed at that time.  Defendants never bothered to provide Plaintiffs with actual notice that the provision had been added.  See Exs. 23-40, ¶¶ 5-6.  Avid points to nothing in the terms that would indicate it was contemplated

that Avid would add an arbitration provision to the terms.  Avid made a material unilateral modification by adding an arbitration clause—a modification not contemplated in the original agreement—without notice and to which Plaintiffs never provided affirmative assent.  <u>Id.</u> Therefore the modification provision is illusory and/or ineffective and the arbitration provision is not enforceable against Plaintiffs.

### C. THE DESIGN OF AVID'S ASHLEY MADISON WEBSITE DID NOT REQUIRE UNAMBIGUOUS MANIFESTATION OF ASSENT FROM THE PLAINTIFFS.

Even setting aside Avid's inability to link post-arbitration accounts to pre-arbitration Plaintiffs, Avid cannot carry its burden to demonstrate that any Plaintiff agreed to its terms and conditions, because every version of the Ashley Madison sign-up screens was designed to keep users from discovering the onerous nature of the terms.[11]

Courts have noted that, in this context, internet consumers "require clearer notice than do traditional retail buyers.  In the absence of contrary proof, it can be assumed that the burden should be on the offeror to impress upon the offeree—<u>i.e.</u>, the average internet user—the importance of the details of the binding contract being entered into." <u>Berkson</u>, 97 F. Supp. 3d at 382.  A person using the Internet may not realize that she is agreeing to a contract at all, whereas a reasonable person signing a physical contract will rarely be unaware of that fact. <u>Sgouros v. TransUnion Corp.</u>, 817 F.3d 1029, 1035 (7th Cir. 2016).  Therefore, courts will not enforce website terms and conditions where "the importance of the details of the contract" are "obscured or minimized by the physical manifestation of assent expected of a consumer seeking to purchase

---

[11] Avid's claim that "nearly half" of the Plaintiffs "have already admitted that they read or looked at the Terms and Conditions" (Doc. 265 at 1) is misleading.  Plaintiffs Benefield, Coward, Farr, Garrett, Hiles, Lisuzzo, Miller, Truong and Witengier do *not* recall reading the terms.  Ex. 6 at 7, Ex. 8 at 7, Ex. 9 at 7, Ex. 10 at 7, Ex. 12 at 7, Ex. 15 at 7, Ex. 17 at 7, Ex. 20 at 7, Ex. 21 at 7.  Plaintiff Macomber believes he probably saw the terms but does not specifically remember.  Ex. 16 at 7.  Plaintiffs Cabiness, Shows, and Yagel believe they saw the terms, but that would have been *before* they contained an arbitration provision.  Ex. 7 at 7; Ex. 19 at 7, Ex. 22 at 6-7.  Plaintiff Russell read the terms in the process of attempting to delete his accounts and did not use the site thereafter.  Ex. 18 at 7, Ex. 36.  Plaintiff Alfaro only recalls a "code of conduct." Ex. 5 at 7. Jiwan also asserts that Plaintiffs Coward and Lisuzzo saw a dialogue/popup box on May 1, 2011 and April 29, 2011, respectively, <u>see</u> Jiwan Decl., at ¶ 24; however these Plaintiffs do not recall ever being presented with a "dialogue box." <u>Ex. 26</u>, at ¶ 7; Ex. 33, at ¶ 7.

or subscribe to a service or product." <u>Meyer</u>, 2016 WL 4073012, at *9, citing <u>Berkson,</u> 97 F.Supp.3d at 402.

As then Second Circuit Court of Appeals Judge Sonia Sotomayor wrote in an early decision concerning the enforceability of online contracts of adhesion, "[r]easonably conspicuous notice of the existence of contract terms and ***unambiguous manifestation of assent to those terms by consumers*** are essential if electronic bargaining is to have integrity and credibility." <u>Specht</u>*,* 306 F.3d at 35. This was not a groundbreaking announcement of cutting-edge developments in the law of cyber-contracts. Indeed, "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract," <u>Register.com, Inc. v. Verio, Inc.</u>*,* 356 F.3d 393, 403 (2nd Cir. 2004). And "manifestation of assent" has long been "the touchstone of contract." <u>Specht</u>*,* 306 F.3d at 29.

Avid tries to avoid these issues by presenting its argument in two seemingly simple parts: (1) The Ashley Madison sign-up screens contained a "clickwrap agreement" and (2) courts usually enforce "clickwrap agreements." Avid is wrong on both counts.

First, "[t]he issue of whether [a] plaintiff … agreed to arbitrate his claims turns more on customary and established principles of contract law than on newly-minted terms of classification." <u>Meyer</u>, 2016 WL 4073012 at *6 (citations and quotations omitted). Instead, "electronic agreements fall along a spectrum in the degree to which they provide notice, and it is difficult to draw bright-line rules because each user interface differs from others in distinctive ways." <u>Meyer</u>*,* 2016 WL 4073012 at *8. As a result, "courts must embark on a fact-intensive inquiry in order to make determinations about the existence of reasonably conspicuous notice in any given case." <u>Id</u>*.* (internal citations and quotations omitted). Simply affixing the "clickwrap" moniker to a particular web site design does not magically result in a binding agreement by consumers to the web site's hidden terms. <u>Id</u>. <u>See</u> also <u>Berkson</u>, 97 F. Supp. 3d at 397 ("The term "clickwrap" only appears in seven reported Courts of Appeals decisions, none of which

16

decide the *per se* enforceability of these agreements").[12]

Second, as discussed below, at its best, Avid's sign-up screens most closely resembled either "browsewrap" or "sign-in wrap," which courts routinely find ***inadequate*** to obtain an unambiguous manifestation of assent. See Berkson, 97 F. Supp. 3d at 399; Meyer, 2016 WL 4073012, at *6. It is not difficult for website operators to design their sites in a way that permits them to obtain proper documentation of consumers' manifestation of affirmative assent.[13] But Avid chose not to do this, knowing the likelihood that disclosing its terms would harm profits by scaring off users.

Plaintiffs signed up for Ashley Madison over a ten year period from 2005 through 2015, during which Avid made multiple changes to its sign-up screens. Jiwan Decl., ¶ 5; Ex. 4. The basic process used to create a profile remained essentially the same: An individual visiting the site was asked to input his or her relationship status (and, at times, other information), after which he or she was directed to a sign-up screen containing fields used to input personal information such as username, password, email address, postal code, greeting, date of birth, and physical characteristics such as height, weight, and ethnicity. See Ex. 4 (various forms of the sign up screen over time). Unlike many websites, ***Avid chose never to display its terms to users during the registration process.*** The only way an individual creating an account would ever see the terms is by clicking on a small hyperlink. Jiwan Tr., at 50:24-51:5. Even then, the

---

[12] Cf. Juliet M. Moringiello and William L. Reynolds, *From Lord Coke to Internet Privacy: The Past, Present, and Future of the Law of Electronic Contracting,* 72 Md. L.Rev. 452, 466 (2013) ("In the world of electronic contracts... clickwrap is a meaningless term. Click-to-agree transactions come in many flavors. Sometimes the click is at the end of the terms so that a reader must at least scroll through to reach the 'I agree' icon, while [at] other times the click is next to a hyperlink that leads to the terms, either in one click or in several. ***Whether the terms are classified as clickwrap says little about whether the offeree had notice of them***.").

[13] See, e.g., Mohamed v. Uber Technologies, Inc., 109 F. Supp.3d 1185, 1190-91 (N.D. Cal. 2015), aff'd in part, rev'd in part and remanded, 836 F.3d 1102 (9th Cir. 2016) (New users were presented with a message in large text stating, "TO GO ONLINE, YOU MUST AGREE TO ALL THE CONTRACTS BELOW." Hyperlinks below the text contained the full terms of each contract, and below the hyperlinks a message read, "By clicking below, you acknowledge that you agree to all the contracts above." If the user clicked the button labeled "Yes, I agree," a new full-screen page appeared that stated, "PLEASE CONFIRM THAT YOU HAVE REVIEWED ALL THE DOCUMENTS AND AGREE TO ALL THE NEW CONTRACTS" and provided buttons for users to click either "YES, I AGREE" or "NO.").

arbitration provision (once it existed) was buried after pages of legalese about acceptable user conduct, disclaimers of responsibility for user-created content, refund and account cancellation policies, warranty and liability disclaimers, and acceptable use of Avid's intellectual property. See, e.g., Doc. No. 230-14.

After entering his or her profile information, the individual clicked a button near the bottom of the sign-up form and was directed to another web page to begin using the site.  It is during this last step (clicking a button on a web page or tiny smartphone screen) that Avid claims plaintiffs "agreed" to relinquish their "most precious and fundamental right," their Seventh Amendment right to a jury trial.  Meyer, 2016 WL 4073071 at *1.  But under the current state of law, this is incorrect.

### 1.     Defendants cannot say how the Ashley Madison sign-on process appeared or functioned for users who created accounts prior to 2010.

As an initial matter, once again Avid's shoddy recordkeeping practices make it impossible for Avid to show how anyone who opened an account prior to 2010 (when no arbitration provision even existed) allegedly manifested affirmative assent to the terms.  Avid's declarant, Rizwan Jiwan, has no first-hand knowledge of how the Ashley Madison sign-up process worked before he was hired by Avid in late 2009.  Jiwan Tr., at 32:4-5, 43:18-44:16, 48:8-49:8.  Moreover, Jiwan conceded the only way to determine with certainty how previous versions of the sign-up screens worked is to examine the computer source code (or install it on a server for testing purposes). Jiwan Tr., at 79:24-80:8, 85:20-86:4.  However, Avid did not keep a copy of *any* source code for any version of the Ashley Madison sign-up screens in use prior to 2010.  Id.; Jiwan Tr., at 46:18-48:2; 76:11-13; 84:21-23.

In an attempt to remedy this proof problem, Avid produced four snapshots of pre-2010 screens[14] it was able to obtain from the Internet Archive's "Wayback Machine," a third-party

---

[14] Based on the URLs appearing at bottom, the snapshots were apparently taken on February 9, 2003, October 4, 2003, December 19, 2006, and September 24, 2008.  Ex. 4, at 1-4; Jiwan Tr., at 235:12-16; Supp. Resp. Int., at 26.

web site that periodically accesses and saves snapshots of some web pages. Supp. Resp. Int., at 26; Ex. 4, at 1-4.  As Jiwan effectively conceded during his deposition, however, there is insufficient foundation and evidence of reliability to rely on this approach. The Wayback Machine takes its snapshots only periodically and with unpredictable frequency.[15]  As a result, ***it is not possible to determine how Ashley Madison's sign-up pages looked on any date other than those dates on which snapshots happened to be taken***. Jiwan Tr., at 133:20-134:17, 136:14-137:2.  Thus, even if Avid knew the date on which any plaintiff created an account prior to 2010 (it does not, for the reasons explained above, see, supra, Section III.A), it cannot prove what the sign-up screens viewed during this process looked like.[16]  Plaintiffs Yagel, Lisuzzo, Truong, Cabiness, Macomber, and Shows state that they created Ashley Madison accounts prior to 2010, when Avid began keeping the Ashley Madison website source code. See McDonough Decl., at Appendix A.  Avid simply does not know what the sign up screens looked like for these Plaintiffs.  This fact alone should be fatal to Avid's claim that they "agreed" to any terms and conditions.

**2.  Avid cannot prove unambiguous assent to the terms prior to 2010 because the signup process was deceptive and Avid cannot show that its checkbox was a required field.**

Assuming any Plaintiffs did sign up for Ashley Madison using the screens Defendants rely on, however, they did not thereby enter into a binding agreement to the terms because they did not receive reasonably conspicuous notice of the existence of the terms or unambiguously manifest assent to those terms.  See Specht, 306 F.3d at 35.

The 2006 screen is in fact a form of "browsewrap" that courts routinely refuse to enforce

---

[15] *See Forbes,* "How Much Of The Internet Does The Wayback Machine Really Archive?" Available at http://www.forbes.com/sites/kalevleetaru/2015/11/16/how-much-of-the-internet-does-the-wayback-machine-really-archive (last visited Nov. 10, 2016).  (observing that "the Archive has never published an inventory of the websites it archives or the algorithms it uses to determine what to capture and when" and describing "the myriad oddities of its holdings," including the fact that the frequency of snapshots is completely unpredictable).

[16] Similarly, even if no other sign-up pages appeared on the Ashley Madison web site between the dates on which the "Wayback Machine" took snapshots, it is not possible to determine which of the two successive snapshots would have appeared on the site on a particular date.  Jiwan Tr. 133:20-137:2.

against consumers.  See Avid's Supp. Resp. Int., at pp. 26, 56-58; Ex. 4, at AVID 00000276-278.

"Browsewraps can take various forms but basically the website will contain a notice that—by

merely using the services of, obtaining information from, or initiating applications within the

website—the user is agreeing to and is bound by the site's terms of service."  United States v.

Drew, 259 F.R.D. 449, 462 (C.D. Cal. 2009).  Although courts sometimes enforce browsewrap

agreements against sophisticated users such as technology companies, they are generally

unwilling to do so against individual consumers, because such "agreements" provide insufficient

notice of the terms and no mechanism by which a user can unambiguously manifest affirmative

assent. Meyer, 2016 WL 4073071 at *6; see also Berkson, 97 F.Supp.3d at 396 ("Following the

ruling in Specht, courts generally have enforced browsewrap terms only against knowledgeable

accessors, such as corporations, not against individuals.").

 Avid's 2006 screenshot exemplifies both problems with this type of design.  First, the

only reference to the terms is a hyperlink adjacent to numerous other links appearing at the

bottom of the screen. "[W]here a website makes its terms of use available via a conspicuous

hyperlink on every page of the website but otherwise provides no notice to users nor prompts

them to take any affirmative action to demonstrate assent, even close proximity of the hyperlink

to relevant buttons users must click on—without more—is insufficient to give rise to

constructive notice."   Nguyen, 763 F.3d at 1178–79 (declining to find agreement to terms

"available via a 'Terms of Use' hyperlink located in the bottom left-hand corner of every page on

the Barnes & Noble website, which appears alongside other hyperlinks labeled 'NOOK Store

Terms,' 'Copyright,' and 'Privacy Policy'").

 Second, even if a user noticed the hyperlink and followed it to the terms, the design

provided no mechanism whereby he or she could unambiguously manifest assent.  In fact, Avid's

design provided no notice whatsoever that clicking on its button had anything to do with any

terms.  Instead, the button indicated only that by clicking on it a user could "CONTINUE."

Because "clicking on a . . . button does not communicate assent to contractual terms if the offer

did not make clear to the consumer that clicking on the . . . button would signify assent to those

terms," Specht, 306 F.3d at 29-30, courts routinely refuse to enforce online "agreements" where a submit button's label does not clearly indicate its contractual significance.  See, e.g., Berkson, 97 F. Supp.3d at 404 (Use of 'NEXT' button insufficient to show adequate notice of assent to terms of use); Meyer, 2016 WL 4073071, at *4, 6 (no contract was formed where plaintiff "could sign up for Uber by clicking on the 'Register' button without explicitly indicating his assent to the terms and conditions that included the arbitration provision"); Nicosia, 834 F.3d at 236 ("clicking 'Place your order' does not specifically manifest assent to the additional terms"); Specht, 306 F.3d at 22-23, 32 (finding no contract was formed by a user clicking on a "Download" button above a link to terms).

Next, for some unknown period between December 19, 2006 and 2010,[17] Avid's sign-up screen appeared as it did on September 24, 2008.  See Ex. 4, Avid Supp. Resp. Int., at pp. 26, 56-58.  This version introduced the use of a "checkbox." Users signing up for Ashley Madison using this and subsequent versions of the sign-up page that employed a button adjacent to a checkbox referencing Avid's terms did not unambiguously indicate affirmative assent to any terms.

Courts have described "**sign-in wrap**," whereby a user is allegedly notified of the existence and applicability of the site's terms of use via hyperlink when proceeding through the website's sign-in or login process as a "questionable form of internet contracting."  Meyer, 2016 WL 4073071, at *6 (internal quotations and citations omitted).  That is because "purveyors of electronic form contracts are legally required to take steps to provide consumers with reasonable notice of contractual terms," and [u]ser interfaces designed to encourage users to overlook contractual terms in the process of gaining access to a product or service are hardly a suitable way to fulfill this legal mandate."  Meyer, 2016 WL 4073071, at *10.  See also Berkson, 97 F. Supp.3d at 396 (collecting cases finding this sort of design inadequate to obtain manifestation of affirmative assent to terms).

It is not possible to determine what the submit button said during this period because the

---

[17] Plaintiffs Lisuzzo, Truong, Cabiness, Macomber, and Shows signed up between 2006 and 2010. See McDonough Declaration, Appendix A.

Wayback Machine did not correctly reproduce the button; however, Jiwan surmises that it said something along the lines of the "alt text" associated with the button, "Complete Registration." Jiwan Tr., at 147:11-149:1.   Assuming this to be true, this version suffers from the same infirmity as the December 2006 design because, based on the case law set forth above, "Complete Registration" does not unambiguously manifest affirmative assent.

Furthermore, Avid cannot show that any "checkbox" in use prior to 2010 was a required field, which is fatal to any claim that Plaintiffs manifested assent during this time period. In Berkson, the court determined, for several reasons, that a sign-up screen nearly identical to Avid's was insufficient to bind consumers to online terms.   An early version of the Berkson account creation page contained a checkbox adjacent to text stating "I agree to the Terms of Use." Berkson, 97 F. Supp. 3d at 370-71.   The words "Terms of Use" were a hyperlink to another page of the website containing the terms.   Id.   The bottom of the page contained buttons labeled "NEXT" and "CANCEL." Id.   The court held that this design was inadequate because, among other things, the defendant was unable to prove that the checkbox was a required field— in other words, that the checkbox had to be checked in order for a user to continue the registration process.   Berkson, 97 F. Supp. 3d at 403.   ***Because defendant could not prove that the plaintiff checked the box, it could not demonstrate that the plaintiff did anything at all that would manifest assent to the terms***.   Id.

Avid is unable to meet this same burden for the sign-up screens it used prior to 2010. As Jiwan admitted during his deposition, the only way to confirm whether a checkbox was a required field during this period is to examine the source code.   Jiwan Tr., at 79:25-80:8, 86:2-4, 84:5-20, 85:20-86:1. This cannot be accomplished using the Wayback Machine because the Wayback Machine does not have access to the server side code that controlled how Ashley Madison's web pages actually worked.[18]   Jiwan Tr., at 155:5-156:9.

---

[18] As a result, snapshots obtained from the "Wayback Machine" do not look and function the same way actual sign-up pages accessed by a user creating an account on Ashley Madison. Jiwan Tr., at 153:2-14. This can be readily demonstrated by checking and unchecking the checkbox before clicking "Complete Registration" at this "Wayback Machine" link (which loads very slowly):

This is a problem of Avid's creation.  Even if it could not retain the source code for some reason, it could admittedly have kept a record of whether any user actually checked these checkboxes.  Avid's servers were designed so that information contained in the sign-up screen fields were saved to Ashley Madison's database when a user clicked the submit button ("Complete Registration" in the version above).  There was one notable and highly material exception to this:  ***Avid chose never to record whether any "terms and conditions" checkbox was checked or unchecked***.  Jiwan Tr., at 85:10-19.  As Jiwan admitted in his deposition, this is not only technically possible but something Avid did elsewhere on the Ashley Madison website in order to record the value of multiple checkboxes associated with users' "profile options."  Jiwan Tr., at 192:19-193:14; see also Avid's Supp. Resp. Int., at pp. 74-76.  Thus, Avid cannot demonstrate that any plaintiff *ever* manifested assent based on a checkbox, because Avid chose not to keep a record of that information.

### 3. Avid cannot show unambiguous assent to the terms based on Ashley Madison's signup process during the "Search Now" time period from 2010 until April 2013

According to Jiwan, the version of the sign-up screen in use from ***January 2010 until May of 2011*** looked something like that which is presented at Ex. 4, at AVID00000280.[19]  See Id.; Avid's Supp. Resp. Int., at pp. 26, 56-58.  An approximation of the sign-up screen as it appeared ***through November 10, 2011***, appears at Ex. 4, at AVID00000281.[20]  See Id.; Avid's Supp. Resp. Int., at pp. 26, 56-58.  The general look of the sign-up screen as it appeared ***through May of 2012***, is presented Ex. 4, at AVID00000282-284.  See Id.; Avid's Supp. Resp. Int., at pp.

---

http://web.archive.org/web/20080924144854/http://www.ashleymadison.com/app/public/guarantee/registration.p (last visited November 10, 2016).

[19] To be clear, the page did ***not*** look exactly like this because the big red arrow that draws attention to the checkbox adjacent to the small terms and conditions text did not appear on the site.  That was a note added by an Avid employee requesting changes to the sign-up screen in December 2010.  Jiwan Tr., at 162:12-22, 165:12-169:22, 176:18-177:4.

[20] However, the page would not have displayed in the Spanish language unless a user selected that option in his browser and, again, the red arrow would not have appeared on the screen.  Jiwan Tr., at 181:7-182:17, 185:2-11.

26, 56-58.  Finally, an approximation of the sign-up screens as they appeared *through April 18,*
*2013*, is shown at Ex. 4, at AVID 00000285-288. See Id.; Avid's Supp. Resp. Int., at pp. 26, 56-
58.

Plaintiffs Coward, Russell, Witengier, Goetting, Imbarrato, Farr, Jack, and Hiles (and
possibly Alfaro and Garett) believe they created accounts during this period.[21]  See McDonough
Decl., at Appendix A.  Like the previous version, these screens do not permit users to
unambiguously manifest affirmative assent.  First, although the color of the button changed from
orange to pink to green, the label was constant through this period—users were invited to
"Search Now."  Ex. 4, at AVID 00000280-287; Avid's Supp. Resp. Int., at pp. 26, 56-58.  ***And***
***clicking a "Search Now" button does not manifest assent to any terms***.

Second, all of Ashley Madison's sign-up pages (the basic layout of which remained
essentially the same prior to the breach) were obviously designed to ***avoid*** providing reasonably
conspicuous notice of any terms.  "[T]he conspicuousness and placement of the 'Terms of Use'
hyperlink, other notices given to users of the terms of use, and the website's general design all
contribute to whether a reasonably prudent user would have inquiry notice of a browsewrap
agreement."  Nguyen, 763 F.3d at 1177.  The most noticeable thing on Avid's sign-up screens
during this period was the large "Search Now" button.  In contrast, the terms and conditions were
not displayed to the user during the account creation process and could be accessed only by
clicking on a hyperlink rendered in relatively tiny font.  See Meyer, 2016 WL 4073071, at *8;
Berkson, 97 F. Supp. 3d at 404; Lee v. Intelius Inc., 737 F.3d 1254, 1260 (9th Cir. 2013).

Third, Avid's design actively misled consumers.  Text below the "Search Now" button
stated that Ashley Madison may periodically contact users about potential "new matches" or
"changes to the service that may be of interest."  See, e.g., Ex. 4, at AVID00000280-288.  An
average user would be at least as likely to believe that he was agreeing to allow Avid to contact

---

[21] Jiwan's chart does not include Hiles in this time period, and also adds Macomber, Truong, and Shows
to the time period, as well as some other asterisked accounts Avid's somehow imputed to Plaintiffs.
Avid's Supp. Resp. Int., at 7-11

(and spam) him about service changes than to terms hidden in pages of legalese hidden behind a tiny link to a different web page.  See Sgouros, 817 F.3d at 1036 (plaintiff did not agree to "Service Agreement" displayed in scroll box above "I Accept" button where text below a scroll box that authorized defendant to access plaintiff's personal information "distracted the purchaser from the Service Agreement by informing him that clicking served a particular purpose unrelated to the Agreement.").  Moreover, beginning in November of 2011, Avid added large, prominent text to the top of its sign-up screens stating "You're almost done! Please take 30 seconds to complete your profile and start searching."   Ex. 4, at AVID00000282. This text was clearly intended to encourage users to "start searching," by clicking the "Search Now" button, rather than to draw their attention to a tiny hyperlink referencing pages of legalese only a superhuman with extensive legal training could read and comprehend in far greater time.

### 4. Avid cannot show unambiguous assent because its checkbox was checked by default.

As discussed above, Avid began using the checkbox at some time between 2006 and its appearance on the 2008 screenshot. Avid apparently removed the checkboxes beginning October 19, 2012. Jiwan Tr., at 210:15-22.  However, as implicitly recognized by one Avid employee (who drew a big red arrow on the copy of the 2010 screenshot Avid produced – an arrow that did not ever actually appear on the web site), none of the Ashley Madison sign-up screens utilizing the checkbox during this time period could obtain consumers' unambiguous manifestation of assent to Avid's terms. Jiwan Tr., at 162:12-22, 165:12-169:22, 176:18-177:4. That employee created a project management system "ticket" in 2010 stating, "Please make sure that the customers have to **actively select** their agreement to the T&C rather than having the box pre-checked….  Only for Germany, Austria, and Switzerland!"  Jiwan Tr., at 169:23-170:13.  For U.S. users, however, the box remained ***checked by default.***[22]

---

[22] This was true except possibly during a brief three week period from September 12, 2012 to October 19, 2012, at which time Avid stopped using the checkbox altogether. Jiwan Tr., at 210:15-22.  Jiwan's "amended" declaration and deposition errata sheet state that the checkbox was not a required field for at least nine days in 2012. Doc. No. 258, at ¶6.

It is impossible for a user to manifest affirmative assent to terms using this screen.  At most a user could *withhold* assent by affirmatively clearing the pre-checked box before clicking on a large button affirmatively indicating his desire to "Search Now."  In this respect, Avid's design is *less capable* of demonstrating affirmative assent than the <u>Berkson</u> checkbox, which was not checked unless first clicked by the user.  97 F. Supp. 3d at 370.  Instead, as the <u>Meyer</u> court recently found, designs like this are akin to traditionally unenforceable browsewrap:

> Here, the User Agreement to which plaintiff Meyer allegedly assented was clearly not a clickwrap agreement.  Mr. Meyer did not need to affirmatively click any box saying that he agreed to Uber's "Terms of Service." On the contrary, he could sign up for Uber by clicking on the "Register" button without explicitly indicating his assent to the terms and conditions that included the arbitration provision. As with a browsewrap agreement, an Uber user could access Uber's services "without visiting the page hosting the browsewrap agreement or even knowing that such a webpage exists."

<u>Meyer</u>, 2016 WL 4071071, at *6 (internal citations and quotations omitted).  No user using these form manifested assent to any terms during this time period.[23]

### 5. Avid cannot show unambiguous assent based on Ashley Madison's signup process between April, 2013 and the data breach.

Beginning in April 2013, Avid replaced the green "Search Now" button with a button captioned "I Agree."[24]  <u>See</u> Avid's Supp. Resp. Int., at pp. 26, 56-58; <u>Ex. 4</u>, at AVID 00000288.[25]  By this point, the part of the page containing the functional portion of the sign-up screen was reduced in size to a narrow, smartphone-like screen.  *Id.*  In addition, the text containing the hyperlink referencing the terms was rendered in a small gray font on a white background.  <u>Id.</u>  This layout is strikingly similar to versions of "sign-in wrap" courts deem insufficient to create a binding agreement to arbitrate.

---

[23] Plaintiffs Yagel, Lisuzzo, Truong, Cabiness, Macomber, Shows, Russell, Witengier, Coward, Hiles, Imbarrato, Jack and Farr believe they only created accounts during 2012 or earlier. <u>See</u> Appendix A.

[24] Plaintiffs Miller and Benefield believe they created accounts after April of 2013.  Ex. 6, at 4-6; Ex. 17, at 4-6.  Jiwan's chart lists multiple plaintiffs, some designated with asterisks.  Supp. Resp. Int., at 7-11.

[25] Additional renderings of sign-up screens in use during this period are at pp. 14-45 of Exhibit 4.  <u>See</u> Supp. Resp. Int., at pp. 26, 56-58.

In <u>Berkson</u>, for example, the court found that small text stating, "By clicking 'NEXT' I agree to the [hyperlinked] terms of use and privacy policy" was insufficient to give adequate notice of the terms and that clicking on an adjacent "NEXT" or "SIGN IN" button under such circumstances did not manifest anything except a consumer's desire to purchase the website's product. <u>Berkson</u>, 97 F. Supp. 3d at 404. Important to the court's decision were the facts that, like here, "The hyperlink to the 'terms of use' was not in large font, all caps, or in bold" whereas "the 'SIGN IN' button [was] very user-friendly and obvious…." <u>Id.</u> Similarly, the <u>Meyer</u> court declined to enforce an arbitration agreement allegedly created by a similar sign-up screen because someone using it neither received "reasonably conspicuous notice of Uber's User Agreement, including its arbitration clause, or evince[d] unambiguous manifestation of assent to those terms." <u>Meyer,</u> 2016 WL 4073071, at *9 (internal quotations omitted). In reaching this conclusion, the court deemed it significant that, like here, the placement, color, and size of the terms of service hyperlink relative to the screen's overall design was "simply too inconspicuous" to meet the *Specht* standard. *Id.* In addition, the court found that the reference to both "Terms of Service" and the "Privacy Policy" added to "the relative obscurity" of the terms:

> The Court cannot simply assume that the reasonable (non-lawyer) smartphone user is aware of the likely contents of Terms of Service, ***especially when that phrase is placed directly alongside Privacy Policy.*** There is, after all, a breadth of the range of technological savvy of online purchasers (and smartphone users). The reasonable user might be forgiven for assuming that Terms of Service refers to a description of the types of services that Uber intends to provide, not to the user's waiver of his constitutional right to a jury trial or his right to pursue legal redress in court should Uber violate the law. In other words, the importance of the details of the contract was obscured or minimized by the physical manifestation of assent expected of a consumer seeking to purchase or subscribe to a service or product. There is a real risk here that ***Uber's registration screen made joining Uber fast and simple and made it appear—falsely—that being a user imposed virtually no burdens on the consumer besides payment***.

*Id.* (internal citations, quotations and modifications omitted). Going back as far as November of 2012, Avid similarly chose to place its "Privacy Policy" link alongside the "Terms and Conditions" link, and linked to the "Privacy Policy" first, which is even less likely to draw a

user's attention to the terms than Ubers' registration screen.  See, e.g., Ex. 4, at AVID 00000286-339.

During this period, a new Ashley Madison user's confusion would be compounded by the fact that Avid kept the language (below the button) that suggested that he or she agreed, if anything, to receive periodic notifications and spam from Ashley Madison.com and affiliated entities.  Ex. 4, at AVID 00000288.  In addition, for most of the period between April of 2013 and the data breach,[26] the small, light-colored text above and below Avid's "I Agree" button created further ambiguity about the effect of clicking the button.  Although the button was now labeled "I Agree," rather than "Search Now," the small text above stated, "I acknowledge that by choosing to continue and search now, I certify I am 18 years old and have read and agree to the Ashley Madison Privacy Policy and Terms and Conditions."   See, e.g., Ex. 4, at AVID 00000331.

Worse yet, beginning in November, 2013, Avid added an additional line of text to the small, light-colored text below the button, but this text was separated from the other text and rendered in all caps: "WE DO NOT PERFORM ANY CRIMINAL BACKGROUND CHECKS," suggesting perhaps it was *that* to which Avid was actually seeking agreement.  Just as in Sgouros, the competing messages surrounding Avid's button were designed to distract a new user from the terms and to suggest that clicking "I Agree" served a purpose unrelated to the terms, such as an agreement to receive Avid's notifications or an acknowledgement that Avid "DO[ES] NOT PERFORM ANY CRIMINAL BACKGROUND CHECKS."  Compare Ex. 4, at AVID 00000301 to Sgouros, 817 F.3d at 1036 (plaintiff did not agree to "Service Agreement" displayed in scroll box above "I Accept" button where text below a scroll box that authorized defendant to access plaintiff's personal information "distracted the purchaser from the Service Agreement by informing him that clicking served a particular purpose unrelated to the Agreement.").  Notwithstanding the addition of its "I agree" button, the additional changes Avid

---

[26] This was apparently the case from April 18, 2013 through May 29, 2013, and from November 18, 2013 through the time of the breach in 2015.

made to its sign-up screens during this period make it *less* likely an ordinary user would understand the significance of clicking the button.  For this reason, these signup screens are no better than the others and do not demonstrate unambiguous assent.

### 6.      The cases Avid cites do not support its claims.

Avid cites several cases for the proposition that "'clickwrap' agreement[s] have been enforceable in this Court for more than a decade . . . ."  Motion, at p. 17.  At the outset, this proposition relies on the assumption that Avid's enrollment form was a "clickwrap" agreement, when it clearly cannot be categorized as such at any time.  See Section III.C.  Further, the cases relied on by Avid are in no way comparable to the case at bar.

For instance, Internet Gateway, involved an electronic contract that was sent out on CD to the user.  "[T]he user [wa]s presented with the terms of an End User License Agreement ("EULA").  At the end of the EULA, [defendant] include[d] a button with the text, "I Agree" in it, which the user must click in order to proceed with the installation.  Davidson & Associates, Inc. v. Internet Gateway, Inc., 334 F. Supp. 2d 1164, 1169–70 (E.D. Mo. 2004), aff'd sub nom. 422 F.3d 630 (8th Cir. 2005).  As discussed above, Avid's sign-up screens never presented the terms in this way.   In Burcham v. Expedia, Inc. (a case about forum selection clauses, not arbitration), Expedia provided uncontested evidence that "[a] customer must affirmatively click a box on the website acknowledging receipt of and assent to the contract terms before he or she is allowed to proceed using the website."  2009 WL 586513, at *2 (E.D. Mo. Mar. 6, 2009). Unlike the Plaintiffs here, the Burcham plaintiff presented no evidence that the website "operated any differently" that Expedia claimed. 2009 WL 586513, at *1, *3 (E.D. Mo. Mar. 6, 2009). Finally, Appistry, Inc. v. Amazon.com, Inc. (a case about a venue clause, not arbitration), contains no description at all concerning the form of the alleged "clickwrap" agreement or how it was presented—the form of the agreement was not an issue raised in that case—so it is unclear how Avid makes its comparison to that case and concludes its signup screen is the same.[27]  See

---

[27] Similarly, in multiple string cites (on pages 20-21 of its Motion) Avid, it makes no attempt to compare the signup screens here with those in the cited cases, and in any event, the signup forms and evidence here

2015 WL 881507 (E.D. Mo. Mar. 1, 2015).

## IV.    AVID'S ARBITRATION PROVISION IS UNCONSCIONABLE

Even setting aside the fact that Plaintiffs simply never agreed to arbitrate, "An unconscionable arbitration provision in a contract will not be enforced." Fay, 2010 WL 4905698, at *2.  Where unconscionable terms "pervade" an agreement, courts should refuse to rewrite the agreement and instead invalidate the provision. Gandee v. LDL Freedom Enterprises, Inc., 293 P.3d 1197, 1201 (Wash. 2013).

There are procedural and substantive aspects to unconscionability.  Procedural unconscionability relates to the formalities of the making of an agreement and encompasses "oppression" and "unfair surprise" indicating that the transaction lacked meaningful choice or equality of bargaining power. See Id.; see also Discover Bank v. Super. Ct., 113 P.3d 1100 (Cal. 2005); Tillman v. Commercial Credit Loans, Inc., 655 S.E.2d 362, 370 (N.C. 2008).  Substantive unconscionability means an undue harshness in the contract terms. Fay, 2010 WL 4905698, at *2; Mohebbi v. Khazen, 2014 WL 6845477, at *6 (N.D. Cal. Dec. 4, 2014).

While certain states only require that one of the prongs be satisfied to strike down an unconscionable agreement, most courts have moved toward a "sliding scale" where substantive evidence in support of one of the prongs is sufficient, so long as there is at least some evidence of unconscionability under the other prong. See Maxwell v. Fidelity Fin. Servs., Inc., 907 P.2d 51, 58-59 (Ariz. 1995) (citing 2 William D. Hawkland, Uniform Commercial Code Series § 2–302:05 (1984)).[28]  Defendant relies on only two examples of its Arbitration Provision. Doc. No.

fall far short of the evidence relied on in those cases.

[28] See also Romano ex rel. Romano v. Manor Care, Inc., 861 So. 2d 59, 62 (Fla. Dist. Ct. App. 2003); Razor v. Hyundai Motor Am., 854 N.E.2d 607, 622 (Ill. 2006); Brewer v. Mo. Title Loans, Inc., 323 S.W.3d 18, 22 (Mo. 2010); Gonski v. Second Judicial Dist. Court of Nev. ex rel. Washoe, 245 P.3d 1164, 1169–70 (Nev. 2010); Delta Funding Corp. v. Harris, 912 A.2d 104, 111 (N.J. 2006); Berkson, 97 F. Supp. 3d at 391.  Notably, even those courts that continue to require both procedural and substantive unconscionability to invalidate a contract, such as California, have principles similar to the "sliding scale" concept. See Argueta v. J.P. Morgan Chase, 787 F. Supp. 2d 1099, 1106 (E.D. Cal. 2011) (noting that "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.")

230, at pp. 11-12.   There is substantial evidence demonstrating at least some evidence of procedural unconscionability, along with ample and overwhelming evidence of substantive unconscionability.  Avid's Motion should thus be denied.

A.    THE ARBITRATION PROVISIONS ARE PROCEDURALLY UNCONSCIONABLE

The Terms and Conditions in this case represent a classic adhesion contract, in which Plaintiffs were not involved in negotiating the specific terms in any way. Courts have held that such contracts generally possess at least some indicia of unconscionability. See Affholter v. Franklin Cty. Water Dist., 2008 WL 5385810, at *8 (E.D. Cal. Dec. 23, 2008); Morando v. NetWrix Corp., 2012 WL 1440229, at *3 (D.N.J. Apr. 24, 2012); Grossman v. Thoroughbred Ford, Inc., 297 S.W.3d 918, 921 (Mo.App. 2009), as modified (Dec. 22, 2009); Surman v. Merrill Lynch, Pierce, Fenner & Smith, 733 F.2d 59, 61 (8th Cir.1984).

In addition to being a contract of adhesion, procedural unconscionability is demonstrated by the inclusion of provisions that the Plaintiffs had no opportunity to negotiate and that demonstrate "oppression and surprise" and a lack of equal bargaining rights.  For example:

- Defendants seek to apply the arbitration provision retroactively (i.e., without negotiation) to pre-arbitration Plaintiffs and without notice, based on a modification provision which purportedly gives Defendants the unlimited right to make unilateral changes. See Razor, 854 N.E.2d at 623 (Disclaimer in car warranty provided to car purchaser after purchase was completed was void for procedural unconscionability).

- The arbitration provision provides that, should an arbitrator determine that a Plaintiff's claim could not be arbitrated, that arbitration agency would apparently be removed and some other arbitrator selected.  See Jiwan Decl., Ex. M at AVID 00000076.

The presence of these provisions, which would be surprising to any objective consumer, demonstrates the unequal bargaining power between the parties and oppression.  No reasonable Plaintiff would negotiate an agreement that allows the other party to make unlimited changes whenever it likes. Nor would any reasonable consumer agree to an arbitration provision that allows Defendants to keep picking an arbitrator until they find one that will enforce the

31

arbitration terms.

**B.     THE ARBITRATION PROVISIONS ARE SUBSTANTIVELY UNCONSCIONABLE**

In addition, Defendants' arbitration provisions are substantively unconscionable for the following reasons:

- As stated, the terms include an unconscionable unilateral modification provision that, when coupled with the arbitration provision, allows both prospective and retroactive modification of the arbitration terms. See Ingle v. Circuit City Stores, Inc., 328 F.3d 1165, 1179 (9th Cir. 2003).

- The arbitration provision is not mutual because Avid retains the sole discretion to avoid arbitration for injunctive claims relating to "intellectual property rights and *confidential information*." See Jiwan Decl., Ex. M at AVID 00000081.  See Fitz v. NCR Corp., 118 Cal. App. 4th 702, 724 (2004) (one-sided arbitration clause substantively unconscionable because it exempted claims for intellectual property rights and noncompete agreements from arbitration). See also Eaton v. CMH Homes, Inc., 461 S.W.3d 426, 434 (Mo. 2015) (Lack of mutuality of obligation to arbitrate "is a relevant factor to be considered in answering the larger question of whether the agreement to arbitrate is unconscionable.") Plaintiffs' Consolidated Complaint is premised on the idea that Plaintiffs' confidential information was improperly secured (resulting in a breach) and/or improperly maintained despite Defendants' promises to delete it. Furthermore, Plaintiffs' Consolidated Complaint seeks injunctive relief, and therefore the lack of mutuality goes directly to this case.

- The arbitration provision mandates that all arbitrations take place in Toronto, Canada. See Jiwan Decl., Ex. M at AVID 00000081.  If it is clear that "trial in the contractual forum will be so gravely difficult and inconvenient that he will for all practical purposes be deprived of his day in court," it would be "unfair, unjust, [and] unreasonable" to enforce the forum selection provision. See Aral v. EarthLink, Inc., 36 Cal. Rptr. 3d 229,

241–42 (Cal. App. 4th 2005).  Should that provision be enforced here, Plaintiffs would be required to travel thousands of miles from their states to arbitrate what, in some cases, would be relatively small claims (for instance, "paid delete" charges costing  $20.00). See Gandee, 176 Wash. 2d at 604.

- The arbitration provision provides that "If the arbitration organization will not enforce this Arbitration Provision, it cannot serve as the arbitration organization to resolve your dispute." See Jiwan Decl., Ex. M at AVID 00000076.  In other words, if an arbitrator rejects the enforceability of the arbitration provision Avid is entitled to replace that arbitrator until it finds one that will enforce the provision.

These separate grounds, individually or taken together, demonstrate that enforcement of Defendants' arbitration provision in this case is unconscionable and should not be permitted by this Court.

WHEREFORE for the reasons set forth above, Plaintiffs respectfully request that the Court make and enter its Order denying Motions to Dismiss or Stay and to Compel Arbitration.

Respectfully Submitted,

DOWD & DOWD, P.C.

By:     */s/  Douglas P. Dowd*
        Douglas P. Dowd (29240MO)
        William T. Dowd (39648MO)
        Alex R. Lumaghi (56569MO)
        211 North Broadway, Suite 4050
        St. Louis, Missouri 63102
        Tel.: (314) 621-2500  Fax: (314) 621-2503
        doug@dowdlaw.net
        bill@dowdlaw.net
        alex@dowdlaw.net

        *Plaintiffs' Interim Liaison Counsel*

THE DRISCOLL FIRM, P.C.

By:     */s/  John J. Driscoll*
        John J. Driscoll (54729MO)
        Christopher J. Quinn (41883MO)
        Gregory G. Pals (48820MO)
        211 N. Broadway, 40th Floor
        St. Louis, Missouri 63102
        Tel.: (314) 932-3232
        Fax: (314) 932-3233
        john@thedriscollfirm.com
        chris@thedriscollfirm.com
        greg@thedriscollfirm.com

        W. Lewis Garrison, Jr.
        Christopher B. Hood
        Taylor C. Bartlett
        HENINGER GARRISON DAVIS, LLC
        2224 1st Avenue North
        Birmingham, Alabama 35203
        Tel.: (205) 326-3336
        Fax: (205) 326-3332
        wlgarrison@hgdlawfirm.com
        chood@hgdlawfirm.com
        taylor@hgdlawfirm.com

        James F. McDonough, III
        HENINGER GARRISON DAVIS, LLC
        3621 Vinings Slope, Suite 4320
        Atlanta, Georgia 30339
        Tel.: (404) 996-0869
        Fax: (205) 326-3332
        jmcdonough@hgdlawfirm.com

        *Plaintiffs' Interim Co-Lead Counsel*

        John Arthur Eaves, Jr.
        JOHN ARTHUR EAVES
        ATTORNEYS AT LAW
        101 North State Street
        Jackson, Mississippi 39201
        Tel.: (601) 355-7961
        Fax: (601) 355-0530
        johnjr@eaveslaw.com

34

Gary F. Lynch
Jamisen A. Etzel
CARLSON LYNCH SWEET &
KILPELA, LLP
1133 Penn Ave., 5th floor
Pittsburgh, Pennsylvania 15222
Tel.: (412) 322-9243
Fax: (724) 656-1556
glynch@carlsonlynch.com
jetzel@carlsonlynch.com

Thomas A. Zimmerman, Jr.
Jordan Mitchell Rudnick
ZIMMERMAN LAW OFFICES, P.C.
77 West Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020
tom@attorneyzim.com
jordan@attorneyzim.com

Julian A. Hammond
Ari Cherniak
Polina Pecherskaya
HAMMONDLAW, P.C.
1180 S. Beverly Drive, Suite 610
Los Angeles, CA 90035
(310) 601-6766
(310) 295-2385 (Fax)
jhammond@hammondlawpc.com
acherniak@hammondlawpc.com
ppecherskaya@hammondlawpc.com

Katrina Carroll
Kyle Alan Shamberg
LITE DEPALMA GREENBERG
211 W. Wacker Drive, Ste. 500
Chicago, IL 60606
312-750-1591
Fax: 312-212-5919
kcarroll@litedepalma.com
kshamberg@litedepalma.com

*Plaintiffs' Interim Executive Committee*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 18, 2016, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all parties.

*/s/  Douglas P. Dowd*