**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: ASHLEY MADISON CUSTOMER DATA SECURITY BREACH LITIGATION | ) ) ) | |
| | ) | MDL No. 2669 |
| This Document Relates to: | ) | |
| | ) | Case No. 4:15-MD-02669-JAR |
| ALL CASES | ) ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT**
**OF MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**

## I.    INTRODUCTION.

Plaintiffs' Lead Counsel submit this memorandum on behalf of the Plaintiffs named in the

Consolidated Class Action Complaint, who have agreed to this Settlement, (the "Plaintiffs") and

the proposed Class in support of the Motion for Preliminary Approval of Settlement under Federal

Rule of Civil Procedure 23(e), filed concurrently herewith (the "Motion for Approval").[1]

This lawsuit involves the Ruby Corp. (previously named Avid Life Media Inc.) and Ruby

Life Inc. (previously named Avid Dating Life Inc.) (together, "Avid") owned website

AshleyMadison.com, and Noel Biderman, Avid's former Chief Executive Officer (altogether,

"Defendants").  Plaintiffs bring this class action as a result of a breach of the security system of

Defendants' AshleyMadison.com website, which resulted in compromised security of Plaintiffs'

and Class Members' highly confidential personal information.  Plaintiffs also allege that the data

breach disclosed misrepresentation concerning the "Ashley Madison" website, which Plaintiffs

allege Defendants controlled, along with other conduct as described herein, to the injury of

---

[1] Any capitalized or defined terms used in this Motion shall be a reference to that capitalized or defined term in the Stipulation of Settlement.

Plaintiffs and the Class, including charging for a "paid delete" of users' information without in fact deleting all such information, and employing artificial computer programs, known as "engagers" or "bots" to induce payments for use of the site. Defendants dispute Plaintiffs' allegations.

After hard-fought litigation, Plaintiffs and Defendants have reached a fair and reasonable settlement, which is memorialized in the Settlement Agreement attached as Exhibit 1 to the Motion for Preliminary Approval.

The proposed Settlement is an excellent result for the proposed Class, given the risks and costs of continued litigation (including the risks relating to Defendants' Motion to Compel Arbitration), class certification, trial, and potential appeals. Plaintiffs' Lead Counsel and counsel for the Plaintiffs fully support the Settlement, having concluded that it is fair, reasonable, adequate, and in the best interests of the Plaintiffs and the proposed Class. Accordingly, Plaintiffs respectfully request that the Court provisionally certify the proposed Class for purposes of settlement; grant preliminary approval of the proposed Settlement; approve the forms of notice and the plan for dissemination of notice; and set a schedule for the final approval process.

## II.    FACTUAL BACKGROUND AND LITIGATION HISTORY

Plaintiffs allege that Defendants operated social networking and dating websites including a site branded as "Ashley Madison" and located at www.ashleymadison.com. AshleyMadison described itself as "the most famous name in infidelity and married dating" and as a website for "discreet encounters between married individuals." Defendants marketed AshleyMadison to consumers in the United States, as well as to consumers in about 45 other countries. In order to sign up and use the website, Plaintiffs and putative Class Members (hereafter "Class Members") submitted highly sensitive information such as their names, addresses, telephone numbers, credit

or debit card numbers, email addresses, dates of birth, gender, ethnicity, sexual preferences, and relationship status ("Personal Information"). *See* Declaration of W. Lewis Garrison, Jr. In Support of Motion for Preliminary Approval of Settlement, dated July 14, 2017, at ¶ 5 ("Garrison Declaration").

The website is "designed to facilitate intimate relationships for individuals who are either married or in a committed relationship." *See* JPML Transfer Order (Dec. 9, 2015) [Doc. No. 1] at 1-2.   Due to the sensitive nature of the website and information a consumer chose to share when activating an account, Defendants marketed to consumers that their network system and the servers that contained consumers' Personal Information were carefully monitored and equipped with the highest levels of security. In addition, Defendants made assertions regarding the sophistication of data theft prevention systems and its ability to protect users' Personal Information from third parties. Plaintiffs believe these assertions were false.  *See* Garrison Declaration*,* at ¶ 6.

This litigation arises from a data security breach affecting AshleyMadison.com on approximately July 15, 2015.  *See* JPML Transfer Order (Dec. 9, 2015) [Doc. No. 1] at 1-2.  This data breach resulted in the electronic theft of personally identifiable and financial information of some thirty-seven (37) million users of AshleyMadison.com.  On or about July 19, 2015, it was reported that hackers had infiltrated Ashley Madison's computer systems.  The intruders subsequently made various public statements that the database and underlying documents obtained from the systems, particularly the private and sensitive information and data about Ashley Madison's members, would be leaked to the public. Then, roughly 30 days later, on August 18 and 20, 2015, some of the information compromised in the data breach was released on the Internet. *See* Garrison Declaration*,* at ¶ 7.

The breach at issue resulted in the public release of personally identifiable and financial

information contained in approximately 37 million AshleyMadison.com "user" accounts, and included account information of AshleyMadison.com "users" who had paid a fee to purge their information from the AshleyMadison.com database.  *See* JPML Transfer Order (Dec. 9, 2015) [Doc. No. 1], at 2.  In addition, the data "dumps" revealed that AshleyMadison.com "made extensive use of artificial intelligence 'bots' and other mechanisms to mimic fake users (specifically, female users) on the Ashley Madison website in order to induce actual (predominantly male) users to make purchases." *Id.*  "[P]laintiffs learned of this alleged fraudulent scheme through analysis of the data disclosed in the Ashley Madison data breach."  *Id.; see also* Garrison Declaration*,* at ¶ 8.

Plaintiff Jane Doe filed the first lawsuit regarding the Ashley Madison data breach in this Court on July 22, 2015.  Garrison Declaration*,* at ¶ 9.  Over the course of the next month, at least four additional cases were filed, resulting in five separate actions pending in Federal court in four different states, alleging similar causes of action, all arising from the same data security breach involving the online dating site, AshleyMadison.com.  Garrison Declaration*,* at ¶ 9.  Plaintiff Jane Doe promptly moved for transfer of those actions to this Court pursuant to 28 U.S.C. § 1407.  On December 9, 2015, the Judicial Panel on Multidistrict Litigation ("JPML") transferred five related actions stemming from the breach to this Court for coordinated pretrial proceedings.  *See* JPML Transfer Order (Dec. 9, 2015) [Doc. No. 1], at 3-4; *see also* Garrison Declaration*,* at ¶ 9.

On February 5, 2016, the Court appointed John J. Driscoll and The Driscoll Firm, P.C., and W. Lewis Garrison, Jr., and Heninger Garrison Davis, LLC, as Plaintiffs' Interim Co-Lead Counsel and Douglas P. Dowd and Dowd & Dowd, P.C. as Plaintiffs' Interim Liaison Counsel.  *See* Doc. No. 87.  Additionally, the Court appointed a Plaintiffs' Interim Executive Committee comprised of John Arthur Eaves, Jr., and the Eaves Law Firm; Gary F. Lynch and Carlson Lynch

Sweet & Kilpela, LLP; Katrina Carroll and Lite DePalma Greenberg LLC; Julian A. Hammond and Hammondlaw P.C.; and Thomas A. Zimmerman, Jr. of Zimmerman Law Offices. *Id.; see also* Garrison Declaration*,* at ¶ 10.

Pursuant to the schedule entered by the Court, Plaintiffs' Interim Counsel filed their Motion for Leave to Proceed Under Pseudonyms on February 15, 2016, whereby they sought an order allowing plaintiffs to proceed with their causes of action under pseudonym names in order to reduce the risk of further personal and professional consequences resulting from the data breach. *See* Doc. No. 91.   That Motion was denied on April 6, 2016 (*see* Doc. No. 138), with the Court requiring any plaintiff named in the consolidated class action complaint to be identified by his or her real name.  *See also* Garrison Declaration*,* at ¶ 11.

Plaintiffs filed their First Amended Consolidated Class Action Complaint on June 24, 2016, whereby the Plaintiffs brought claims for violation of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962), the Federal Stored Communications Act (18 U.S.C. § 2702),  negligence and negligence *per se,* breach of implied contract – data breach, breach of contract – paid delete, unjust enrichment, negligent misrepresentation, violations of various state consumer fraud, protection, and record acts, and violations of various state data breach notification statutes. *See* Doc. No.  186; *see also see also* Garrison Declaration*,* at ¶ 12.

In anticipation of a motion to compel arbitration by Defendants, the parties engaged in extensive discovery on the issue of the arbitrability of the Plaintiffs' claims against Defendants, including an exchange of interrogatories and document requests related to the issue of arbitration. *See* Doc. Nos. 189.  Plaintiffs were forced to move for additional discovery related to certain information sought that was relevant to the arbitration issue. *See* Doc. No. 207. That motion was granted, and the Court ordered Defendants to respond to certain of Plaintiffs' arbitration related

discovery requests on August 24, 2016.  *See* Doc. No. 228, *see also* Garrison Declaration, at ¶ 13.

Defendants filed their Motion to Dismiss or to Stay and Compel Arbitration on August 29, 2016 (*see* Doc. Nos. 229, 230, 232, 233).  In that motion, Defendants sought to compel all of the Plaintiffs into individual and binding arbitration and prevent them from pursuing their claims on behalf of a class in this Court.   Due to the nature of certain arguments, factual assertions, and a declaration filed by Defendants in support the Motion to Dismiss or to Stay and Compel Arbitration, Plaintiffs sought an extension of time to respond to the Motion to Dismiss or to Stay and Compel Arbitration and further sought leave from the Court at the September 9, 2016, status conference to depose declarant Rizwan Jiwan. *See* Doc. No. 237.  Such extension and leave were granted. *See* Doc. No. 241.  Following the Jiwan deposition, Plaintiffs opposed Defendants' Motion to Dismiss or to Stay and Compel Arbitration (*see* Doc. Nos. 273-304), and Defendants replied in support of their motion with an additional declaration from Mr. Jiwan (*see* Doc. Nos. 314-5, 316-5), to which Plaintiffs objected and sought stricken from the record.  *See* Doc. No. 323; *see also* Garrison Declaration, at ¶ 14.

The briefing was completed and the parties were set for oral argument.  *See* Garrison Declaration, at ¶ 15.  However, the parties sought a continuance of oral argument on the Motion to Dismiss or to Stay and Compel Arbitration in order to make a good faith effort at resolving the case.  *Id.*

## III.   THE PARTIES ENGAGED IN HARD-FOUGHT AND EXTENSIVE NEGOTIATIONS.

The Parties first began discussing settlement in earnest in September of 2016.    From September of 2016 through December of 2016, the parties worked together to try to reach a resolution of the litigation in light of the claims alleged, positions, and risks to the Parties in litigation.   Despite an extensive exchange of positions and information, and despite telephone

conferences and an in person conference, the parties were unable to reach agreement.  *See* Garrison Declaration*,* at ¶ 16.

On December 14, 2016, the Federal Trade Commission (FTC), working with a coalition of 13 states— Alaska, Arkansas, Hawaii, Louisiana, Maryland, Mississippi, Nebraska, New York, North Dakota, Oregon, Rhode Island, Tennessee, Vermont—and the District of Columbia announced settlements with Avid that resolved claims similar to those asserted by Plaintiffs in the First Amended Consolidated Class Action Complaint ("Government Settlements").[2] *See, e.g.,* https://www.ftc.gov/news-events/press-releases/2016/12/operators-ashleymadisoncom-settle-ftc-state-charges-resulting.  The Government Settlements included a required payment by Avid in the amount of $1,657,000 to the FTC and the states.  That payment represented a partial suspension of a $17,500,000 settlement that was negotiated, and this suspension was expressly premised upon the truthfulness, accuracy, and completeness of Avid's sworn financial statements and related documents submitted to the FTC, dated September 30, 2016, October 17, 2016, and October 19, 2016 (collectively, "Financial Representations").[3]   *Id.*   In other words, much of the monetary obligations resulting from the settlement were "suspended based on ruby Corp.'s inability to pay."  *See*   https://ag.ny.gov/press-release/ag-schneiderman-announces-175-million-settlement-owner-ashleymadisoncom-joint-multi; *see also* Garrison Declaration*,* at ¶ 17.

---

[2] The FTC complaint charged that Avid misrepresented that it had taken reasonable steps to ensure AshleyMadison.com was secure, that it had received a "Trusted Security Award," and that it would delete all of the information of consumers who utilized their Full Delete service. The complaint also charged Avid with misrepresenting that communications received by members were from actual women when in fact they were from fake engager profiles.  Finally, the FTC alleged that Avid engaged in unfair security practices by failing to take reasonable steps to prevent unauthorized access to personal information on their network, causing substantial consumer harm.

[3] The suspension of the judgment was to be lifted as to Avid if, upon motion by the FTC, the court found that Avid failed to disclose any material asset, materially misstated the value of any asset, or made any other material misstatement or omission in the Financial Representations.

In the wake of the Government Settlements, Plaintiffs pushed back against Defendants, believing that a broader, more extensive settlement would serve the class's best interest, and engaged in further settlement discussions and negotiations directly with Defendants, and eventually through a mediator.  *See* Garrison Declaration, at ¶ 18.

To move negotiations forward following an impasse reached in February of 2017, the parties then engaged retired U.S. District Court Judge Layn Phillips to assist with further settlement discussions.   Declaration of Layn R. Phillips In Support of Motion for Preliminary Approval of Settlement, dated July 13, 2017, at ¶ 5 ("Phillips Declaration").  Under his guidance, the parties conducted an in-person mediation session on April 7, 2017, as well as numerous telephone conferences with Judge Phillips and co-mediator Michelle Yoshida.   *Id.* at ¶ 9.  Extensive mediation briefs were exchanged. *Id.* at ¶¶ 8-9.  The parties made progress on the general contours of a settlement, but could not agree on the amount of the settlement.  *Id.* at ¶¶ 9-10. Eventually, Judge Phillips made a mediator recommendation that formed the basis of a settlement in principle dated April 21, 2017.  *Id.* at ¶¶ 9-10; *see also* Garrison Declaration, at ¶ 19.

Once the agreement in principle was reached, the parties began the painstaking effort of negotiating the full Settlement Agreement. This process, too, was hard fought. The parties negotiated over virtually every aspect of the notice and claims process, and the best way to identify and compensate Class Members.  Thus, Class Counsel negotiated with Defendants literally up to the day of the filing of the preliminary approval motion in order to obtain the best relief possible for the class. Garrison Declaration, at ¶ 20.

## IV.    PRINCIPAL BENEFITS OF THE CLASS SETTLEMENT

The Settlement creates a Settlement Fund of $11.2 million, all of which—after deductions for Court-approved fees and costs—will be distributed to Class Members. No funds will revert to

Defendants.  Garrison Declaration, at ¶ 22.

The Settlement Fund will be used to compensate Class Members for three distinct types of losses and includes damages for having personal information released in the first instance.  Class Members will be reimbursed for losses they incurred for (a) purchasing Full Delete but still having their personal information released publicly as a result of the data breach ($19 for such claims up to a maximum of $500 for multiple accounts), (b) purchasing or using credits and having a good faith belief that they used those credits to communicate with engagers or "bots" (up to $500 for such claim), and (c) unreimbursed losses caused by the data breach that are not included in sections (a) and (b) including, without limitation, related to identity theft (up to $2000 for such claim).  Any funds remaining after allocations under Sections (a), (b), and (c) will be divided equally amongst those whose Personal Information was released publicly as a result of the Data Breach (such a claim being eligible to receive up to $500) for such claim.  These cash benefits will be distributed on a *pro rata* basis up to a maximum of $3,500 per class member.   The details of how this will work in light of various data limitations are set forth in the Settlement and described in the notices attached to the Settlement.   Garrison Declaration, at ¶ 23.

If the amounts paid in cash distributions do not exhaust the settlement fund, the remainder will be donated to an Internal Revenue Code Section 501(c)(3) charitable digital privacy or similar organization that is jointly chosen by class counsel and Avid.  Garrison Declaration, at ¶ 24.

If a Class Member believes the relief provided by the Settlement is inadequate for any reason, the Class Member can opt out of the Settlement.   In addition, the Settlement does not interfere with any of Avid's obligations under its agreements with the FTC or any state related to the data breach. Garrison Declaration, at ¶ 25.

## V.      ASSESSMENT OF LITIGATION RISKS

Although Plaintiffs believe they have evidence to support a finding that Defendants' lack of proper security protocols and concurrent marketing to consumers claiming they had implemented higher than industry standard security protocols caused their damages, this was far from an easy case.  Defendants' arguments concerning their (a) alleged arbitration clause and class arbitration waiver, (b) need to retain certain information for certain time periods from "Paid Delete" customers for financial and legal reasons, and (c) the alleged disclosure of the "engagers" in their terms and conditions present significant obstacles that could prevent certain claims from moving forward and can subvert class adjudication.   While Plaintiffs have what they believe to be strong arguments to the contrary, success is far from certain.  Garrison Declaration, at ¶ 26.

Defendants may also raise a *Spokeo* argument with respect to data breach victims and claim that Plaintiffs have no standing to sue in the first instance.  Although in this particular case, Plaintiffs do not think that argument has merit (and is especially meritless with respect to "Paid Delete" customers and those defrauded by engagers), there is a certain amount of risk in these arguments nonetheless, at least due to the continued development of case law and uncertainly after *Spokeo* raises concerns for those affected by the breach but that cannot show any concrete damages.  Moreover, as made abundantly clear in negotiations over the claims and allocation process, class certification could be difficult as well.   In a contested setting, Defendants would certainly take the position that determining any injury or damages resulting from the data breach would require extensive individual assessment.  Garrison Declaration, at ¶ 27.

Avid's financial condition is also a significant risk.  Avid represented to the FTC that its financial condition impaired its ability to pay more than $1,657,000 to the FTC and the states in the FTC action, representing a partial (and substantial) suspension of Avid's total settlement of

$17,500,000 there.  And that suspension was agreed to by the FTC and the states due to Avid's inability to pay, and as demonstrated through production of financial statements to the FTC. Plaintiffs reviewed the same financial statements that were provided to the FTC and similarly concluded that Avid's financial condition presented a significant threat to the ability to collect on any future judgment.  *Garrison Declaration,* at ¶ 28.

Considering all the risks, weighing them against the substantial recovery achieved in this case, and taking into account the potential recovery in the absence of a settlement, Plaintiffs believe that they have achieved an outstanding result for the Class.  *Garrison Declaration,* at ¶¶ 29, 34.

## VI.    NOTICE TO THE CLASS

In this particular case, direct notice to the class is impossible and has the potential to create further harm to Class Members.  *Garrison Declaration,* at ¶ 30.  First of all, the Defendants do not have verifiable email addresses or street addresses for all Class Members. *Id.*  Although AshleyMadison.com members were required to provide an email address when signing up for the website, those email addresses were not verified.  *Id.* In fact, individuals signed up using fabricated email addresses and even email addresses of other persons to avoid being identifiable to Defendants.  *Id.*  As such, Defendants have no reliable email addresses on file for Class Members. *Id.* Additionally, the addresses that Defendants have related to credit card transaction are not necessarily accurate or up to date (some being from as far back at 2008), and many persons never actually purchased anything on the site, so there is no street address stored for them.  *Id.*

Second, the security and privacy concerns of the Class Members, which were memorialized in the amicus brief filed by Amici Does 1 through 3 regarding Defendants' motion for protective order [Doc. No. 136] and in Plaintiffs' motion for leave to proceed under pseudonyms, are still an issue at the settlement stage of the litigation.  *Garrison Declaration,* at ¶ 31.  Specifically, the Amici

Does 1 through 3 intimated the following concerns, which Class Members have also identified to

Class Counsel:

> At the time of registration, each consumer reasonably expected that the information
> provided to Defendant would be kept highly confidential and secure against
> Hackers. Involvement on a website that facilitates extramarital affairs is a highly
> sensitive and confidential matter for virtually anyone engaging in such activity.
> Thus, Movants and other Consumers had a legitimate expectation of privacy in their
> data and never intended or anticipated that their information would be made public.

Doc. No. 136, at p. 12.   Indeed, "[p]rior dissemination of the Stolen Data has caused incalculable

damage to many Ashley Madison [c]onsumers and their families, including divorces and even

suicide of some [c]onsumers." *Id.* at p. 6.  Additionally, the Court's order on the pseudonym issue

found that

> the possible injury to Plaintiffs rises above the level of mere embarrassment or harm
> to reputation and weighs against public disclosure. Under the facts alleged, it
> appears this may be a case where the "injury litigated against would be incurred as
> a result of the disclosure of the plaintiff's identity." *M.M. v. Zavaras*, 139 F.3d 798,
> 803 (10th Cir. 1998). The disclosure of Plaintiffs' identities could expose their
> sensitive personal and financial information - information stolen from Avid when
> its computer systems were hacked - to public scrutiny and exacerbate the privacy
> violations underlying their lawsuit.

Doc. No. 138, pp. 6-7.  And while the Court ultimately required class representatives to use their

real names because of their position as representatives of the Class, the Court found that because

"class members are not typically testifying or offering evidence, they do not need to be specifically

identified by name in order to be part of the litigation; they merely need to be identifiable." *Id.*

p. 8.  With respect to email addresses and street addresses maintained by Defendants, and even

assuming they were 100% accurate (which they are not), these addresses may include the users'

business   address   or   marital   residence,   and   sending   communications   regarding

AshleyMadison.com to such addresses can create additional damage to Class Members.  Garrison

*Declaration,* at ¶ 31.  Implementation of a notice program that would cause even further harm to

Class Members by sending notice to wrong email addresses (implicating person that may never

have been on the site) or to marital or work addresses would be improper because it can create more of the very harm the case is intended to remedy in the first place.   *Id.*

For these reasons, the Notice Plan proposed here does not use email addresses or street addresses but rather is composed of both traditional consumer magazine publication(s), as well as highly targeted digital banner ads to reach the Class Members without creating collateral harm. Garrison Declaration*,* at ¶ 32; *see also* Declaration of Steven Weisbrot, Esq. On Adequacy of Notice Program, dated July 13, 2017, at ¶¶ 12-24 ("Weisbrot Declaration") (explaining Notice Program details).  The Notice Plan effectuates Rule 23's notice requirements and is laid out in detail along with the reach and frequency data that will deliver 75.3% reach with an average frequency of 3.04.  Garrison Declaration*,* at ¶ 32; *see also* Weisbrot Declaration, at ¶¶ 29-31. This Notice Plan will be effective at notifying the Class Members and will also avoid creating further harm that direct contact could create.  Garrison Declaration*,* at ¶ 32; *see also* Weisbrot Declaration, at ¶ 12.  The notice program here is designed with the desire to actually inform class members of their rights under the Settlement.  Weisbrot Declaration, at ¶ 32.  Indeed, the Notice Plan is the best notice practicable under the circumstances.  Garrison Declaration*,* at ¶ 32; *see also* Weisbrot Declaration, at ¶ 32.  In addition, given the significant public interest in this case, counsel anticipate substantial media coverage of the proposed Settlement.  *Id.*

## VII.   ARGUMENT

### A.   PROVISIONAL CLASS CERTIFICATION FOR PURPOSES OF SETTLEMENT SHOULD BE GRANTED

To qualify for certification, an action must satisfy all of the provisions of Federal Rule of Civil Procedure 23(a), plus one of the subdivisions of Rule 23(b). Fed. R. Civ. P. 23(a), (b). Rule 23(a) requires the proponents of certification to establish each of the following: (1) that the members of the proposed class are so numerous that joinder of the individual claims would be

impracticable; (2) that there are questions of law or fact common to the class; (3) that the claims of the proposed class representatives are typical of the claims of the Class Members; and (4) that the proposed class representatives will adequately represent the interests of the class. Fed. R. Civ. P. 23(a). As relevant here, Rule 23(b)(3) requires that the common questions of law and fact must predominate over individual questions, and the class must be superior to other available methods for fairly and efficiently adjudicating the controversy. *See In re Select Comfort Corp. Sec. Litig.,* 202 F.R.D. 598, 611 (D. Minn. 2001).

### 1.    Numerosity Is Satisfied.

For a class action to be appropriate, the proposed class must be so numerous that joinder of all members is "impracticable." Fed. R. Civ. P. 23(a)(1).  While there is no bright line test regarding the minimum number of plaintiffs needed to satisfy the numerosity requirement, there is support for certification of classes vastly smaller than the proposed class before this Court. *See Carpe v. Aquila, Inc.*, 224 F.R.D. 454, 457 (W.D. Mo. 2004) ("thousands of members geographically dispersed throughout the United States" satisfied numerosity requirement); *see also Ark. Educ. Ass'n v. Bd. of Educ.,* 446 F.2d 763, 765 (8th Cir.1971) (twenty class plaintiffs satisfied numerosity requirement). Satisfaction of the numerosity prong does not require that joinder be impossible, but only that plaintiffs will suffer a strong litigational hardship or inconvenience if joinder is required. *Id.*

Here, there are millions of potential Class Members whose data was released in the data breach or who made payments on AshleyMadison.com and who may recover under the settlement. *See* Amended Consolidated Complaint, paras. 83, 88, 92, 122.  Therefore, the proposed Class is sufficiently numerous to satisfy Rule 23(a)(1) on its face.

## 2.    There are Common Questions of Law and Fact.

A common question, for purposes of Rule 23(a)(2), is a "common contention" that is "of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011). What matters is "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (quoting Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. L.Rev. 97, 132 (2009)).  The existence of a single, common question will satisfy Rule 23(a)(2). *Id.* at 2556.

Here there are numerous common questions of fact that unite the class claims.  This includes (1) whether Defendants used reasonable care and commercially reasonable methods to secure and safeguard its customers' private and highly sensitive personal information; (2) for those Class Members who paid to exercise the "full delete" or "paid delete" option, and who are reimbursed under this settlement, whether Defendants in fact erased all evidence of the Class Members' usage and all personally identifiable information; (3) whether Defendants employed fake "bot" or "engager" accounts to improperly induce payments from Class Members; (4) whether Defendants participated in a scheme or plan to defraud the Class Members, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, promises, or omissions, with regards to the paid delete and bot issues; (5) whether Defendants' scheme violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962 (Count I); the Stored Communications Act ("SCA") 18 U.S.C. § 2702 (Count II) and the consumer fraud statutes of the respective states; and many other common questions of fact. *See* Consolidated Class Action Complaint, para. 124.  These common questions clearly satisfy the requirements of Rule 23(a)(2).

### 3.     Plaintiffs' Claims Are Typical of the Class.

Typicality under Rule 23(a)(3) means that there are "other members of the class who have the same or similar grievances as the plaintiff." *Carpe v. Aquila, Inc.*, 224 F.R.D. 454, 457 (W.D. Mo. 2004), *citing Donaldson v. Pillsbury Co.,* 554 F.2d 825, 830 (8th Cir. 1977), *cert. denied,* 434 U.S. 856, 98 S.Ct. 177, 54 L.Ed.2d 128 (1977). The burden is "fairly easily met so long as other Class Members have claims similar to the named plaintiff." *DeBoer v. Mellon Mortgage Co.,* 64 F.3d 1171, 1174 (8th Cir. 1995). Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory. *Donaldson,* 554 F.2d at 831; *see, e.g., DeBoer,* 64 F.3d at 1174–75 (typicality requirement satisfied even though Class Members held different mortgage instruments but sought same form of relief). "When the claims or defenses of the representative and the class are based on the same course of conduct or legal theory, it is thought that the representatives will advance the interest of the Class Members by advancing his or her own interests." *In re Control Data Corp. Sec. Litig.,* 116 F.R.D. 216, 220 (D. Minn. 1986) (citations omitted). Accordingly, courts have held that the burden of demonstrating typicality is fairly easily met. *DeBoer v. Mellon Mortgage Co.,* 64 F.3d 1171, 1174 (8th Cir. 1995).

Here, the plaintiffs and Class Members' claims are based on the same course of conduct and legal theories.  The same course of Defendants' conduct is at issue with regard to each of the Class Members who had information released as a part of the data breach.  Similarly, the same course of Defendants' conduct is at issue with regard to paid delete and credit payments.  Because the same course of conduct with regard to Defendants is at issue, Interim Class Counsel have brought claims under class-wide legal theories based on those courses of conduct.  Each of the named Plaintiffs in the Complaint are members of the data breach who had their personal

information disclosed.  Furthermore, Plaintiffs have suffered the same injuries as the other Class Members by making payments for the "paid delete" option or to purchase credits and services as a result of Defendants' use of bot accounts.   As such, the Plaintiffs' claims are typical of the class.

### 4.    Plaintiffs Have Adequately Represented the Class.

Under Rule 23(a)(4), a class representative must also "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  In order to meet this requirement, the Court must find that (1) the representatives and their counsel are able and willing to prosecute the action competently and vigorously and (2) each representative's interests are sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge. *Carpe,* 224 F.R.D. at 458.

 In this case, the Court appointed Interim Co-Lead Counsel, Liaison Counsel and an Executive Committee who have vigorously prosecuted this action on behalf of not only the Plaintiffs but also the entire proposed Class.  Counsel have demonstrated their willingness to vigorously represent the Class in this action. *See* Phillips Declaration, ¶¶ 14-16; *see also* Garrison Declaration, ¶¶5-20, 34.  Counsel have expended thousands of hours on this matter and close to one hundred thousand dollars in expenses, without compensation to date, in order to pursue this claim. *Id.*, ¶ 20.  Similarly, the Plaintiffs have stepped forward to represent the Class in connection with the proposed Settlement, in spite of the risk of great embarrassment.   Garrison *Id.*, ¶ 33. Plaintiffs have demonstrated their commitment to this litigation by responding to Defendants' written discovery requests, among other requests, both formal and informal. *Id.*  Furthermore, while many of the initial lawsuits relating to the Ashley Madison breach were brought by pseudonymous plaintiffs, the Court in this matter has required that Plaintiffs and putative class representatives bring claims in their own names. *Id.; see also* Doc. 138.   Each of the Plaintiffs

seeking approval of this settlement have done so.  Garrison Declaration, ¶ 33.

The claims of the Plaintiffs are sufficiently similar to those of the other members of the proposed Class that it is unlikely that the goals and viewpoints of the Plaintiffs and other Class Members will diverge.  *Id.*  Plaintiffs in most instances have been actively following this litigation for more than a year and a half and have been involved in and been consulted about the progress of the litigation, including settlement talks.  *Id.*  Each of the Plaintiffs have put substantial work into this litigation, have been committed to the litigation, and have been involved from start to finish.  *Id.*  Each of them also believe that the settlement represents a good outcome for the Class Members and is fair, adequate, and reasonable, and want to continue to represent the Class for settlement purposes because of how the Defendants' actions negatively impacted their lives.  *Id.* The proposed Class has been and is adequately represented for purposes of provisionally certifying the Class for settlement.  Garrison Declaration, ¶ 33.

### 5.   Certification Under Fed. R. Civ. P. Rule 23(b)(3):

In addition to Rule 23(a), certifying the proposed Class is appropriate because a class action in this litigation satisfies the requirements of predominance and superiority under Rule 23(b)(3).

### a.   Common Questions of Law and Fact Predominate Over Individual Questions.

A proposed class meets the predominance requirement of Rule 23(b)(3) when "the questions of law or fact common to Class Members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3); *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997). Courts have recognized that "[a]s with commonality and typicality requirements, the predominance inquiry is directed toward the issue of liability." *In re Select Comfort*, 202 F.R.D. at 610. When determining whether common questions predominate, courts "focus on the liability

issue … and if the liability issue is common to the class, common questions are held to predominate over individual questions." *Id.* (citations omitted). In the context of a proposed settlement class, "a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620 (citation omitted).

In the context of the proposed Settlement, the common questions identified above clearly predominate over individual issues, particularly on issues relating to liability. This is because the Plaintiffs and Class Members' claims all arise from a common set of circumstances relating to the Ashley Madison breach and a course of conduct by Defendants in operating the Ashley Madison website. As to those Plaintiffs and Class Members who purchased the "paid delete" option, common questions predominate not only on issues of liability, but also on issues of damages because each Class Member made the same payment of $19.00 to exercise that option.

**b.      Class Action is Superior to Other Available Methods for Resolving this Controversy.**

Consistent with Fed. R. Civ. P. 23(b)(3), a class action in this case is a superior method for resolving these claims. Class Members in many instances have suffered out-of-pocket economic damages of only $19.00 for purchases of the paid delete option or damages of hundreds of dollars or less for credits to use the website. The prosecution of separate actions by these Plaintiffs against these foreign Defendants would be impractical and the costs of prosecution would exceed what any Class Member has at stake. Each Class Member would be required to litigate Defendants' motion to compel arbitration and dispositive motions, perform discovery and prepare for trial. A multitude of such suits would also create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for the Defendants in this case and would lead to repetitious trials of the numerous common questions of fact and law.

Settling Plaintiffs have satisfied Rule 23(a) and (b)(3) for purposes of the proposed Settlement, and the Court should provisionally certify the proposed Class.

## B.    PRELIMINARY APPROVAL OF THE SETTLEMENT IS APPROPRIATE.

As a matter of long standing public policy, settlement is a strongly favored method for resolving disputes. *See Katun Corp. v. Clarke*, 484 F.3d 972, 975 (8th Cir. 2007); *Liddell v. Board of Educ. of the City of St. Louis*, 126 F.3d 1049, 1056 (8th Cir. 1997); *Petrovic v. Amoco Oil Co*., 200 F.3d 1140, 1148 (8th Cir. 1999) ("[S]trong public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor."). Especially in the context of class actions, the federal judiciary has a strong policy of promoting and encouraging settlements between litigating parties. *Schoenbaum v. E.I. Dupont De Nemours & Co.*, No. 4:05CV01108ERW, 2009 WL 4782082, at *2 (E.D. Mo. Dec. 8, 2009); *Cohn v. Nelson,* 375 F.Supp.2d 844, 852 (E.D.Mo.2005) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.") (internal citations and quotations omitted); *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 313 (7th Cir. 1980) ("there is an overriding public interest in favor of settlement," particularly in complex class actions, as settlement "minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.")  Furthermore, the Eighth Circuit has recently reaffirmed that a class action settlement agreement is "presumptively valid." *See Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015), *cert. denied*, 136 S. Ct. 1166, 194 L. Ed. 2d 177 (2016).

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval for the compromise of claims brought on a class basis. The procedure for review of a proposed class action settlement is a well-established process. *See* Manual for Complex Litigation § 13.14 (4th ed. 2007)

(hereinafter "Manual"). First, the Court conducts a preliminary hearing to determine whether the proposed settlement falls within the range of possible judicial approval. 4 Herbert B. Newberg, Newberg on Class Actions, § 11.25 (4th ed. 2002) ("Newberg"). Before scheduling the fairness hearing, the court makes preliminary determinations with respect to the fairness of the settlement terms, approves the means of notice to Class Members, and sets the date for that final hearing. *Schoenbaum v. E.I. Dupont De Nemours & Co.*, No. 4:05CV01108ERW, 2009 WL 4782082, at *2 (E.D. Mo. Dec. 8, 2009), *citing* Manual for Complex Litigation (Fourth) § 21.632 (2004) and *Liles v. Del Campo,* 350 F.3d 742, 745 (8th Cir.2003).

In determining whether preliminary approval is warranted, the sole issue before the Court is whether the proposed Settlement is within the range of what might be found fair, reasonable and adequate, so that notice of the proposed Settlement can be given to the Class Members and a hearing scheduled to consider Plaintiffs' motion for final approval of the proposed Settlement. *See, e.g., Xcel Energy, Inc*., 364 F. Supp. 2d 1005 (D. Minn. 2005). ***"[A] proposed settlement is presumptively reasonable at the preliminary approval stage, and there is an accordingly heavy burden of demonstrating otherwise*.*"*** *Schoenbaum*, 2009 WL 4782082, at *3 (E.D. Mo. Dec. 8, 2009). "At the preliminary approval stage, the 'fair, reasonable, and adequate' standard is lowered, with emphasis only on whether the settlement is within the range of possible approval due to an absence of any glaring substantive or procedural deficiencies." *Heldt v. Payday Fin., LLC*, No. 3:13-CV-03023-RAL, 2016 WL 96156, at *6 (D.S.D. Jan. 8, 2016). *See also* William B. Rubenstein, Newberg on Class Actions § 13: 13 (5th ed. 2011) ("[T]he standard that governs the preliminary approval inquiry is less demanding than the standard that applies at the final approval phase.")

The Eighth Circuit has established four factors for determining whether a proposed settlement is fair, reasonable and adequate: (1) the merits of plaintiffs' case, weighed against the terms of the settlement; (2) the defendant's financial conditions; (3) the complexity and expense of further litigation; (4) the amount of opposition to the settlement. *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015); *In re Wireless Tel Fed. Cost Recovery Fees Litig*., 396 F.3d 922, 932 (8th Cir. 2005). At the preliminary approval stage, only the first three factors are considered. *In re Wireless Tel*., 396 F.3d at 932. A court may also consider procedural fairness to ensure the settlement is not the product of collusion but resulted from arm's length negotiations. *In re Wireless*, 396 F.3d at 934; *DeBoer*, 64 F.3d at 1178.

> **1.      The Terms Of The Proposed Settlement Provide A Substantial Benefit To The Class And Are Fair And Reasonable, Particularly In Light of Defendants' Financial Condition.**

Plaintiffs will consider the first two factors together. *See In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013).  The first factor and most important consideration in deciding whether a settlement is fair, reasonable and adequate is "the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." *Petrovic*, 200 F.3d at 1150 (internal quotations omitted); *In re Wireless Tel.,* 396 F.3d at 932-33. The Court "cannot be expected to balance the scales with the nicety of an apothecary. The very object of compromise 'is to avoid the determination of sharply contested and dubious issues.'" *White,* 822 F. Supp. at 1417 (quotation omitted). Thus, the Court's determination generally "will not go beyond 'an amalgam of delicate balancing, gross approximation and rough justice.'" *Id.* (quotation omitted).

As discussed above, the settlement in this case provides an $11.2 million settlement fund. It provides compensation for each of the significant categories of damages to the class as set forth

in the Consolidated Complaint, including (1) compensation for those who spent $19.00 to have all information relating to their use of the Ashley Madison website permanently deleted (up to $500 for multiple accounts); (2) compensation for credits and other amounts spent on the website as a result of Defendants' use of "bot" or "engager" accounts (up to $500); and (3) other losses, including identity theft or other fraud, that resulted from the data breach (up to $2000).  Cash benefits will be distributed on a *pro rata* basis up to a maximum of $3,500 per Class Member. Remaining funds will be divided equally amongst class members injured from having personal, confidential information relating to use of the Ashley Madison website disclosed in the breach (up to $500).  In the event that the pro rata distribution of funds to these class members is economically impractical, the remaining will be donated to one or more Internal Revenue Code Section 501(c)(3) charitable digital privacy or similar organizations chosen jointly by Class Counsel (on behalf of the Settlement Class) and Avid (a "Charity").  *See* Motion for Preliminary Approval, Exs. 1, 2, and 3 (for a more detailed description of the cash benefits and distribution).

While Plaintiffs and counsel believe in the merits of the case against Defendants, they are mindful of significant challenges. A favorable ruling for Defendants on their Motion to Dismiss or Stay and Compel Arbitration could bring this class action to a quick end as individual class members are forced to either arbitrate their claims under the onerous terms of Defendants' arbitration clause, or abandon them altogether.  *See, supra,* Section V.  Defendants' arguments concerning their (a) alleged arbitration clause and class action waiver, (b) need to retain certain information for certain time periods from "Paid Delete" customers for financial and legal reasons, and (c) the alleged disclosure of the "engagers" in their terms and conditions present significant obstacles that could prevent certain claims from moving forward and can subvert class adjudication.  *Id.* Defendants may also raise a *Spokeo* argument with respect to data breach victims

and claim that Plaintiffs have no standing to sue.  *Id.*  Moreover, in a contested setting, Defendants would certainly take the position that determining damages resulting from the data breach would require extensive individual assessment.  *Id.*  While Plaintiffs have what they believe to be strong arguments to the contrary, success is far from certain.   *Id.*

Perhaps as importantly, should Plaintiffs and the Class proceed through further years of litigation to prevail at trial and on appeal and obtain a judgment significantly greater than $11.2 million, there remains a significant likelihood that Plaintiffs would never be able to recover that judgment from Defendants.  As discussed above, Avid's settlement with the federal government relating to the same conduct at issue in this case was for $17,500,000, however Avid was required to only make payment in the amount of $1,657,000 based on evidence of its inability to pay the full judgment, including sworn financial statements and related documents submitted to the FTC. Counsel for Plaintiffs have similarly reviewed the very same financial statements provided by Avid to the FTC, and have additionally reviewed Avid's insurance policies and verified Avid's representations that it lacks the ability to pay a higher settlement than what has been agreed to.

Of course, courts have approved settlements even where defendants could pay far more than they required by the settlement. *See Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1152 (8th Cir. 1999)("it is undisputed that Amoco could pay more than it is paying in this settlement, this fact, standing alone, does not render the settlement inadequate.")  And the situation where a defendant is simply not in a position to pay the full damages to the Class has been considered by courts to strongly support approval of class settlements based on this fact. *See In re Lucent Techs., Inc., Sec. Litig.*, 307 F. Supp. 2d 633, 646 (D.N.J. 2004).

Counsel are cognizant of the large size of the Class in this case.  The class of those who suffered from their personal information being released in the data breach numbers in the millions

in the United States.  Many of these class members have additional damages in the form of out of pocket payments for the "Paid Delete" option and/or for "credits" and other purchases from the Ashley Madison website.  By certain calculations, the universe of damages for this class could be greater than $11.2 million.  However, it is uncontroverted that Defendants simply "could not withstand a judgment reflecting the magnitude of potential damages in this Action." *See c.f., In re Lucent Techs.,* 307 F. Supp. 2d at 646.  This fact supports the fairness and reasonableness of the class settlement in this case.

An evaluation of the benefits of a settlement must be tempered by a recognition that any compromise involves concessions on the part of all settling parties. As this Court has noted: "The Court concludes that, at the time of settlement, there remained significant risk of a null recovery. This risk, balanced against the settlement's substantial recovery, favors approval." *In re UnitedHealth Group Inc. PSLRA Litig.,* 643 F. Supp. 2d 1094, 1099 (D. Minn. 2009). *See also Officers for Justice v. Civil Serv, Comm'n,* 688 F.2d 615, 624 (9th Cir. 1982) (noting that "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandonment of highest hopes.'" (citations omitted)); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (recognizing that a trial court should not make a proponent of a proposed settlement "justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained …"). Here, in Counsel for Plaintiffs' judgment, Defendants are not in a position to pay the full damages suffered by the Class, and are not even in a position to pay an amount any higher than the settlement.  Further, the insurance coverage at issue is a wasting asset in that it is reduced by attorneys' fees incurred by Defendants in litigating this case.  Furthermore, the Avid defendants are Canadian companies whose websites perform business all over the world.  There are other

pending legal matters and other potential liabilities relating to the claims at issue in this case that could further reduce Defendants' ability to satisfy a judgment.

The Court is also "entitled to rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement." *See In re Employee Benefit Plans Sec. Litig.,* No. 3-92-708, 1993 WL 330595, at *5 (D. Minn. June 2, 1993). *See also In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.,* 11-MD-2247 ADM /JJK, 2012 WL 2512750 (D. Minn. June 29, 2012) ("[C]ourts give great weight to and may rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement.") (quotations omitted); *Xcel Energy, Inc.,* 364 F. Supp. 2d at 1018.

Based on the risks of future litigation, including Defendants' arbitration motion, as well as Defendants' inability to pay  a greater judgment, Counsel have concluded that the Settlement is fair, reasonable, and adequate, and in the best interest of the proposed Class.   *See* Garrison Declaration, ¶ 34.  This assessment is shared by mediator and former District Judge Layn R. Phillips, who recommended the settlement amount.  *See* Phillips Declaration, ¶ 17.  For these reasons, the Court should grant preliminary approval.

## 2.   The Complexity and Expense of Continued Litigation Favor Preliminary Approval.

The complexity and expense of class action litigation is well-recognized. *See Schmidt v. Fuller Brush Co.,* 527 F.2d 532, 535 (8th Cir.1975) ("[r]ecognizing that class actions place an enormous burden of costs and expense upon the parties ..."). Moreover, as has been noted in other class action cases, "the various procedural and substantive defenses likely to be argued to the hilt by the…Defendants, the expense of proving Class Members' claims, the certainty of resolution under this Settlement forecloses any subsequent appeals, and the fear that the ultimate resolution of the action ... could well extend into the distant future," all weigh in favor of the Settlement's

approval. *In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.,* 11-MD-2247 ADM/JJK, 2012 WL 2512750 at *8 (D. Minn. June 29, 2012) (quoting *Snell v. Allianz Life Ins. Co. of N. Am.,* CIV. 97-2784 RLE, 2000 WL 1336640 (D. Minn. Sept. 8, 2000)).

Counsel for Plaintiffs has already invested significant resources, including thousands of hours of work, into this litigation over approximately the last two years, both in the individual cases prior to consolidation and in this MDL.  Garrison Declaration, ¶ 20.  This includes the litigation of multiple motions, interviewing and collecting information from potential plaintiffs/class representatives, creating a Consolidated Complaint setting forth the factual and legal theories of the plaintiffs, performing written discovery concerning Defendants' Motion to Dismiss or Stay and Compel Arbitration, obtaining the deposition of the Avid's corporate designee, and responding to Defendants' Motion to Dismiss.  *Id.*  However, this is only the beginning should the parties continue the litigation. Should Plaintiffs prevail on the arbitration motion, Defendants will certainly file Motions to Dismiss. Should Plaintiffs prevail, the parties will then proceed with formal discovery and depositions, much of which will involve burdensome travel to a foreign country where Defendants' reside. And, as set forth above, there is little likelihood that this additional work will ever result in a better outcome than that offered by the settlement, given Defendants' inability to satisfy a larger settlement. Under these circumstances, the complexity and expense of continuing the litigation heavily favors granting preliminary approval of the proposed Settlement.

### 3.     The Proposed Settlement Is the Result of Arm's-Length Negotiation, Which Favors Granting Preliminary Approval.

As discussed above, the terms of the proposed Settlement are the product of arm's-length negotiations conducted between counsel who are well experienced in complex litigation. *In re UnitedHealth Group Inc. S'holder Derivative Litig.*, 631 F. Supp. 2d 1151, 1158 (D. Minn. 2009);

*Xcel Energy, Inc.,* 364 F. Supp. 2d at 1018. During the settlement negotiations over the course of several months, including an in-person mediation with a well-experienced and qualified mediator, Plaintiffs' Counsel zealously advanced the position of Plaintiffs and the proposed Class and was fully prepared to continue to litigate rather than accept a settlement that was not in the best interest of the Plaintiffs and the proposed Class.  Garrison Declaration, ¶ 20.

Plaintiffs submit herewith the Declaration of Layn Phillips, the mediator in this case and a former United States Attorney and United States District Judge, describing the negotiations between the parties and the result obtained. Phillips Declaration, ¶¶ 1-17.   Judge Phillips offers his opinion that "Based on my experience as a litigator, a former U.S. District Judge, and a mediator, it is my opinion that the settlement reached by the parties is fair, reasonable, and adequate. It represents a fairly negotiated resolution of what would no doubt be expensive, time-consuming, and uncertain litigation, including appeals." Phillips Declaration, ¶ 17. This factor again weighs heavily in favor of preliminary approval.

## VIII.   THE PROPOSED NOTICE PROGRAM IS APPROPRIATE

Here, the proposed notice program will consist of the following: the notice plan is composed of both consumer magazine publications in People and Sports Illustrated, as well as serving 11,484,000 highly targeted digital banner ads to reach the prospective class members.  The recommended notice plan will deliver approximately 75.3% reach with an average frequency of 3.04   Weisbrot Declaration, at ¶¶ 8-30.

Fed. R. Civ. P. Rule 23(e)(1) provides that, in the settlement context, "[t]he court must direct notice in a reasonable manner to all Class Members who would be bound by the proposal." According to the *Manual*, Rule 23(e)(1)'s mandatory notice provision applies to all settlement classes, "regardless of whether the class certification under Rule 23(b)(1), (b)(2) or (b)(3)."

*Manual*, § 21.312 at 416. What constitutes reasonable notice under Rule 23(e)(1) depends on case-specific factors. "Trial courts are … afforded considerable discretion in fashioning notice appropriate to the particular circumstances[.]" Newberg § 8.13.

Here, class members will have 60 days from the Class Notice Date in which to opt-out of or object to the settlement.  This is plainly sufficient under applicable law.  *See In re Zurn Pex Plumbing Products Liab. Litig.*, 08-MDL-1958 ADM/AJB, 2012 WL 5055810 at *10 (D. Minn. Oct. 18, 2012) ("The opt-out period of 45 days provided for in the Settlement is reasonable."); *Xcel Energy,* 364 F. Supp. 2d 1005 (providing 55 days between mailing notice and final approval hearing); *In re Marsh & McLennan Companies, Inc. Sec. Litig.*, 04 CIV. 8144 (CM), 2009 WL 5178546 at *23(S.D.N.Y. Dec. 23, 2009) ("…the Notice plan satisfied due process. Notice was first mailed on November 13, 2009. Objections were due thirty days later on December 14, 2009. Courts have repeatedly found such a time period to constitute sufficient notice.").

Under Rule 23, class members must receive "the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(b).  "The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950).  "Th[e] [Supreme] Court has not hesitated to approve of resort to publication as a customary substitute in another class of cases where it is not reasonably possible or practicable to give more adequate warning." *Id.* at 317. "An elementary and fundamental requirement of due process ... is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314.  Courts have long accepted traditional paid media as a form of adequate notice. *Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758

F.2d 86, 90 (3d Cir. 1985) (It is well settled that in the usual situation first-class mail and publication in the press fully satisfy…notice requirements . . . and the due process clause.”).

In terms of Notice to the Class Member, the Notice Plan proposed here does not use email addresses or street addresses but rather is composed of both traditional consumer magazine publication(s), as well as highly targeted digital banner ads to reach the Class Members without creating collateral harm.   Garrison Declaration, at ¶ 32; Weisbrot Declaration, at ¶¶ 8-30.   As noted above, the unverified and incomplete information that Defendants have regarding Class Members’ email and street addresses, coupled with the concern of creating further harm by contacting Class Members at an inappropriate address—for instance, the work or marital address—create a situation where direct notice is impossible, and in any event, has the potential to create further harm to Class Members if used.  *See* Garrison Declaration, at ¶¶ 30-32; *see also* Weisbrot Declaration, at ¶¶ 12.   The Notice Plan proposed effectuates Rule 23’s notice requirements and is laid out in detail along with the reach and frequency data that will deliver 75.3% reach with an average frequency of 3.04 with respect to the internet campaign (users of AshleyMadison.com were obviously internet users).  *See* Garrison Declaration, at ¶ 32; *see also* Weisbrot Declaration, at ¶¶ 30-32.   Additionally, publication in standard media supplements the notice to achieve a program that is desirous to actually inform.  *See* Garrison Declaration, at ¶ 32; *see also* Weisbrot Declaration, at ¶¶ 32.   This Notice Plan will be effective at notifying the Class Members and will also avoid creating further harm that direct contact could create and is the best notice practicable under the circumstances.  *See* Garrison Declaration, at ¶ 32; *see also* Weisbrot Declaration, at ¶¶ 32.

For these reasons the Plaintiffs respectfully request that the Court approve the Notice Program.

## IX.     PROPOSED SCHEDULE FOR SETTLEMENT APPROVAL PROCESS

The Motion for Preliminary Approval and the Proposed Order submitted with the Motion set forth proposed dates or deadlines for: (a) preliminary approval of the Class Settlement; (b) The Settlement Website and the settlement notice on Class Counsels' websites to go live; (c) The Print Publication Notice and Online Publication Notice; (d) requests for exclusion from the Class Settlement (the Opt Out Deadline); (e) Objections to the Class Settlement, (the Objection Deadline); (f) Class Members to submit claims to the Settlement Administrator; (g) Class Counsel to file their Motion for Attorneys' Fees, Expenses, and Class Representative Incentive Awards; (h) the parties to file a response to any written Objection; and (i) a hearing date regarding Final Approval of the Class Settlement.  Plaintiffs respectfully submit that these dates are reasonable and in compliance with applicable legal principles, and therefore requests that the Court approve same.

## X.     CONCLUSION

As described above, the settlement negotiations in this case were intense, lengthy, and adversarial. Furthermore, both Plaintiffs' Counsel and counsel for Defendants are experienced in class action litigation and brought that experience to bear in both the prosecution and negotiation of this matter. Plaintiffs' Counsel respectfully submit that the proposed settlement is fair, reasonable, and adequate with respect to the Class. In light of both the nature of the negotiations and the informed recommendation of counsel, the Court should enter its Order granting preliminary approval to the settlement in this case.

WHEREFORE, the parties respectfully request that the Court enter an Order, substantially in the form attached as Exhibit A to the Class Agreement, (*1*) CERTIFYING the Class as a Settlement Class; (*2*) APPOINTING the Representative Plaintiffs as Class Plaintiffs and the law

firms of The Driscoll Firm, P.C., 211 N. Broadway, 40th Floor, St. Louis, Missouri 63102; Heninger Garrison Davis, LLC, 2224 1st Avenue North, Birmingham, Alabama 35203 and Dowd & Dowd, P.C., 211 North Broadway, Suite 4050, St. Louis, Missouri 63102 as Class Settlement Counsel; (*3*) GRANTING preliminary approval to the Class Agreement pursuant to Federal Rule of Civil Procedure 23(e); (*4*) SCHEDULING a fairness hearing and establishing all related deadlines; (*5*) DIRECTING that notice be provided to the Class in accordance with the Notice Program; and (*6*) PRELIMINARILY ENJOINING all Class Members who have not opted out from pursuing, as class members, actions based on or relating to the claims to be released by the Class Agreement; and further enjoining all persons from pursuing a lawsuit in any jurisdiction involving Class Members who have not timely excluded themselves that is based on or relating to the claims to be released by the Class Agreement.

Date:  July 14, 2017

Respectfully Submitted,

THE DRISCOLL FIRM, P.C.

By:      */s/ John J. Driscoll*
         John J. Driscoll (54729MO)
         Christopher J. Quinn (41883MO)
         Gregory G. Pals (48820MO)
         211 N. Broadway, 40th Floor
         St. Louis, Missouri 63102
         Tel.: (314) 932-3232
         Fax: (314) 932-3233
         john@thedriscollfirm.com
         chris@thedriscollfirm.com
         greg@thedriscollfirm.com

         W. Lewis Garrison, Jr.
         Christopher B. Hood
         Taylor C. Bartlett
         HENINGER GARRISON DAVIS, LLC
         2224 1st Avenue North
         Birmingham, Alabama 35203
         Tel.: (205) 326-3336
         Fax: (205) 326-3332
         wlgarrison@hgdlawfirm.com
         chood@hgdlawfirm.com
         taylor@hgdlawfirm.com

         James F. McDonough, III
         HENINGER GARRISON DAVIS, LLC
         3621 Vinings Slope, Suite 4320
         Atlanta, Georgia 30339
         Tel.: (404) 996-0869
         Fax: (205) 326-3332
         jmcdonough@hgdlawfirm.com

         *Plaintiffs' Interim Co-Lead Counsel*

         Douglas P. Dowd (29240MO)
         William T. Dowd (39648MO)
         Alex R. Lumaghi (56569MO)
         DOWD & DOWD, P.C.
         211 North Broadway, Suite 4050
         St. Louis, Missouri 63102
         Tel.: (314) 621-2500  Fax: (314) 621-2503
         doug@dowdlaw.net

33

bill@dowdlaw.net
alex@dowdlaw.net

*Plaintiffs' Interim Liaison Counsel*

John Arthur Eaves, Jr.
JOHN ARTHUR EAVES
ATTORNEYS AT LAW
101 North State Street
Jackson, Mississippi 39201
Tel.: (601) 355-7961
Fax: (601) 355-0530
johnjr@eaveslaw.com

Gary F. Lynch
Jamisen A. Etzel
CARLSON LYNCH SWEET &
KILPELA, LLP
1133 Penn Ave., 5th floor
Pittsburgh, Pennsylvania 15222
Tel.: (412) 322-9243
Fax: (724) 656-1556
glynch@carlsonlynch.com
jetzel@carlsonlynch.com

Thomas A. Zimmerman, Jr.
ZIMMERMAN LAW OFFICES, P.C.
77 West Washington Street, Suite 1220
Chicago, Illinois 60602
(312) 440-0020
tom@attorneyzim.com

Julian A. Hammond
Ari Cherniak
Polina Pecherskaya
HAMMONDLAW, P.C.
1180 S. Beverly Drive, Suite 610
Los Angeles, CA 90035
(310) 601-6766
(310) 295-2385 (Fax)
jhammond@hammondlawpc.com
acherniak@hammondlawpc.com
ppecherskaya@hammondlawpc.com

Katrina Carroll
Kyle Alan Shamberg

34

LITE DEPALMA GREENBERG
211 W. Wacker Drive, Ste. 500
Chicago, IL 60606
312-750-1591
Fax: 312-212-5919
kcarroll@litedepalma.com
kshamberg@litedepalma.com

*Plaintiffs' Interim Executive Committee*

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2017, the foregoing was filed electronically with the Clerk

of the Court to be served by operation of the Court's electronic filing system upon all parties.


*/s/ John J. Driscoll*