UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| IN RE:  ASHLEY MADISON CUSTOMER DATA SECURITY BREACH LITIGATION )<br>)<br>) | <br><br>MDL No. 2669 |
| This Document Relates to: )<br>) | <br>4:15-MD-2669-JAR |
| ALL CASES ) <br>) | |

**DECLARATION OF W. LEWIS GARRISON, JR. IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**

I, W. Lewis Garrison, Jr., declare as follows:

1. I am a partner at the law firm of Heninger Garrison Davis, LLC and head the firm's class action and mass tort group. A copy of Heninger Garrison Davis, LLC's class action and mass tort group resume is attached as Ex. 3 to the Motion for Appointment of Plaintiffs' Interim Liaison Counsel, Interim Co-Lead Counsel, and Interim Executive Committee filed in this case (Doc. No. 13) (the "Motion for Appointment of Interim Counsel"). John Driscoll is President of The Driscoll Firm, P.C. A copy of The Driscoll Firm, P.C.'s class action and mass tort group resume is attached is attached as Ex. 2 to the Motion for Appointment of Interim Counsel (*id.*). Douglas P. Dowd is a partner at Dowd & Dowd, P.C. A copy of Dowd & Dowd, P.C.'s class action and mass tort group resume is attached is attached as Ex. 1 to the Motion for Appointment of Interim Counsel (*id.*).

2. Heninger Garrison Davis, LLC and The Driscoll Firm, P.C., are co-lead counsel, and Dowd & Dowd, P.C. is liaison counsel, and together they represent Brian Farr, Steven Coward, Marc Benefield, Nhung Truong, Gustavo Alfaro, David Yagel, John Hiles III, Matthew Lisuzzo,

1

Britt Garrett, Christopher Russell, David Miller, James Mike Shows, Todd Witengier, Byron Goetting, Marvin Cabiness, Keith Macomber, Paul Jack, and Anthony Imbarrato (the "Class Representatives" or "Plaintiffs"), both individually and on behalf of the Settlement Class, in the consolidated class action filed against Defendants Ruby Corp. (previously named Avid Life Media Inc.) and Ruby Life Inc. (previously named Avid Dating Life Inc.) (together, "Avid), and Noel Biderman (altogether, "Defendants") in this District.

3. I submit this declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and for Certification of Settlement Class.[1]  I have personal knowledge of the information contained herein, and, if called as a witness, I could and would testify competently thereto.

### A. Class Counsel's Complex Litigation and Class Action Experience

4. Heninger Garrison Davis is experienced in handling complex class actions similar to this Action and is a national leader in consumer and class action litigation. Heninger Garrison Davis serves or has served as lead and co-lead counsel in many prominent class action cases throughout the country. *See generally* Motion for Appointment of Interim Counsel, Ex. 3.  The Driscoll Firm is also adept in the area of consumer and class action litigation, is a national leader in the same, and has served as lead and co-lead counsel in class actions around the country.  *See generally* Motion for Appointment of Interim Counsel, Ex. 2.  Similarly, Dowd & Dowd is skilled in the area of consumer and class action litigation.  *See generally* Motion for Appointment of Interim Counsel, Ex. 1. Co-lead and liaison counsel have proven track records of experience, knowledge, and success in litigating complicated litigation matters, including consumer data

---

[1] The capitalized terms in this declaration have the meanings ascribed to them in the Stipulation of Settlement ("Settlement"), filed concurrently.

security breach, consumer privacy and consumer fraud class actions.

**B. Investigation and Litigation of the Ashley Madison Data Breach, The Use of Bots to Engage Customers, and "Paid Delete" scam.**

5. Defendants operate social networking and dating websites including a site branded as "Ashley Madison" and located at www.ashleymadison.com. AshleyMadison described itself as "the most famous name in infidelity and married dating" and as a website for "discreet encounters between married individuals." Defendants marketed AshleyMadison to consumers in the United States, as well as to consumers in about 45 other countries. In order to sign up and use the website, Plaintiffs and putative class members (hereafter "Class Members") submitted highly sensitive information such as their names, addresses, telephone numbers, credit or debit card numbers, email addresses, dates of birth, gender, ethnicity, sexual preferences, and relationship status ("Personal Information").

6. The website is "designed to facilitate intimate relationships for individuals who are either married or in a committed relationship." *See* JPML Transfer Order (Dec. 9, 2015) [Doc. No. 1] at 1-2. Due to the sensitive nature of the website and information a consumer chose to share when activating an account, Defendants marketed to consumers that their network system and the servers that contained consumers' personal information were carefully monitored and equipped with the highest levels of security. In addition, Defendants made assertions regarding the sophistication of data theft prevention systems and its ability to protect users' Personal Information from third parties. Plaintiffs believe these assertions were false.

7. This litigation arises from a data security breach affecting AshleyMadison.com on approximately July 15, 2015. *See* JPML Transfer Order (Dec. 9, 2015) [Doc. No. 1] at 1-2. This data breach resulted in the electronic theft of personally identifiable and financial information of some 37 million users of AshleyMadison.com. On or about July 19, 2015, it was reported that

hackers had infiltrated Ashley Madison's computer systems. The intruders subsequently made various public statements that the database and underlying documents obtained from the systems, most particularly the private and sensitive information and data about Ashley Madison's members, would be leaked to the public. Then, roughly 30 days later, on August 18 and 20, 2015, the information compromised in the data breach was released on the Internet.

8.    The breach at issue resulted in the public release of personally identifiable and financial information contained in approximately 37 million AshleyMadison.com "user" accounts, and included account information of AshleyMadison.com "users" who had paid a fee to purge their information from the AshleyMadison.com database. *Id.* at 2. In addition, the data "dumps" revealed that AshleyMadison.com "made extensive use of artificial intelligence 'bots' and other mechanisms to mimic fake users (specifically, female users) on the Ashley Madison website in order to induce actual (predominantly male) users to make purchases." *Id.* "[P]laintiffs learned of this alleged fraudulent scheme through analysis of the data disclosed in the Ashley Madison data breach." *Id.* at 2.

**C. Litigation History**

9.    Plaintiff Jane Doe filed the first lawsuit regarding the Ashley Madison data breach in this Court on July 22, 2015. Over the course of the next month, at least four additional cases were filed, resulting in five separate actions pending in Federal court in four different states, alleging similar causes of action, all arising from the same data security breach involving the online dating site AshleyMadison.com. Plaintiff Jane Doe promptly a motion for transfer of those actions to this Court pursuant to 28 U.S.C. § 1407. On December 9, 2015, the Judicial Panel on Multidistrict Litigation ("JPML") transferred five related actions stemming from the breach to this

4

Court for coordinated pretrial proceedings. *Id.* at 3-4.[2]

10. On February 5, 2016, the Court appointed John J. Driscoll and The Driscoll Firm, P.C., and W. Lewis Garrison, Jr., and Heninger Garrison Davis, LLC, as Plaintiffs' Interim Co-Lead Counsel and Douglas P. Dowd and Dowd & Dowd, P.C. as Plaintiffs' Interim Liaison Counsel. *See* Doc. No. 87. Additionally, the Court appointed a Plaintiffs' Interim Executive Committee comprised of John Arthur Eaves, Jr., and the Eaves Law Firm; Gary F. Lynch and Carlson Lynch Sweet & Kilpela, LLP; Katrina Carroll and Lite DePalma Greenberg LLC; Julian A. Hammond and Hammondlaw P.C.; and Thomas A. Zimmerman, Jr. of Zimmerman Law Offices. *Id.*

---

[2] Over the course of the litigation, up to and including the present day, additional cases have been transferred into this MDL 2669, and in the end, the following cases are consolidated before this Court: *Doe, et al.* v. *Avid Life Media, Inc., et al.*, No. 15-cv-01132 (E.D. Mo., filed 7/22/15); *Doe* v. *Avid Life Media, Inc., et al.*, No. 15-cv-02750 (N.D. Tex., filed 8/21/15); *Doe 1, et al.* v. *Avid Life Media, Inc., et al.*, No. 15-cv-06405 (C.D. Cal., filed 8/21/15); *Doe 1, et al.* v. *Avid Life Media, Inc., et al.*, No. 15-cv-01347 (C.D. Cal., filed 8/24/15); *Doe* v. *Avid Life Media, Inc., et al.*, No. 15-cv-01464 (N.D. Ala., filed 8/25/15); *Doe 1, et al.* v. *Avid Life Media, Inc., et al.*, No. 15-cv-06619 (C.D. Cal., filed 8/28/15); *Doe* v. *Avid Life Media, Inc., et al.*, No. 15-cv-07760 (N.D. Ill., filed 9/2/15); *Doe* v. *Avid Life Media, Inc., et al.*, No. 15-cv-00386 (E.D. Va., filed 9/3/15); *Doe* v. *Avid Life Media, Inc., et al.*, No. 15-cv-07017 (S.D.N.Y., filed 9/4/15); *Doe 1, et al.* v. *Avid Life Media, Inc., et al.*, No. 15-cv-00658 (S.D. Miss., filed 9/8/15); *Russell* v. *Avid Life Media, Inc., et al.*, No. 15-cv-02693 (D. Md., filed 9/11/15); *Doe* v. *Avid Life Media, Inc., et al.*, No. 15-cv-08270, (N.D. Ill., filed 9/21/15); *Pauly* v. *Avid Life Media, Inc., et al.*, No. 15-cv-08842 (N.D. Ill, filed 10/5/15); *Doe* v. *Avid Life Media, Inc., et al.*, No. 15-cv-00640 (E.D. Ark., filed 10/16/15); *Berki, et al.* v. *Avid Life Media, Inc., et al.*, No. 15-cv-08208 (C.D. Cal., filed 10/20/15); *Poyet* v. *Avid Life Media, Inc., et al.*, No. 15-cv-08456 (C.D. Cal., filed 10/29/15); *Alfaro* v. *Avid Life Media, Inc., et al.*, No. 15-cv-02295 (C.D. Cal., filed 11/6/15); *Deloach* v. *Avid Life Media, Inc., et al.*, No. 15-cv-00299 (S.D. Ga., filed 11/10/15); *Campbell* v. *Avid Life Media, Inc., et al.*, No. 15-cv-09475 (C.D. Cal., filed 12/8/2015);[2] *Lisuzzo* v. *Avid Life Media, Inc., et al.*, No. 15-cv-11305 (N.D. Ill., filed 12/16/15); *Fipps* v. *Avid Life Media, Inc., et al.*, No. 16-cv-00152 (N.D. Ala., filed 1/27/16); *Scharf* v. *Avid Life Media Inc et al*, No. 16−cv-00225 (E.D. Ark., filed July 20, 2016); *Plaisance* v. *Avid Life Media, Inc. et al*, No. 16-cv-16077 (E.D. La., filed Nov. 4, 2016); *Doe 312017* v. *Avid Life Media, Inc.*, No. 17-2492 (C.D. Cal., filed March 30, 2017). Any action filed after the date of this Settlement Agreement that is transferred by the JPML to MDL 2669 shall be deemed to be included within the definition of Individual Actions.

5

11. Pursuant to the schedule entered by the Court, Plaintiffs' Interim Counsel filed their Motion for Leave to Proceed Under Pseudonyms on February 15, 2016, whereby they sought an order allowing plaintiffs to proceed with their causes of action under pseudonym names in order to reduce the risk of further personal and professional consequences resulting from the data breach. *See* Doc. No. 91. That Motion was denied on April 6, 2016 (*see* Doc. No. 138), with the Court requiring any plaintiff named in the consolidated class action complaint to be identified by their real name. *Id.*

12. Plaintiffs filed their First Amended Consolidated Class Action Complaint on June 24, 2016, whereby the Plaintiffs brought claim for violation of the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962), the Federal Stored Communications Act (18 U.S.C. § 2702), negligence and negligence *per se,* breach of implied contract – data breach, breach of contract – paid delete, unjust enrichment, negligent misrepresentation, violations of various state consumer fraud, protection, and record acts,[3] and violations of various state data breach

---

[3] These state statutes include: Alabama Deceptive Trade Practices Act, Ala. Code §§ 8-19-1 *et seq.*; Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1521, *et seq.*; Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101 *et seq.*; California Consumers Legal Remedies Act, California Civil Code §1750, *et seq.*; California Unfair Competition Law, California Business and Professions Code §17200, *et seq.*; and California False and Misleading Advertising Law, California Business and Professions Code §17500, *et seq.*; Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*; Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*; Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*; Louisiana Unfair Trade Practices and Consumer Protection Act ("LUTPA") La. Rev. Stat. Ann. § 51:1405 *et seq.*; Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101 *et seq.*; Minnesota Consumer Fraud Act, Minn. Stat. §§325F.68-325F.69 *et seq.*; Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq.*; Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.020 *et seq.*; Nevada Deceptive Trade Practices Act, Nev. Rev. Stat. § 41.600 *et seq.* and Nev. Rev. Stat. §§ 598.0915-598.0925; New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56-8-19, *et seq.*; North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 *et seq.*; Virginia Consumer Protection Act, Va. Code § 59.1-196 *et seq.*; Washington Consumer Protection Act, Rev. Code Wash. Ann. § 19.86.010, *et seq.*; and California's Customer Records Act, California Civil Code §1798.81.5.

notification statutes.[4] *See* Doc. No. 186.[5]

13. In anticipation of a motion to compel arbitration by Defendants, the parties engaged in extensive discovery on the issue of the arbitrability of the Plaintiffs' claims against Defendants, including an exchange of interrogatories and document requests related to the issue of arbitration *See* Doc. Nos. 189.  Plaintiffs were forced to file a motion to compel discovery related to certain information sought that was relevant to the arbitration issue. *See* Doc. No. 207. That motion was granted, and Defendants were ordered to respond to certain of Plaintiffs' arbitration related discovery, on August 24, 2016. *See* Doc. No. 228.

14. Defendants filed their Motion to Dismiss or to Stay and Compel Arbitration on August 29, 2016 (*see* Doc. Nos. 229, 230, 232, 233). In that motion, Defendants sought to compel all of the Plaintiffs into individual and binding arbitration, rather than being able to pursue their claims on behalf of a class in this Court.  Due to the nature of certain arguments, factual assertions, and a declaration filed by Defendants in support the Motion to Dismiss or to Stay and Compel Arbitration, Plaintiffs sought an extension of time to respond to the Motion to Dismiss or to Stay and Compel Arbitration and further sought leave from the Court at the September 9, 2016, status conference to depose declarant Rizwan Jiwan. *See* Doc. No. 237.  Such extension and leave sought were granted. *See* Doc. No. 241.  Following the Jiwan deposition, Plaintiffs opposed Defendants'

---

[4] These data breach notification statutes include:  Arizona – Ariz. Rev. Stat. § 44-7501; Arkansas - Ark. Code § 4-110-101 *et seq.*; California - Cal. Civ. Code §§ 1798.29, 1798.80 *et seq.*;  Colorado - Colo. Rev. Stat. § 6-1-716; Florida - Fla. Stat. §§ 501.171, 282.0041, 282.318(2)(i); Illinois - 815 ILCS §§ 530/1 to 530/25; Louisiana - La. Rev. Stat. §§ 51:3071 *et seq.*, 40:1300.111 to .116; Maryland - Md. Code Com. Law §§ 14-3501 *et seq.*, Md. State Govt. Code §§ 10-1301 to -1308; Minnesota - Minn. Stat. §§ 325E.61, 325E.64; Mississippi - Miss. Code § 75-24-29; Missouri - Mo. Rev. Stat. § 407.1500; New Jersey - N.J. Stat. § 56:8-161, -163; North Carolina - N.C. Gen. Stat §§ 75-61, 75-65; Virginia - Va. Code § 18.2-186.6, § 32.1-127.1:05, § 22.1-20.2; Washington - Wash. Rev. Code § 19.255.010, 42.56.590, 2015 H.B. 1078, Chapter 65.

[5] Plaintiffs filed their first Consolidated Class Action Complaint on June 3, 2016. *See* Doc. No. 180.

Motion to Dismiss or to Stay and Compel Arbitration (*see* Doc. Nos. 273-304), and Defendants replied in support of their motion with an additional declaration from Mr. Jiwan (*see* Doc. Nos. 314-5, 316-5), to which Plaintiffs objected and sought stricken from the record.  *See* Doc. No. 323.

15. The briefing was completed and the parties were set for oral argument.  However, the parties sought a continuance of oral argument on the Motion to Dismiss or to Stay and Compel Arbitration in order to make a good faith effort at resolving the case.

**D. The Settlement Negotiations Were Hard-Fought and Extensive**

16. The Parties first began discussing settlement in earnest in September of 2016. From September of 2016 through December of 2016, the parties worked together to try to reach a resolution of the litigation in light of the claims alleged, positions, and risks to the Parties in litigation.  Despite an extensive exchange of positions and information, and despite telephone conferences and an in person conference, the parties were unable to reach agreement.

17. On December 14, 2016, the Federal Trade Commission (FTC), working with a coalition of 13 states— Alaska, Arkansas, Hawaii, Louisiana, Maryland, Mississippi, Nebraska, New York, North Dakota, Oregon, Rhode Island, Tennessee, Vermont—and the District of Columbia announced settlements with Ruby Corp., formerly known as Avid Life Media Inc.; Ruby Life Inc. also doing business as AshleyMadison.com, formerly known as Avid Dating Life Inc.; and ADL Media Inc. (the "FTC Defendants") that resolved claims similar to those asserted by Plaintiffs in the First Amended Consolidated Class Action Complaint ("Government Settlements").[6]  *See, e.g.,* https://www.ftc.gov/news-events/press-releases/2016/12/operators-

---

[6] The FTC complaint charged that Avid misrepresented the steps they took to ensure AshleyMadison.com was secure, that they had received a "Trusted Security Award," and that they would delete all of the information of consumers who utilized their Full Delete service. The complaint also charged Avid with misrepresenting that communications received by members were from actual women when in fact they were from fake engager profiles.  Finally, the FTC

8

ashleymadisoncom-settle-ftc-state-charges-resulting. The Government Settlements included a required payment by the FTC Defendants in the amount of $1,657,000 to the FTC and the states. That payment represented a partial suspension of a $17,500,000 settlement that was negotiated, and this suspension was expressly premised upon the truthfulness, accuracy, and completeness of the FTC sworn Defendants' financial statements and related documents submitted to the FTC, dated September 30, 2016, October 17, 2016, and October 19, 2016 (collectively, "Financial Representations").[7]  *Id.*  In other words, much of the monetary obligations resulting from the settlement were "suspended based on ruby Corp.'s inability to pay." *See* https://ag.ny.gov/press-release/ag-schneiderman-announces-175-million-settlement-owner-ashleymadisoncom-joint-multi

18. In the wake of the Government Settlements, Plaintiffs pushed back against Defendants, believing that a broader, more extensive settlement would serve the class's best interest, and engaged in further settlement discussions and negotiations directly with Defendants, and eventually through a mediator.

19. To move negotiations forward following an impasse reached in February of 2017, the parties then engaged retired U.S. District Court Judge Layn Phillips to assist with further settlement discussions. Under his guidance, the parties conducted an in-person mediation session on April 7, 2017, as well as numerous telephone conferences with Judge Phillips and co-mediator Michelle Yoshida. Extensive mediation briefs were exchanged. The parties made progress on the general contours of a settlement, but could not agree on the amount of the settlement.

---

alleged that Avid engaged in unfair security practices by failing to take reasonable steps to prevent unauthorized access to personal information on their network, causing substantial consumer harm.

[7] The suspension of the judgment was to be lifted as to Avid if, upon motion by the FTC, the court found that Avid failed to disclose any material asset, materially misstated the value of any asset, or made any other material misstatement or omission in the financial representations.

Eventually, Judge Phillips made a mediator recommendation that formed the basis of a settlement in principle dated April 21, 2017.

20. Once the agreement in principle was reached, the parties began the painstaking effort of negotiating the full Settlement agreement. This process, too, was hard fought. The parties negotiated over virtually every aspect of the notice and claims process, and the best way to identify and compensate class members. Thus, we fought with Defendants literally up to the day of the filing of the preliminary approval motion to obtain the best relief possible for the class. We have expended thousands of hours working on this matter and close to a hundred thousand in expenses to pursue these claims. This includes the litigation of multiple motions, interviewing and collecting information from potential plaintiffs/class representatives, creating a Consolidated Complaint setting forth the factual and legal theories of the plaintiffs, performing written discovery concerning Defendants' Motion to Dismiss or Stay and Compel Arbitration, obtaining the deposition of the Avid Defendants' corporate designee, and responding to Defendants' Motion to Dismiss.

**E. Benefits Obtained for Class Members**

21. Other materials presented to the Court in support of preliminary approval define the Settlement Class, and describe the mechanics of the claims process and allocation. Rather than repeating this information, I believe it is useful to highlight some key features of the Settlement that are particularly noteworthy.

22. The Settlement creates a Settlement Fund of $11.2 million, all of which—after deductions for Court-approved fees and costs—will be distributed to Class Members. No funds will revert to Defendants.

23. The Settlement Fund will be used to compensate Class Members for three distinct

types of losses and includes damages for having personal information released in the first instance. Class Members will be reimbursed for losses they incurred for (a) purchasing Full Delete but still having their personal information released publicly as a result of the data breach ($19 for such claims up to a maximum of $500 for multiple accounts), (b) purchasing or using credits and having a good faith belief that they used those credits to communicate with engagers or "bots" (up to $500 for such claim), and (c) unreimbursed losses caused by the data breach that are not included in sections (a) and (b) including, without limitation, related to identity theft (up to $2000 for such claim).  Any funds remaining after allocations under Sections (a), (b), and (c) will be divided equally amongst those whose Personal Information was released publicly as a result of the Data Breach (such a claim being eligible to receive up to $500) for such claim.  These cash benefits will be distributed on a *pro rata* basis up to a maximum of $3,500 per class member.  The details of how this will work in light of various data limitations are set forth in the Settlement and described in the notices attached to the Settlement.

24. If the amounts paid in cash distributions does not exhaust the settlement fund, the remainder will be donated to an Internal Revenue Code Section 501(c)(3) charitable digital privacy organization that is jointly chosen by class counsel.

25. If a Class Member believes the relief provided by the Settlement is inadequate for any reason, the Class Member can opt out of the Settlement.  In addition, the Settlement does not interfere with any of Defendants' obligations under its agreements with the FTC or any state related to the data breach.

### F. Assessment of Risk

26. Although Plaintiffs believed they have evidence showing that Avid had a lack of proper security protocols while marketing to consumers claiming they had implemented higher

than industry standard security protocols, this was far from an easy case. Defendants' arguments concerning their (a) alleged arbitration clause and class action waiver, (b) need to retain certain information for certain time periods from "Paid Delete" customers for financial and legal reasons, and (c) disclosure of the engagers in their terms and conditions present significant obstacles that could prevent certain claims from moving forward and can subvert class adjudication. We have what we believe are strong arguments to the contrary, which we asserted in the litigation—but recognize that success is not a certainty.

27. Defendants may also raise a *Spokeo* argument with respect to data breach victims and claim that Plaintiffs have no standing to sue in the first instance. Although in this particular case we think that argument does not have any merit, and it is especially meritless with respect to "Paid Delete" customers and those defrauded by engagers, there is a certain amount of risk in these arguments nonetheless, at least due to the continued development of case law and uncertainly after *Spokeo* raises concerns for those affected by the breach but that cannot show any concrete damages. Moreover, as made abundantly clear in negotiations over the claims and allocation process, class certification could be difficult as well. In a contested setting, Defendants would certainly take the position that determining damages resulting from the data breach would require extensive individual assessment.

28. The Defendants financial condition is also a significant risk. Avid represented to the FTC that they were in poor financial condition, and the payment of $1,657,000 to the FTC and the states in the FTC action represented a partial (and substantial) suspension of Avid's total settlement of $17,500,000 there. And that suspension was agreed to by the FTC and the states due to Avid's inability to pay, and as demonstrated through production of financial statements to the FTC. We reviewed the same financial statements that were provided to the FTC, and we similarly

concluded that Avid's financial condition presented a significant threat to the ability to collect on any judgment.

29. Considering all the risks, weighing them against the substantial recovery achieved in this case, and taking into account the potential recovery in the absence of a settlement, we believe that we have achieved an outstanding result for the Class.

**G. Notice to the Class.**

30. In this particular case, direct notice to the class is impossible and has the potential to create further harm to Class Members. First of all, the Defendants do not have verifiable email addresses or street addresses for all Class Members. Although AshleyMadison.com members were required to provide an email address when signing up for the website, those email addresses were not verified. In fact, individuals signed up using fabricated email addresses and even email addresses of other persons to avoid being identifiable to Avid. As such, Avid has no verifiable (or reliable) email addresses on file for Class Members. Additionally, the addresses that Defendants have related to credit card transaction are not necessarily accurate or up to date (some being from as far back at 2008), and many persons never actually purchased anything on the site, so there is no street address stored for them.

31. Second, the security and privacy concerns of the Class Members, which were memorialized in the amicus brief filed by Amici Does 1 through 3 regarding Defendants' motion for protective order [Doc. No. 136] and in Plaintiffs' motion for leave to proceed under pseudonyms, remain an issue at the settlement stage of the litigation. Specifically, the Amici Does 1 through 3 intimated the following concerns, which many Class Members also have identified to Class Counsel:

> At the time of registration, each consumer reasonably expected that the information provided to Defendant would be kept highly confidential and secure against

13

> Hackers. Involvement on a website that facilitates extramarital affairs is a highly sensitive and confidential matter for virtually anyone engaging in such activity. Thus, Movants and other Consumers had a legitimate expectation of privacy in their data and never intended or anticipated that their information would be made public.

Doc. No. 136, at p. 12.  Indeed, "[p]rior dissemination of the Stolen Data has caused incalculable damage to many Ashley Madison [c]onsumers and their families, including divorces and even suicide of some [c]onsumers." *Id.* at p. 6.  Additionally, the Court's order on the pseudonym issue found that

> the possible injury to Plaintiffs rises above the level of mere embarrassment or harm to reputation and weighs against public disclosure. Under the facts alleged, it appears this may be a case where the "injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity." *M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir. 1998). The disclosure of Plaintiffs' identities could expose their sensitive personal and financial information - information stolen from Avid when its computer systems were hacked - to public scrutiny and exacerbate the privacy violations underlying their lawsuit.

Doc. No. 138, pp. 6-7.  And while the Court ultimately required class representatives to use their real names because of their position as representatives of the Class, the Court found that because "class members are not typically testifying or offering evidence, they do not need to be specifically identified by name in order to be part of the litigation; they merely need to be identifiable."  *Id.* p. 8.  With respect to email addresses and street addresses maintained by Defendants, and even assuming they were 100% accurate (which we know they are not), these addresses may include the users' business address or marital residence, and sending communications regarding AshleyMadison.com to such addresses can create even more damage to Class Members.  As Class Counsel, we cannot implement a notice program that would cause even further harm to Class Members by sending notice to wrong email addresses (implicating person that may never have been on the site) or to marital or work addresses.   The last thing we want to do is create more of the very harm the case is intended to remedy in the process of trying to compensate Class Members.

32.     For these reasons, the Notice Plan proposed here does not use email addresses or street addresses but rather is composed of both traditional consumer magazine publication(s), as well as highly targeted digital banner ads to reach the Class Members without creating collateral harm.  The Notice Plan effectuates Rule 23's notice requirements and is laid out in detail along with the reach and frequency data that will deliver 75.3% reach with an average frequency of 3.04.  This Notice Plan will be effective at notifying the Class Members and will also avoid creating further harm that direct contact could create.  Indeed, the Notice Plan represents the best notice practicable under the circumstances.  In addition, given the significant public interest in this case, counsel anticipate substantial media coverage of the proposed Settlement.

### H. The Named Plaintiffs

33.     The Plaintiffs have stepped forward to represent the Class in connection with the proposed Settlement despite the risk of great embarrassment and other adverse consequences.  Plaintiffs have demonstrated their commitment to this litigation by responding to Defendants' written discovery requests, and other formal and informal discovery.  Furthermore, while many of the initial lawsuits relating to the Ashley Madison breach were brought by pseudonymous plaintiffs, the Court in this matter has required that Plaintiffs and putative class representatives bring claims in their own names. *See* Doc. 138.  Each of the Plaintiffs seeking approval of this settlement have done so.  The claims of the Plaintiffs are sufficiently similar to those of the other members of the proposed Class that it is unlikely that the goals and viewpoints of the Plaintiffs and other Class Members will diverge.  Plaintiffs in most instances have been actively following this litigation for more than a year and a half and have been involved in and been consulted about the progress of the litigation, including settlement talks.  Each of the Plaintiffs have put substantial work into this litigation, have been committed to the litigation, and have been involved from start

to finish. Each of them also believes that the settlement represents a good outcome for the Class Members and is fair, adequate, and reasonable, and each wants to continue to represent the Class for settlement purposes because of how the Defendants' actions negatively impacted their lives. The proposed Class has been and is adequately represented for purposes of provisionally certifying the Class for settlement.

### I. Conclusion

34. Throughout the case, my colleagues and I have been dedicated to achieving the best result possible for the Class. We negotiated for months to ensure not just a fair result, but an outstanding result. The Settlement provides relief to customers for their Personal Information being released in the data breach, reimbursement for purchasing the "Paid Delete" service, and reimbursement for fees spent communicating with engagers, and it also adds significant additional relief, including for identity theft injury — a matter of significant concern to many Class Members. In our opinion, based on our substantial experience in complex, class action litigation, and our work in this case, we respectfully submit that the Settlement is fair, adequate, and reasonable, and warrants the Court's preliminary approval.

35. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of July, 2017, at Birmingham, Alabama.

_____
W. Lewis Garrison, Jr.