# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: ASHLEY MADISON CUSTOMER DATA SECURITY BREACH LITIGATION | ) ) ) ) | MDL No. 2669 |
| This Document Relates to: | ) ) | Case No. 4:15-MD-02669-JAR |
| ALL CASES | ) ) ) | |

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT, APPROVAL OF CY PRES DISTRIBUTION AND TO OVERRULE THE SINGLE "OBJECTION" TO THE SETTLEMENT

## I.      INTRODUCTION.

Plaintiffs' Class Settlement Counsel[1] submit this motion on behalf of the Plaintiffs named in the Consolidated Class Action Complaint, who have agreed to the Settlement, (the "Plaintiffs") and the proposed Class in support of the Motion for Final Approval.   Class Settlement Counsel respectfully request an Order granting final approval of the proposed settlement, approving the settlement as fair and reasonable, deeming Class Notice to be compliant with Federal Rule of Civil Procedure Rule 23 and due process, and granting final class certification for settlement purposes.  Class Settlement Counsel also request that the Court  issue an order (i) approving the distribution of the remainder of the Net Settlement Fund to any *cy pres* recipients (to whom a *pro rata* equal share of any remainder of the Settlement Fund will go) approved by the Court, and (ii) overruling Mr. O'Malley's objection to the settlement.   Class

---

[1] The Court appointed the law firms of The Driscoll Firm, P.C., 211 N. Broadway, 40th Floor, St. Louis, Missouri 63102; Heninger Garrison Davis, LLC, 2224 1st Avenue North, Birmingham, Alabama 35203, and Dowd & Dowd, P.C., 211 North Broadway, Suite 4050, St. Louis, Missouri 63102, as Class Settlement Counsel. *See* Preliminary Approval Order, at p. 2.

Settlement Counsel also include in this motion a list of exclusions, pursuant to the Preliminary Approval Order.[2]

After hard-fought litigation, Plaintiffs and Defendants reached a fair and reasonable settlement, which is memorialized in the Stipulation of Settlement, attached as "Exhibit 1" to the Motion for Preliminary Approval, including all exhibits to it (Doc. 343-1 to 343-7) (hereinafter, the "Stipulation").   As outlined in the Motion for Preliminary Approval, the proposed Settlement is an excellent result for the Class, given the risks and costs of continued litigation (including the risks relating to Defendants' Motion to Compel Arbitration), class certification, trial, and potential appeals. Class Settlement Counsel and other counsel for the Plaintiffs fully support the Settlement, having concluded that it is fair, reasonable, adequate, and in the best interests of the Plaintiffs and the Class.   *See* Doc. 343 and 344 (hereinafter, the "Motion for Preliminary Approval").[3]

On July 21, 2017, the Court issued an Order preliminarily approving the settlement, directing notice to the Class, scheduling a final approval hearing for November 20, 2017, and certifying a settlement Class.  *See* Doc. 354, Order Granting Preliminary Approval of Settlement, Directing Notice to the Class, Scheduling a Final Approval Hearing, and Certifying a Settlement Class (hereinafter, the "Preliminary Approval Order").   In short, the Settlement created a Settlement Fund of $11.2 million, all of which—after deductions for Court-approved fees and costs—is due to be distributed to Class Members subject to any remainder, which will go to a charitable organization and prevent future harms of the type that affected Class Members here.

---

[2] Any capitalized or defined terms used in this Motion shall be a reference to that capitalized or defined term in the Stipulation of Settlement, which is docketed at Doc. 343-1-343-7 (the "Stipulation").

[3] Plaintiffs hereby incorporate by reference the Motion for Preliminary Approval, including the supporting memorandum of authorities, all exhibits, and all declarations thereto (Docs. 343-344).

No funds will revert to Defendants.  *See* Doc. 344-1, Declaration of W. Lewis Garrison, Jr. in Support of Motion for Preliminary Approval or Settlement, at ¶ 22-24 (hereinafter, the "Garrison Declaration").

Pursuant to the Preliminary Approval Order, the Settlement Fund will be used to compensate Class Members for three distinct types of losses and includes damages for having personal information released in the first instance.  *Id.*  Class Members will be reimbursed for losses they incurred for (a) purchasing Full Delete but still having their personal information released publicly as a result of the data breach ($19 for such claims up to a maximum of $500 for multiple accounts), (b) purchasing or using credits and having a good faith belief that they used those credits to communicate with engagers or "bots" (up to $500 for such claim), and (c) unreimbursed losses caused by the data breach that are not included in sections (a) and (b) including, without limitation, related to identity theft (up to $2,000 for such claims).  *Id.*  Any funds remaining after allocations under Sections (a), (b), and (c) will be divided equally amongst those whose Personal Information was released publicly as a result of the Data Breach (such a claim being eligible to receive up to $500).  *Id.*  These cash benefits will be distributed on a *pro rata* basis up to a maximum of $3,500 per class member.[4]    *Id.*

If the amounts paid in cash distributions do not exhaust the settlement fund by the end of the claims deadline, the remainder will be donated to an Internal Revenue Code Section 501(c)(3) charitable digital privacy or similar organization that is jointly chosen by Class Settlement Counsel and Avid (the "Charities").  Garrison Declaration, at ¶ 24.  At the Fairness Hearing set for November 20, 2017, and with the Court's approval, the parties will jointly present to the Court a set of Charities as *cy pres* award nominees and will request that the Court issue an order

---

[4] The Settlement does not interfere with any of Avid's obligations under its agreements with the FTC or any state related to the data breach. Garrison Declaration, at ¶ 25.

splitting any remainder of the Settlement Fund among and between the set of Charities presented to the Court.[5]

Notice to the class was initiated on August 4, 2017, and was effectuated in accordance with the Preliminary Approval Order.   *See* Preliminary Approval Order, at pp. 8-10.  According to that same Preliminary Approval Order, Plaintiffs now move for final approval of the settlement and approval of attorneys' fees and costs.  They also include herein a list of opt-outs as required by that Order. Plaintiffs respectfully request that the Court certify the proposed Class for final purposes of settlement and grant final approval of the proposed Settlement.

## II.    THE SETTLEMENT SHOULD BE APPROVED AT THE FAIRNESS HEARING

As a matter of long standing public policy, settlement is a strongly favored method for resolving disputes. *See Katun Corp. v. Clarke*, 484 F.3d 972, 975 (8th Cir. 2007); *Liddell v. Board of Educ. of the City of St. Louis*, 126 F.3d 1049, 1056 (8th Cir. 1997); *Petrovic v. Amoco Oil Co*., 200 F.3d 1140, 1148 (8th Cir. 1999) ("[S]trong public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor."). Especially in the context of class actions, the federal judiciary has a strong policy of promoting and encouraging settlements between litigating parties. *Schoenbaum v. E.I. Dupont De Nemours & Co.*, No. 4:05CV01108ERW, 2009 WL 4782082, at *2 (E.D. Mo. Dec. 8, 2009); *Cohn v. Nelson,* 375 F.Supp.2d 844, 852 (E.D.Mo.2005) ("The law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation.") (internal citations and quotations omitted);  *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 313 (7th Cir. 1980) ("there is an overriding public interest in

---

[5] The parties are still in discussions about and attempting to agree upon the Charities to be nominated, and the parties should be able to propose the Charities prior to the Final Approval Hearing if the Court would prefer that.

favor of settlement," particularly in complex class actions, as settlement "minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources.")  Furthermore, the Eighth Circuit has recently reaffirmed that a class action settlement agreement is "presumptively valid." *See Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015), *cert. denied*, 136 S. Ct. 1166, 194 L. Ed. 2d 177 (2016).

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval for the compromise of claims brought on a class basis. The procedure for review of a proposed class action settlement is a well-established process. *See* Manual for Complex Litigation § 13.14 (4th ed. 2007) (hereinafter "Manual").  First, the Court conducts a preliminary hearing to determine whether the proposed settlement falls within the range of possible judicial approval. 4 Herbert B. Newberg, Newberg on Class Actions, § 11.25 (4th ed. 2002) ("Newberg"). Before scheduling the fairness hearing, the court makes preliminary determinations with respect to the fairness of the settlement terms, approves the means of notice to Class Members, and sets the date for that final hearing. *Schoenbaum v. E.I. Dupont De Nemours & Co.*, No. 4:05CV01108ERW, 2009 WL 4782082, at *2 (E.D. Mo. Dec. 8, 2009), *citing* Manual for Complex Litigation (Fourth) § 21.632 (2004) and *Liles v. Del Campo,* 350 F.3d 742, 745 (8th Cir. 2003).

The Court held the preliminary hearing on July 21, 2017.  On that same day, the Court determined that the proposed settlement fell within the range of judicial approval and authorized notice to the Class through the methods proposed in the Motion for Preliminary Approval and the attached Notice Plan.  The Court also set the date of November 20, 2017, for the final hearing to determine the fairness of the settlement.  This Motion argues that the Court should find the settlement fair, adequate, and reasonable, and order the settlement finally approved at that final hearing.

A.      **THE SETTLEMENT MERITS FINAL APPROVAL**

1.      **The Standards for Evaluating Final Approval of a Class Action Settlement.**

A class action settlement requires Court approval, and a settlement should be approved if the Court finds it "fair, reasonable, and adequate." See FED. R. CIV. P. 23(e)(2); *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999); *Van Horn v. Trickey*, 840 F.2d 604, 606 (8th Cir. 1988). In determining whether to approve a settlement, the district court acts as a fiduciary, serving as a guardian of the rights of absent class members. *See In re Wireless Tel.*, 396 F.3d at 932.  "A strong public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor." *Petrovic*, 200 F.3d at 1148. This policy is "particularly strong in the class action context." *In re Uponor, Inc.*, *F1807 Plumbing Fittings Prods. Liab. Litig.*, No. 11-MD-2247 ADM/JJK, 2012 WL 2512750, at *7 (D. Minn. June 29, 2012).

In the Eighth Circuit, district courts are required to consider four factors in determining whether a class action settlement is fair, reasonable, and adequate: (i) the merits of the plaintiffs' case, weighed against the terms of the settlement; (ii) the defendants' financial condition; (iii) the complexity and expense of further litigation; and (iv) the amount of opposition to the settlement. *See Wireless Tel.*, 396 F.3d at 932; *Van Horn*, 840 F.2d at 607; *Grunin v. Int'l House of Pancakes*, 513 F.2d 114,124 (8th Cir. 1975). These four factors are not exclusive; courts may also consider factors such as the arm's-length nature of the settlement negotiations, the experience and opinion of counsel on both sides, and the use of an independent mediator. *See, e.g., DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995); *Buckley v. Engle*, No. 8:07CV254, 2011 WL 2161135, at *2 (D. Neb. June 2, 2011).

Finally, in considering whether a settlement should be approved, the Court does not need to

resolve disputed issues and should not convert the approval hearing into a trial on the merits, as the purpose of a settlement is to avoid such a trial. See, e.g., *Wireless Tel.*, 396 F.3d at 932- 33; *DeBoer,* 64 F.3d at 1178; *Charter Commc'ns, Inc. Sec. Litig.*, No. MDL 1506, 3:02-CV-1186 CAS, 2005 WL 4045741, at *5 (E.D. Mo. June 30, 2005). Here, the proposed Settlement easily satisfies the Eighth Circuit criteria for approval.     Considering all of the risks, weighing them against the substantial recovery achieved in this case, and taking into account the potential recovery in the absence of a settlement, Plaintiffs believe that they have achieved an outstanding result for the Class.

      **2.**      **The Settlement Is Excellent and Satisfies Eighth Circuit Standards.**

            **a.**      **The terms of the settlement provide a substantial benefit to the class and are fair and reasonable, particularly in light of Defendants' financial condition.**

Plaintiffs will consider the first two factors together. *See In re Uponor, Inc., F1807 Plumbing Fittings Prod. Liab. Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013). The first factor and most important consideration in deciding whether a settlement is fair, reasonable and adequate is "the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." *Petrovic*, 200 F.3d at 1150 (internal quotations omitted); *In re Wireless Tel.,* 396 F.3d at 932-33. The Court "cannot be expected to balance the scales with the nicety of an apothecary. The very object of compromise 'is to avoid the determination of sharply contested and dubious issues.'" *White,* 822 F. Supp. at 1417 (quotation omitted). Thus, the Court's determination generally "will not go beyond 'an amalgam of delicate balancing, gross approximation and rough justice.'" *Id.* (quotation omitted).

As discussed above, the settlement in this case provides an $11.2 million settlement fund. It provides compensation for each of the significant categories of damages to the Class as set forth in the Consolidated Complaint, including (1) compensation for those who spent $19.00 to

have all information relating to their use of the Ashley Madison website permanently deleted (up to $500 for multiple accounts); (2) compensation for credits and other amounts spent on the website as a result of Defendants' use of "bot" or "engager" accounts (up to $500); and (3) other losses, including identity theft or other fraud, that resulted from the data breach (up to $2,000). Cash benefits will be distributed on a *pro rata* basis up to a maximum of $3,500 per Class Member.  Remaining funds will be divided equally amongst class members injured from having personal, confidential information relating to use of the Ashley Madison website disclosed in the breach (up to $500).  In the event that the *pro rata* distribution of funds to these class members is economically impractical, the remaining will be donated to one or more Internal Revenue Code Section 501(c)(3) charitable digital privacy or similar organizations chosen jointly by Class Settlement Counsel (on behalf of the Settlement Class) and Avid (a "Charity").  *See* Motion for Preliminary Approval, Exs. 1, 2, and 3 (for a more detailed description of the cash benefits and distribution).  If these distributions do not exhaust the Net Settlement Fund, the remainder will be donated to Charity subject to approval of the Court.  *See* Preliminary Approval Order, at p. 6.

Although Plaintiffs believe they have evidence to support a finding that Defendants' lack of proper security protocols and concurrent marketing to consumers claiming they had implemented higher than industry standard security protocols caused their damages, this was far from an easy case.  Defendants' arguments concerning their (a) alleged arbitration clause and class arbitration waiver, (b) need to retain certain information for certain time periods from "Paid Delete" customers for financial and legal reasons, and (c) the alleged disclosure of the "engagers" in their terms and conditions present significant obstacles that could prevent certain claims from moving forward and can subvert class adjudication.   While Plaintiffs have what they believe to be strong arguments to the contrary, success was far from certain.  Garrison

Declaration, at ¶¶ 26-27.[6]  For instance, a favorable ruling for Defendants on their Motion to Dismiss or Stay and Compel Arbitration could bring this class action to a quick end as individual class members are forced to either arbitrate their claims under the onerous terms of Defendants' arbitration clause, or abandon them altogether.  Moreover, Defendants' arguments concerning their need to retain certain information for certain time periods from "Paid Delete" customers for financial and legal reasons, and the alleged disclosure of the "engagers" in their terms and conditions present significant obstacles that could prevent certain claims from moving forward and can subvert class adjudication.  Defendants may also raise a *Spokeo* argument with respect to data breach victims and claim that Plaintiffs have no standing to sue.  Moreover, in a contested setting, Defendants would certainly take the position that determining damages resulting from the data breach would require extensive individual assessment.   While Plaintiffs have what they believe to be strong arguments to the contrary, success is far from certain.

Class Settlement Counsel are cognizant of the large size of the Class in this case.  The class of those who suffered from their personal information being released in the data breach numbers in the millions in the United States.  Many of these class members have additional damages in the form of out of pocket payments for the "Paid Delete" option and/or for "credits" and other purchases from the Ashley Madison website.  By certain calculations, the universe of damages for this class could be greater than $11.2 million.  However, it is clear that Defendants

---

[6] Defendants also had a *Spokeo* argument with respect to data breach victims and claim that Plaintiffs have no standing to sue in the first instance.  Although in this particular case, Plaintiffs do not think that argument has merit (and is especially meritless with respect to "Paid Delete" customers and those defrauded by engagers), there is a certain amount of risk in these arguments nonetheless, at least due to the continued development of case law and uncertainly after *Spokeo* raises concerns for those affected by the breach but that cannot show any concrete damages. Moreover, as made abundantly clear in negotiations over the claims and allocation process, class certification could be difficult as well.   In a contested setting, Defendants would certainly take the position that determining any injury or damages resulting from the data breach would require extensive individual assessment.  Garrison Declaration, at ¶ 27.

simply "could not withstand a judgment reflecting the magnitude of potential damages in this Action." *See c.f., In re Lucent Techs.*, 307 F. Supp. 2d at 646.  Should Plaintiffs and the Class proceed through further years of litigation to prevail at trial and on appeal and obtain a judgment significantly greater than $11.2 million, there remains a significant likelihood that Plaintiffs would never be able to recover that judgment from Defendants.  Avid's financial condition is a significant risk, which is supported by the fact that it represented to the FTC that its financial condition impaired its ability to pay more than $1,657,000 to the FTC and the states in the FTC action, representing a partial (and substantial) suspension of Avid's total settlement of $17,500,000 there.  And that suspension was agreed to by the FTC and the states due to Avid's inability to pay, and as demonstrated through production of sworn financial statements to the FTC.

Plaintiffs reviewed the same financial statements that were provided to the FTC and similarly concluded that Avid's financial condition presented a significant threat to the ability to collect on any future judgment.   *Garrison Declaration*, at ¶ 28.  Class Settlement Counsel have additionally reviewed Avid's insurance policies and verified Avid's representations that it lacks the ability to pay a higher settlement than what has been agreed to.   There is no doubt that Defendants' financial condition weighs in favor of approval of the Settlement. *See, e.g., Charter Commc'ns*, 2005 WL 4045741, at *8 (approving settlement and noting that even if lead plaintiffs prevailed on their claims and overcame liability challenges, there were considerable risks regarding its ability to collect any sizeable judgment from defendant); *In re Northfield Labs, Inc. Sec. Litig.*, No. 06 C 1493, 2012 WL 2458445, at *3 (N.D. Ill. June 26, 2012) (granting final approval to settlement and noting that the "plaintiff class is unlikely ever to get more").

Of course, courts have approved settlements even where defendants could pay far more than required by the settlement. *See Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1152 (8th Cir. 1999)("it is undisputed that Amoco could pay more than it is paying in this settlement, this fact, standing alone, does not render the settlement inadequate.")  And the situation where a defendant is simply not in a position to pay the full damages to the Class has been considered by courts to strongly support approval of class settlements based on this fact. *See In re Lucent Techs., Inc., Sec. Litig.*, 307 F. Supp. 2d 633, 646 (D.N.J. 2004).

An evaluation of the benefits of a settlement must be tempered by a recognition that any compromise involves concessions on the part of all settling parties. As Courts in this circuit have noted: "The Court concludes that, at the time of settlement, there remained significant risk of a null recovery. This risk, balanced against the settlement's substantial recovery, favors approval." *In re UnitedHealth Group Inc. PSLRA Litig.,* 643 F. Supp. 2d 1094, 1099 (D. Minn. 2009). *See also Officers for Justice v. Civil Serv., Comm'n,* 688 F.2d 615, 624 (9th Cir. 1982) (noting that "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandonment of highest hopes.'" (citations omitted)); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) (recognizing that a trial court should not make a proponent of a proposed settlement "justify each term of settlement against a hypothetical or speculative measure of what concessions might have been gained …").  Here, in Class Settlement Counsel's judgment, Defendants are not in a position to pay the full damages suffered by the Class, and are not even in a position to pay an amount any higher than the settlement.  Further, the insurance coverage at issue is a wasting asset in that it is reduced by attorneys' fees incurred by Defendants in litigating this case. Furthermore, the Avid defendants are Canadian companies whose websites perform business all

over the world.  There are other pending legal matters and other potential liabilities relating to the claims at issue in this case that could further reduce Defendants' ability to satisfy a judgment.

### b. The complexity and expense of continued litigation favor final approval.

The complexity and expense of class action litigation is well-recognized. *See Schmidt v. Fuller Brush Co.,* 527 F.2d 532, 535 (8th Cir. 1975) ("[r]ecognizing that class actions place an enormous burden of costs and expense upon the parties ..."). Moreover, as has been noted in other class action cases, "the various procedural and substantive defenses likely to be argued to the hilt by the…Defendants, the expense of proving Class Members' claims, the certainty of resolution under this Settlement forecloses any subsequent appeals, and the fear that the ultimate resolution of the action ... could well extend into the distant future," all weigh in favor of the Settlement's approval. *In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.,* 11-MD-2247 ADM/JJK, 2012 WL 2512750 at *8 (D. Minn. June 29, 2012) (quoting *Snell v. Allianz Life Ins. Co. of N. Am.,* CIV. 97-2784 RLE, 2000 WL 1336640 (D. Minn. Sept. 8, 2000)).

Class Settlement Counsel have invested significant resources in this MDL after the plaintiffs steering committee was appointed, including thousands of hours of work and about $100,000 in expenses.  Garrison Declaration, ¶ 20.  This includes the litigation of multiple motions, interviewing and collecting information from potential plaintiffs/class representatives, creating a Consolidated Complaint setting forth the factual and legal theories of the plaintiffs, performing written discovery concerning Defendants' Motion to Dismiss or Stay and Compel Arbitration, obtaining the deposition of Avid's corporate designee, and responding to Defendants' Motion to Dismiss.  *Id.*  However, this is only the beginning should the parties continue the litigation. Should Plaintiffs prevail on the arbitration motion, Defendants will certainly file Motions to Dismiss. Should Plaintiffs prevail, the parties will then proceed with

formal discovery and depositions, much of which will involve burdensome travel to a foreign country where Defendants reside. And, as set forth above, there is little likelihood that this additional work will ever result in a better outcome than that offered by the settlement, given Defendants' inability to satisfy a larger settlement. Under these circumstances, the complexity and expense of continuing the litigation heavily favors granting final approval of the proposed Settlement.

### c.   There is little opposition to the settlement.

The reaction of the Class to the Settlement, to date, also strongly supports final approval. A lack of objections relative to the size of the Class is a "strong indicator" that the class as a whole views the settlement as fair, and weighs heavily in favor settlement." *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, No. MDL 1559, 2004 WL 3671053, at *13 (W.D. Mo. Apr. 20, 2004); *see also DeBoer v. Mellon Mortg. Corp.*, 64 F.3d 1171, 1178 (8th Cir.1995) ("The fact that only a handful of class members objected to the settlement similarly weighs in its favor"); *In re BankAm. Corp. Sec. Litig*, 210 F.R.D. 694, 702 (E.D. Mo. 2002) ("With respect to class members' opinions, the Court finds it significant that fewer than ten objections were filed[.]").

Pursuant to the Preliminary Approval Order, the Court-appointed Claims Administrator, Angeion Group ("Angeion"), implemented the Notice Plan in this matter as described by it in the Declaration of Steven Weisbrot, Esq. on Adequacy of Notice Program, dated July 13, 2017 (Doc. 344-3, and hereafter the "Weisbrot Declaration").  The Notice Plan in this matter was comprised of a combination print media campaign, national press release, and a state-of-the-art targeted internet banner ad notice campaign based on objective syndicated data to reach the Class.  *See* Weisbrot Declaration, ¶¶8-29.   The Notice Plan and accompanying Long Form Notice and Summary Publication Notice set forth the terms of the Settlement in detail and informed Class Members of their right to object to any aspect of the Settlement or the request for attorneys' fees

within 60 days of the Class Notice Date.  Stipulation, at Exs. B-D; Preliminary Approval Order, p. 10.  The Notice also set forth that Class Members could seek exclusion from the Class, and the procedures for doing so.  Stipulation, at Exs. B-D; Preliminary Approval Order, p. 10.   As noted, the deadline for objections and exclusions was October 3, 2017.

In total, there was one objection filed.  That objection is as follows:

1.      Objection from Mr. O'Malley – Mr. O'Malley is not represented, and he believes Avid should pay more to him for settlement because his "personal and financial injury is still ongoing and will continue right up until [he] die[s]." Mr. O'Malley believes Avid was rewarded in this settlement by being allowed to continue to exist.  While characterized as an objection, this objection does not actually point out any issues with the settlement in a way that could be addressed by the Court.  The objection also does not state what a good settlement would have been.  *See* Exhibit 1.

The small number of objections (only one) is a strong indicator that the settlement was fair, adequate, and reasonable, and weighs heavily in favor of final approval.  *See In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, No. MDL 1559, 2004 WL 3671053, at *13; *DeBoer*, 64 F.3d at 1178; *In re BankAm. Corp. Sec. Litig*, 210 F.R.D. at 702.

### d.  The proposed settlement is the result of arm's-length negotiation through the use of a mediator, which favors granting final approval.

As discussed in the Motion for Preliminary Approval, the terms of the proposed Settlement are the product of arm's-length negotiations conducted between counsel who are well experienced in complex litigation. *In re UnitedHealth Group Inc. S'holder Derivative Litig*., 631 F. Supp. 2d 1151, 1158 (D. Minn. 2009); *Xcel Energy, Inc.,* 364 F. Supp. 2d at 1018. During the settlement negotiations over the course of several months, including an in-person mediation with a well-experienced and qualified mediator, Class Settlement Counsel zealously advanced the

position of Plaintiffs and the proposed Class and was fully prepared to continue to litigate rather than accept a settlement that was not in the best interests of the Plaintiffs and the proposed Class. Garrison Declaration, ¶ 20.

Plaintiffs also submitted with the Motion for Preliminary Approval the Declaration of Layn Phillips, the mediator in this case and a former United States Attorney and United States District Judge, describing the negotiations between the parties and the result obtained.  *See* Doc. 344-2, Declaration of Layn R. Phillips in Support of Motion for Preliminary Approval of Settlement, dated July 13, 2017, at ¶¶ 1-17 (the "Phillips Declaration").  Judge Phillips offered his opinion that "[b]ased on my experience as a litigator, a former U.S. District Judge, and a mediator, it is my opinion that the settlement reached by the parties is fair, reasonable, and adequate. It represents a fairly negotiated resolution of what would no doubt be expensive, time-consuming, and uncertain litigation, including appeals." Phillips Declaration, ¶ 17.  This factor also weighs in favor of final approval.

> **e.     Class Settlement Counsel also believe that this settlement is in the best interest of the Class Members.**

The Court is also "entitled to rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement." *See In re Employee Benefit Plans Sec. Litig.,* No. 3-92-708, 1993 WL 330595, at *5 (D. Minn. June 2, 1993). *See also In re Uponor, Inc., F1807 Plumbing Fittings Products Liab. Litig.,* 11-MD-2247 ADM /JJK, 2012 WL 2512750 (D. Minn. June 29, 2012) ("[C]ourts give great weight to and may rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement.") (quotations omitted); *Xcel Energy, Inc.,* 364 F. Supp. 2d at 1018.  Based on the risks of future litigation, including Defendants' arbitration motion, as well as Defendants' inability to pay  a greater judgment, Class Settlement Counsel have concluded that the Settlement is fair, reasonable, and

adequate, and in the best interest of the proposed Class. *See* Garrison Declaration, ¶ 34. This assessment is shared by mediator and former District Judge Layn R. Phillips, who recommended the settlement amount. *See* Phillips Declaration, ¶ 17. For these reasons, the Court should grant preliminary approval.

In sum, all of the factors considered by courts in the Eighth Circuit support approval of the Settlement as fair, reasonable, and adequate.

### B.       NOTICE TO THE CLASS SATISFIED RULE 23 AND DUE PROCESS.

Fed. R. Civ. P. Rule 23(e)(1) provides that, in the settlement context, "[t]he court must direct notice in a reasonable manner to all Class Members who would be bound by the proposal." According to the *Manual*, Rule 23(e)(1)'s mandatory notice provision applies to all settlement classes, "regardless of whether the class certification under Rule 23(b)(1), (b)(2) or (b)(3)." *Manual*, § 21.312 at 416. What constitutes reasonable notice under Rule 23(e)(1) depends on case-specific factors. "Trial courts are … afforded considerable discretion in fashioning notice appropriate to the particular circumstances[.]" Newberg § 8.13.

Under Rule 23, class members must receive "the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(b). "The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950). "Th[e] [Supreme] Court has not hesitated to approve of resort to publication as a customary substitute in another class of cases where it is not reasonably possible or practicable to give more adequate warning." *Id.* at 317. "An elementary and fundamental requirement of due process ... is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314. Courts have long accepted traditional paid media as a form of adequate notice. *Zimmer Paper Prods., Inc. v. Berger & Montague,*

*P.C.*, 758 F.2d 86, 90 (3d Cir. 1985) (It is well settled that in the usual situation first-class mail and publication in the press fully satisfy…notice requirements . . . and the due process clause.").

### 1.    The Notice Plan Had a Desire to Inform the Class Members and Was the Best Notice Practical Under the Circumstances.

As explained in the Motion for Preliminary Approval and at the associated hearing, direct notice to the Class was impossible in this case, and even if it were possible, direct notice had the potential to create further harm to Class Members.  Garrison Declaration, at ¶ 30.  First of all, the Defendants did not have verifiable email addresses or street addresses for the Class Members. *Id.* Although AshleyMadison.com members were required to provide an email address when signing up for the website, those email addresses were never verified.  *Id.* In fact, individuals signed up using fabricated email addresses and even email addresses of other persons to avoid being identifiable to Defendants.  *Id.*  As such, Defendants have no reliable email addresses on file for Class Members.  *Id.* Additionally, the addresses that Defendants had related to credit card transactions were not accurate or up to date (some Class Members' activity being from as far back as 2008), and many persons never actually purchased anything on the site, so there was no contact information at all stored for them.  *Id.*

Secondly, the security and privacy concerns of the Class Members, which were memorialized in the amicus brief filed by Amici Does 1 through 3 regarding Defendants' motion for protective order [Doc. No. 136] and in Plaintiffs' motion for leave to proceed under pseudonyms, were and are still an issue at the settlement stage of the litigation.  Garrison Declaration, at ¶ 31.  Specifically, the Amici Does 1 through 3 intimated the following concerns, which Class Members have also identified to Class Settlement Counsel:

> At the time of registration, each consumer reasonably expected that the information provided to Defendant would be kept highly confidential and secure against Hackers. Involvement on a website that facilitates extramarital affairs is a highly sensitive and confidential matter for virtually anyone engaging in such

activity. Thus, Movants and other Consumers had a legitimate expectation of privacy in their data and never intended or anticipated that their information would be made public.

Doc. No. 136, at p. 12.    Indeed, "[p]rior dissemination of the Stolen Data has caused incalculable damage to many Ashley Madison [c]onsumers and their families, including divorces and even suicide of some [c]onsumers." *Id.* at p. 6.   Additionally, the Court's order on the pseudonym issue found that

> the possible injury to Plaintiffs rises above the level of mere embarrassment or harm to reputation and weighs against public disclosure. Under the facts alleged, it appears this may be a case where the "injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity." *M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir. 1998). The disclosure of Plaintiffs' identities could expose their sensitive personal and financial information - information stolen from Avid when its computer systems were hacked - to public scrutiny and exacerbate the privacy violations underlying their lawsuit.

Doc. No. 138, pp. 6-7.  And while the Court ultimately required class representatives to use their real names because of their position as representatives of the Class, the Court found that because "class members are not typically testifying or offering evidence, they do not need to be specifically identified by name in order to be part of the litigation; they merely need to be identifiable." *Id.* p. 8.  With respect to email addresses and street addresses maintained by Defendants, and even assuming they were 100% accurate (which they are not), these addresses may include the users' business address or marital residence, and sending communications regarding AshleyMadison.com to such addresses can create additional damage to Class Members. *Garrison Declaration,* at ¶ 31.  Implementation of a notice program that would cause even further harm to Class Members by sending notice to wrong email addresses (implicating a person that may never have been on the site) or to marital or work addresses would have been wholly improper because it would have created more of the very harm the case was intended to remedy in the first place. *Id.*

18

For these reasons, the Notice Plan proposed in the Motion for Preliminary Approval did not use email addresses or street addresses but rather was composed of both highly targeted digital banner ads, a press release, and traditional consumer magazine publication(s) to reach the Class Members without creating collateral harm. Garrison Declaration, at ¶ 32; *see also* Weisbrot Declaration, at ¶¶ 12-24 (explaining Notice Program details).  The Notice Plan effectuated Rule 23's notice requirements and was laid out in detail along with the reach and frequency data that delivered 75.3% reach with an average frequency of 3.04.  Garrison Declaration, at ¶ 32; *see also* Weisbrot Declaration, at ¶¶ 29-31. This Notice Plan effectively notified the Class Members and also avoided creating further harm that direct contact could create.  Garrison Declaration, at ¶ 32; *see also* Weisbrot Declaration, at ¶ 12.  The notice program was designed with the desire to actually inform class members of their rights under the Settlement.  Weisbrot Declaration, at ¶ 32.  Indeed, the Notice Plan was the best notice practicable under the circumstances.  Garrison Declaration, at ¶ 32; *see also* Weisbrot Declaration, at ¶ 32.

In addition, given the significant public interest in this case, counsel anticipated substantial media coverage of the proposed Settlement, which in fact did happen and further publicized the settlement.  *Id.*  Notably, at least one article has addressed the issue of direct notice in this case—that is, how to handle class notice in a case where class members do not want to be found.[7]  This article, for instance, acknowledges that "[t]he deal contains provisions that acknowledge the problems inherent in sending out notices and distributing payouts to class members in this case: Many of them gave fake email or street addresses when setting up accounts and, truth be told,

---

[7] *See* "Ashley Madison Class Accord Raises Question: How Do You Find Claimants Who Don't Want to Be Found?," The National Law Journal, *available at* http://www.nationallawjournal.com/id=1202793480144/Ashley-Madison-Class-Accord-Raises-Question-How-Do-You-Find-Claimants-Who-Dont-Want-to-Be-Found?slreturn=20170917154906.

they might not want notices of the deal sent to their businesses or home addresses." *Id.*  This

case is unique in its challenges, and the Notice Plan proposed was the best plan practical.

Here, the proposed notice program consisted of the following:  the notice plan comprised

serving 11,484,000 highly targeted digital banner ads as well as a press release and publication in

two consumer magazine publications (*People* and *Sports Illustrated*) to reach the prospective

class members.  The recommended notice plan delivered approximately 75.3% reach with an

average frequency of 3.04    Weisbrot Declaration, at ¶¶ 8-30.  This was a valid, thoughtful, and

thorough approach to notice where there are issues with directly contacting the class member.

*See, e.g., In re Google Referrer Header Privacy Litigation*, 87 F. Supp. 3d 1122, 1129 (N.D.

Cal.) (granting final approval, where class notice plan included banner ads targeted at potential

class members); *In re YAHOO MAIL Litigation*, Case 5:13-cv-4980, Dkt. No. 203, at *8-9 (N.D.

Cal. Aug. 25, 2016) (granting final approval to settlement employing banner advertisements as

part of class notice); *Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 334-35 (D. Mass 2015)

(finding banner ads as part of class settlement notice adequate in final approval order.

### 2.     The Notice Plan Was Implemented as Planned and Did Inform The Class.

On August 3, 2017, the Settlement Administrator established the following website

devoted to this Settlement:  http://www.WebsiteDataBreach.com.    *See* Declaration of Brian

Devery In Support of Final Approval of Settlement, dated October 17, 2017, at ¶ 10, filed

herewith (the "Devery Declaration").   The Settlement Website contains general information

about the Settlement, allows website visitors to file a Claim online, and contains all relevant

Court documents (including the Long-Form Class Notice and the Stipulation), as well as

important dates and deadlines pertinent to this matter. *Id.*  The Settlement Website also contains

a "Contact Us" page whereby Class Members can contact the Settlement Administrator via email

to submit additional questions or documentation regarding the Settlement.  *Id.*  On August 3, 2017, the Settlement Administrator established the following toll-free telephone line devoted to this Settlement: 844-474-8293.  *See* Devery Declaration, at ¶ 11. The toll-free line utilizes an interactive voice response ("IVR") system to provide Class Members with responses to frequently asked questions and important information regarding the settlement.  *Id.* Additionally, class members may leave a message through the toll-free number to request that a Claim form be mailed to them.  *Id.*  The toll-free line is accessible 24 hours a day, 7 days a week. As of October 18, 2017, the toll-free line has received 91 calls totaling 426 minutes and 58 people have requested a Claim and Long Form be mailed to them.  *Id.*

On August 4, 2017, and pursuant to the Preliminary Approval Order, the Settlement Administrator commenced Class Notice. Specifically, it caused a contextually targeted programmatic mobile and desktop internet advertising campaign to commence.  *See* Devery Declaration, at ¶ 6.[8]  As of October 18, the banner ads have appeared on more than 42,700 websites for a total of 11,578,658 impressions.  *Id.*  Class Settlement Counsel, in conjunction with the Settlement Administrator, designed and released four distinct banner ads with different color and layout designs.[9]  Devery Declaration, at ¶ 7.  Responses to banner ads were tracked so those banner ads that received a higher response could be served more often to help maximize the effect of the banner ad campaign.  *Id.*  All banner ads performed almost identically, therefore each banner ad was served almost an identical amount.  *Id.*

| Ashley Madison - Banner 1 (Red) | 2,896,841 |

---

[8] The Settlement Administrator was advised that the notice pursuant to 28 U.S.C. §§ 1715(a) and (b), was completed by Defendant or Defendant's attorneys.  Devery Declaration, at ¶ 5.

[9] A copy of the banner ads is attached as Exhibit C to the Devery Declaration.  *See* Devery Declaration, at Ex. C.

| | |
|---|---|
| Ashley Madison - Banner 2 (Light Blue) | 2,894,321 |
| Ashley Madison - Banner 3 (Black) | 2,893,793 |
| Ashley Madison - Banner 4 (Royal Blue) | 2,893,703 |

Clicking on the banner ad would cause the viewer to be taken to the Settlement Website, as further discussed below. *Id.*

The Settlement Administrator also caused the Short Form Notice to be published in *People* Magazine, which has a circulation of 3,510,533 people, in the August 28, 2017 edition. Devery Declaration, at ¶ 8.  This edition was delivered to in-home subscribers on August 18, 2017, and was made available for sale to general public on August 28, 2017.[10]  *Id.*  The Settlement Administrator also caused the Short Form Notice to be published in *Sports Illustrated* Magazine, which has a circulation of 3,023,197 people, in the August 28, 2017 edition. Devery Declaration, at ¶ 9.  This edition was delivered to in-home subscribers on August 23, 2017, and was made available for sale to the general public on August 28, 2017.[11]  *Id.*  Class Settlement Counsel also posted information about the settlement prominently on each of their websites and created links directing Class Members to the settlement website.  Each of the firms appointed as Settlement Class Counsel also responded to innumerable questions and requests for information from Class Members.

Class Members filed and can file Claim Forms by mail or via an online portal on the Settlement Website. *See* Devery Declaration, at ¶ 12. As of October 18, 2017, the Settlement Administrator has received and processed a total of 2,522 claims.  *Id.*  Whereas the deadline to submit a claim (January 2, 2018), has not passed, the Settlement Administrator will continue to accept and process claims.  *Id.*  The deadline for Class Members to submit a claim is January 2,

[10] A copy of the publication is attached to the Devery Declaration as Exhibit A.  *See* Devery Declaration, at Ex. A.

[11] A copy of the publication is attached to the Devery Declaration as Exhibit B.  *See* Devery Declaration, at Ex. B.

2018.  *See* Devery Declaration, at ¶ 14. The Settlement Administrator will continue to accept and process Claim Forms, reply to Class Member inquiries and perform the other administrative duties through the deadline date.  *Id.* The Settlement Administrator will also continue to maintain the Settlement Website and toll-free number pursuant to the requirements of the Stipulation, and shall keep the parties apprised of exclusion requests, objections and Claim Forms received, as well as any documentation received or postmarked after the deadline dates. *Id.*

Upon the issuance of a final order from this Court and the achievement of the Effective Date, the Settlement Administrator will cause the distribution of Settlement benefits to take place in accordance with the terms of the Stipulation or as otherwise directed by this Court. *See* Devery Declaration, at ¶ 15.  Whereas the time for filing claims has not yet passed and the final number of participating class members is not yet determined, the Settlement Administrator is unable to provide a definitive and accurate invoice for the total administration fees that will be incurred. *See* Devery Declaration, at ¶ 16.  However, as of October 18, 2017, the total amount of administration expenses incurred is $261,656.65.  *Id.*

Class Members had 60 days from the Class Notice Date in which to opt-out of or object to the settlement, which is plainly sufficient under applicable law.  *See In re Zurn Pex Plumbing Products Liab. Litig.*, 08-MDL-1958 ADM/AJB, 2012 WL 5055810 at *10 (D. Minn. Oct. 18, 2012) ("The opt-out period of 45 days provided for in the Settlement is reasonable."); *Xcel Energy,* 364 F. Supp. 2d 1005 (providing 55 days between mailing notice and final approval hearing); *In re Marsh & McLennan Companies, Inc. Sec. Litig.*, 04 CIV. 8144 (CM), 2009 WL 5178546 at *23(S.D.N.Y. Dec. 23, 2009) ("…the Notice plan satisfied due process. Notice was first mailed on November 13, 2009.    Objections were due thirty days later on December 14, 2009. Courts have repeatedly found such a time period to constitute sufficient notice.").  As of

October 18, 2017, Settlement Administrator has received seventeen (17) requests for exclusion and has been made aware of one (1) objection to the Settlement. *See* Devery Declaration, at ¶ 13. The Settlement Administrator understands that the objection/exclusion deadline has passed but will forward any additional requests for exclusion and/or objections it receives to the parties on an ongoing basis. *Id.*

### 3. The Notice Plan Was Supplemented By the Media Attention Garnered By the Settlement.

As has been noted throughout this case, media and news outlets have written extensively about this case due to the salacious nature of Defendants' business and the nature of the information that was subject to the data breach.[12]  It should not come as a surprise then that the media has also written about the proposed settlement and the notice plan used in this litigation.[13]

---

[12] *See, e.g.,* Thomsen, Simon, 20 July 2015, "Extramarital affair website Ashley Madison has been hacked and attackers are threatening to leak data online," Business Insider, *available at* http://www.businessinsider.com/cheating-affair-website-ashley-madison-hacked-user-data-leaked-2015-7; "Online Cheating Site AshleyMadison Hacked," krebsonsecurity.com, 15 July 2015, *available* at http://krebsonsecurity.com/2015/07/online-cheating-site-ashleymadison-hacked; Hern, Alex. "Ashley Madison customer service in meltdown as site battles hack fallout," The Guardian, *available at* https://www.theguardian.com/technology/2015/jul/21/ashley-madison-customer-service-meltdown-hack-fallout; "Ashley Madison condemns attack as experts say hacked database is real," The Guardian, 19 August 2015, *available at* https://www.theguardian.com/technology/2015/aug/19/ashley-madisons-hacked-customer-files-posted-online-as-threatened-say-reports; Hern, Alex. "Ashley Madison hack: your questions answered," The Guardian, *available at* https://www.theguardian.com/technology/2015/aug/20/ashley-madison-hack-your-questions-answered; "No, You Can't Hire A Hacker To Erase You From The Ashley Madison Leak," Fast Company, *available at* https://www.fastcompany.com/3050127/no-you-cant-hire-a-hacker-to-erase-you-from-the-ashley-madison-leak; "Hackers Finally Post Stolen Ashley Madison Data," WIRED, 18 August 2015, available at https://www.wired.com/2015/08/happened-hackers-posted-stolen-ashley-madison-data/; Pagliery, Jose, 20 August 2015, "Hackers expose Ashley Madison CEO's emails," CNNMoney, *available at* http://money.cnn.com/2015/08/20/technology/ashley-madison-hack-emails/index.html?sr=twmoney082015ashleymadceo4pVOD.

[13] *See, e.g.,* Ashley Madison parent in $11.2 million settlement over data breach," CNBC, *available at* https://www.cnbc.com/2017/07/15/ashley-madison-parent-in-11-point-2-million-settlement-over-data-breach.html;   "Ashley Madison's parent company has proposed a

In fact, a search for "Ashley Madison Settlement" in Google produces links to over a hundred articles covering the settlement.[14]  This extensive and organic media coverage of the settlement has further supplemented the notice to the Class provided by the Settlement Administrator.

### C.     FINAL CLASS CERTIFICATION FOR PURPOSES OF SETTLEMENT SHOULD BE GRANTED.

The Court previously granted preliminary class certification for settlement purposes.  *See* Preliminary Approval Order at pp. 4-5, 13. Because nothing has occurred since then to cast doubt on whether the applicable prerequisites of Rule 23 have been met, the Court should finally certify the Class for settlement purposes and appoint Class Settlement Counsel for settlement on a final basis.

### III.    THE WRITTEN OBJECTION SHOULD BE OVERRULED.

As noted above in Section II.A.2.c, *supra*, there is only one objector to the Stipulation and settlement as proposed in the Motion for Preliminary Approval and the Preliminary Approval Order.  *See, supra.*  That objection comes from Mr. O'Malley, who is unrepresented, but who timely filed an objection with the Clerk (and the Settlement Administrator). *See* Ex. 1. At the outset, while the submission is characterized as an objection, it does not point to any

---

settlement with users exposed in data breach," The Verge, *available at* https://www.theverge.com/2017/7/16/15979222/ashley-madison-ruby-corp-settlement-data-breach-cybersecurity; "Ashley Madison parent in $11.2 million settlement over data breach," Rueters, available at http://www.reuters.com/article/us-ashleymadison-settlement/ashley-madison-parent-in-11-2-million-settlement-over-data-breach-idUSKBN19Z2F0;  "Hacked Ashley Madison users getting $11.2 million settlement," CBS News, *available at* https://www.cbsnews.com/news/ashley-madison-settlement-for-hacked-users-approved-by-judge/;  "Ashley Madison will pay $11.2 million to data breach victims," Engadget, available at https://www.engadget.com/2017/07/16/ashley-madison-lawsuit-settlement/;  "Ashley Madison Data Breach Class Action Settlement," Top Class Actions, available at https://topclassactions.com/lawsuit-settlements/lawsuit-news/816025-ashley-madison-data-breach-class-action-settlement/;

[14] *See id; see also* https://www.google.com/search?rlz=1C1EODB_enUS682US682&biw=1707&bih=735&q=ashley+madison+settlement&oq=ashley+madison+settlement&gs_l=psy-ab.12...0.0.0.3051. 0.0.0.0.0.0.0.0.0..0.0....0...1..64.psy-ab..0.0.0....0.SjSHarJYTlQ

defects or issues with the settlement as structured.  Mr. O'Malley mainly claims suspected or potential damage to his family and social standing (loss of friendships, 90% of co-worker contacts, confessing to his spouse, children, mother, brother, and others, etc.), but does not cite any evidence of actual damage to his person.  Ex. 1, pp. 2-4.  He claims to have spent $100 for credit purchases and $19 for a paid delete.  *Id.*  In "objecting" Mr. O'Malley claims that settling for "$500 to $3500 seems wrong."  *Id.* at p. 3.  He claims "[t]he personal as well as my immediate family trauma, stress, shame, humiliation, social ostracism, financial ruin and over all spiritual warfare seems not accounted for by the current settlement."  *Id.*  He further "reject[s] th[e] settlement on the basis that it rewards the company [Avid] rather than punish it," and he believes Avid should be "shut . . . down forever."  *Id.*

Mr. O'Malley's objection should be overruled.  First of all, most of the damages he claims are highly individualized (social/spiritual damage) and of the type that cannot be addressed in a class settlement, which leads to the conclusion that he should have opted-out of the settlement rather than objected to it.  On the other hand, of those that are compensable, 100% of the monies he paid for credits and the paid delete are payable under the settlement.  Second, the case does not "reward" Avid at all.  In fact, the settlement is substantial and will not soon be forgotten by a company who represented to the FTC (and which the FTC accepted) that its financial condition impaired its ability to pay more than $1,657,000 of Avid's total settlement of $17,500,000, and which resulted in the suspension of payment of the remainder of that settlement with the government.  Finally, Mr. O'Malley's complaints that the person who committed the breach was never identified but "could have been easily [] outed if there was enough will" is without any merit.  Organizations other than Avid, including law enforcement in the United States and Canada attempted to identify the hacker without success.  To be sure, the

reason the hacker was not found was not due to Avid not trying to find that person, as Avid offered a $500,000 reward for information leading to the hacker's arrest. *See* "After the Ashley Madison Hack," www.ashleymadison.com, https://www.ashleymadison.com/hack/ (last accessed October 18, 2017).  For these reasons, Mr. O'Malley's objection should be overruled.

## IV.    THE *CY PRES*  DISTRIBUTION SHOULD BE APPROVED

As noted in the Stipulation and Preliminary Approval Order, the parties have agreed that "[i]f the amounts paid [to claimants] do not exhaust the Settlement Fund, then the remaining funds in the Settlement Fund will be donated to one or more Internal Revenue Code Section 501(c)(3) charitable digital privacy or other similar organizations chosen jointly by Class Counsel (on behalf of the Settlement Class) and Avid (a "Charity")."  Stipulation, at p. 17. Specifically, "[i]f the Net Settlement Fund is not exhausted by compensating for out-of-pocket losses and those whose Personal Information was released publicly, then any remainder will be donated to a Charity subject to approval of the Court."  Preliminary Approval Order, p. 6.  The concept of this *cy pres* distribution was also raised before the Court on July 21, 2017, and the Court requested that the parties present the name of any Charity that will be a *cy pres* award nominee to the Court by the Final Approval Hearing date, which is November 20, 2017.  At this juncture, it appears that the Net Settlement Fund will not be exhausted and a *cy pres* distribution is very likely.  *See* Devery Declaration, at ¶ 12.   As noted above, and pursuant to that request, the parties will have a joint nomination of Charities that will be nominated as *cy pres* award recipients on November 20, 2017, each of which would receive a *pro rata* share of any remainder of the Net Settlement Fund.

Donating the remainder of the Net Settlement Fund in the way that is outlined in the Stipulation, the Motion for Preliminary Approval, and the Preliminary Approval Order, creates a tangible benefit to the Class.  Specifically, there were Class Members that were harmed by the

actions of Avid (as outlined in the operative Consolidated Class Action Complaint) but no longer wanted to ever be contacted regarding AshleyMadison.com or that did not want to submit a claim for fear of additional repercussions flowing from additional contact.  For those Class Members, a *cy pres* award to Charities that will work to prevent or remedy the types of harms experienced by Class Members will confer a benefit on the Class without increasing any perceived risk of future harm to Class Members that want nothing more to do with Avid.  *C.f., In re Google Inc. Cookie Placement Consumer Privacy Litigation*, 2017 WL 446121 at *4 (approving a settlement agreement when the "proposed *cy pres* contributions to the proposed recipients [was] an effective and beneficial remedy that bears a substantial nexus to the interests of the Settlement Class.").

As noted elsewhere in these papers, it is not feasible for the remainder to go to the Class Members for a number of reasons, including the fact that Avid does not have reliable email addresses or other contact information for the Class and many Class Members have made it known to this Court that they do not want to be contacted, and a *cy pres* distribution would confer benefits on those Class Members. "The *cy pres* remedy the settling parties here have devised bears a direct and substantial nexus to the interests of absent class members and thus properly provides for the 'next best distribution' to the class." *C.f., Lane v. Facebook, Inc.*, 696 F.3d 811, 821 (9th Cir. 2012) (affirming the distribution of $6.5 million to a charity that worked for the "protection of identity and personal information online" where distribution to class not feasible); *In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 741–43 (9th Cir. 2017) (where distribution to class members was not feasible, affirming a $5.3 million *cy pres* award that benefitted six organizations with a record of promoting privacy protection on the Internet and that was capable of educating the class about online privacy risks).  For the reasons above,

Class Settlement Counsel respectfully requests that the Court order a *pro rata cy pres* distribution of the remainder of the Net Settlement Fund to the Charities jointly presented to the Court.

## V.      LIST OF EXCLUSIONS

Pursuant to the Preliminary Approval Order, Class Settlement Counsel hereby submits the list of seventeen (17) purported exclusions/opt-outs.  *See* <u>Exhibit 2</u> and <u>Exhibit 3</u>.[15]

## VI.      CONCLUSION

For the foregoing reasons, Class Settlement Counsel respectfully request that the Court grant final approval of the proposed Settlement, approve the Settlement as fair and reasonable, deem Class Notice to be complaint with Federal Rule of Civil Procedure Rule 23 and due process, and grant final class certification for settlement purposes.  Class Settlement Counsel also request that the Court (i) approve the distribution of the remainder of the Net Settlement Fund to any *cy pres* recipients (to whom a *pro rata* equal share of any remainder of the Settlement Fund will go) approved by the Court, and (ii) overrule the Mr. O'Malley's objection to the settlement.  A proposed order will be submitted to the Court prior to the Final Approval Hearing set for November 20, 2017.

---

[15] For all but one of the class members that purport to exclude themselves, the exclusion does not include the class member's signature as required in the Settlement Agreement and Preliminary Approval Order.

Date:  October 20, 2017

Respectfully Submitted,
THE DRISCOLL FIRM, P.C.

By:     */s/ John J. Driscoll*
        John J. Driscoll (54729MO)
        Christopher J. Quinn (41883MO)
        Gregory G. Pals (48820MO)
        211 N. Broadway, 40th Floor
        St. Louis, Missouri 63102
        Tel.: (314) 932-3232
        Fax: (314) 932-3233
        john@thedriscollfirm.com
        chris@thedriscollfirm.com
        greg@thedriscollfirm.com

        W. Lewis Garrison, Jr.
        Christopher B. Hood
        HENINGER GARRISON DAVIS, LLC
        2224 1st Avenue North
        Birmingham, Alabama 35203
        Tel.: (205) 326-3336
        Fax: (205) 326-3332
        wlgarrison@hgdlawfirm.com
        chood@hgdlawfirm.com

        James F. McDonough, III
        HENINGER GARRISON DAVIS, LLC
        3621 Vinings Slope, Suite 4320
        Atlanta, Georgia 30339
        Tel.: (404) 996-0869
        Fax: (205) 326-3332
        jmcdonough@hgdlawfirm.com

        Douglas P. Dowd (29240MO)
        William T. Dowd (39648MO)
        Alex R. Lumaghi (56569MO)
        DOWD & DOWD, P.C.
        211 North Broadway, Suite 4050
        St. Louis, Missouri 63102
        Tel.: (314) 621-2500
        Fax: (314) 621-2503
        doug@dowdlaw.net
        bill@dowdlaw.net
        alex@dowdlaw.net

        *Plaintiffs' Settlement Class Counsel*

30

**CERTIFICATE OF SERVICE**

I hereby certify that on October 20, 2017, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all parties.

*/s/ John J. Driscoll*