**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: ASHLEY MADISON CUSTOMER | ) | |
| DATA SECURITY BREACH LITIGATION | ) | |
| | ) | MDL No. 2669 |
| This Document Relates to: | ) | |
| | ) | Case No. 4:15-MD-02669-JAR |
| ALL CASES | ) | |
| | ) | |

**ORDER GRANTING FINAL APPROVAL OF SETTLEMENT, CY PRES
DISTRIBUTION, AND AWARD OF ATTORNEYS FEES AND SERVICE AWARDS TO
THE CLASS REPRESENTATIVES**

**I. INTRODUCTION**

Plaintiffs Brian Farr, Steven Coward, Marc Benefield, Nhung Truong, Gustavo Alfaro, David Yagel, John Hiles III, Matthew Lisuzzo, Britt Garrett, Christopher Russell, David Miller, James Mike Shows, Todd Witengier, Byron Goetting, Marvin Cabiness, Keith Macomber, Paul Jack, and Anthony Imbarrato, individually and on behalf of the Settlement Class (the "Class Representatives" or "Plaintiffs"), and Defendants Ruby Corp. (previously named Avid Life Media Inc.) and Ruby Life Inc. (previously named Avid Dating Life Inc.) (together, "Avid), and Noel Biderman (altogether, "Defendants") reached a proposed settlement, as set forth in the parties' Stipulation of Settlement (the "Stipulation" or the "Settlement").[1]

Plaintiffs, on behalf of themselves and the Settlement Class (as hereinafter defined), applied to the Court pursuant to Rule 23(e) of the Federal Rules of Civil Procedure for an order: (1) granting preliminary approval of the Settlement in the above-captioned litigation (the

---

[1] Any capitalized or defined terms used in this Motion shall be a reference to that capitalized or defined term in the Stipulation of Settlement, which is docketed at Doc. 343-1-343-7 (the "Stipulation").

"Action") in accordance with the Stipulation; (2) dismissing the Action with prejudice as against all of the Released Parties (as defined in the Stipulation), upon the terms and conditions set forth in the Stipulation; (3) certifying the Action as a class action for settlement purposes only; (4) appointing the Representative Plaintiffs as Class Plaintiffs and the law firms of The Driscoll Firm, P.C., 211 N. Broadway, 40th Floor, St. Louis, Missouri 63102; Heninger Garrison Davis, LLC, 2224 1st Avenue North, Birmingham, Alabama 35203 and Dowd & Dowd, P.C., 211 North Broadway, Suite 4050, St. Louis, Missouri 63102 as Class Settlement Counsel; (5) scheduling a Final Approval hearing and establishing all related deadlines; (6) directing that notice be provided to the Settlement Class in accordance with the Notice Program; and (7) preliminarily enjoining all Settlement Class Members who have not opted out from pursuing, as class members, actions based on or relating to the claims to be released by the Settlement Class Agreement; and further enjoining all persons from pursuing a lawsuit in any jurisdiction involving Settlement Class Members who have not timely excluded themselves that is based on or related to the claims to be released by the Settlement.

That application was granted on July 21, 2017. *See* Doc. 354, Order Granting Preliminary Approval of Settlement, Directing Notice to the Class, Scheduling a Final Approval Hearing, and Certifying a Settlement Class (hereinafter, the "Preliminary Approval Order").

Leading up to the Preliminary Approval Order, and for purposes of background, on July 20, 2015, Avid announced that it had been the victim of an intrusion of its computer network by an unauthorized person or persons who subsequently publicly released personal and account information of Avid customers. Following the announcement, multiple putative class action lawsuits were filed against Avid related to its alleged inadequate data security practices and to alleged misrepresentations regarding Ashley Madison, an online dating website owned and

operated by Avid Dating Life since 2007.  Two of these lawsuits also named Noel Biderman, former Chief Executive Officer of Avid Life Media, as a defendant. Since December 9, 2015, the United States Judicial Panel on Multidistrict Litigation ("JPML") has transferred twenty-four Data Breach Cases to the United States District Court for the Eastern District of Missouri (the "Court") for coordinated or consolidated pretrial proceedings under docket number 4:15-md-02669-JAR.

On January 7, 2016, the Court ordered Plaintiffs to file a consolidated class action complaint (Doc. No. 75). On June 3, 2016, Plaintiffs filed a Consolidated Class Action Complaint (Doc. No. 180), which they amended on June 24, 2016 (Doc. No. 186).  On July 1, 2016, the Court issued an order governing limited discovery and briefing related to anticipated motions to compel arbitration by Defendants (Doc. No. 189).  On August 29, 2016, Defendants moved to dismiss or stay and compel arbitration based on an arbitration clause and class action waiver allegedly contained in the Ashley Madison Terms and Conditions ("Arbitration Motion"). Plaintiffs opposed Defendants' Arbitration Motions, which remain pending before the Court. While the Arbitration Motions were pending, the parties began settlement discussions. (Settlement at 2-3).

In short, the Settlement created a Settlement Fund of $11.2 million, all of which—after deductions for Court-approved fees and costs—is due to be distributed to Settlement Class Members subject to any remainder, which will be directed to various charitable organizations that perform work consistent with the goals of the settlement.  No funds will revert to Defendants.  *See* Doc. 344-1, Declaration of W. Lewis Garrison, Jr. in Support of Motion for Preliminary Approval or Settlement, at ¶ 22-24 (hereinafter, the "Garrison Declaration"). Pursuant to the Preliminary Approval Order, the Settlement Fund will be used to compensate

Settlement Class Members for three distinct types of losses and includes damages for having personal information released in the first instance. *Id.* Settlement Class Members will be reimbursed for losses they incurred for (a) purchasing Full Delete but still having their personal information released publicly as a result of the data breach ($19 for such claims up to a maximum of $500 for multiple accounts), (b) purchasing or using credits and having a good faith belief that they used those credits to communicate with engagers or "bots" (up to $500 for such claim), and (c) unreimbursed losses caused by the data breach that are not included in sections (a) and (b) including, without limitation, related to identity theft (up to $2,000 for such claims). *Id.*

Any funds remaining after allocations under Sections (a), (b), and (c) will be divided equally amongst those whose Personal Information was released publicly as a result of the Data Breach (such a claim being eligible to receive up to $500) for such claims. *Id.* These cash benefits will be distributed on a *pro rata* basis up to a maximum of $3,500 per class member.[2] *Id.* If the amounts paid in cash distributions do not exhaust the settlement fund by the end of the claims deadline, the remainder will be donated to Internal Revenue Code Section 501(c)(3) charitable digital privacy or similar organization(s) jointly chosen by Class Settlement Counsel and Avid (the "Charities"). Garrison Declaration, at ¶ 24.

This matter has now come before the Court pursuant to Plaintiffs' Motion for Final Approval of Settlement, Cy Pres Distribution, and Overruling of the Single Objection to the Settlement (the "Motion"). In that Motion, Class Settlement Counsel[3] request an Order granting

---

[2] The Settlement does not interfere with any of Avid's obligations under its agreements with the FTC or any state related to the data breach. Garrison Declaration, at ¶ 25.

[3] The Court appointed the law firms of The Driscoll Firm, P.C., 211 N. Broadway, 40th Floor, St. Louis, Missouri 63102; Heninger Garrison Davis, LLC, 2224 1st Avenue North,

final approval of the proposed settlement, approving the settlement as fair and reasonable, deeming Class Notice to be compliant with Federal Rule of Civil Procedure Rule 23 and due process, and granting final class certification for settlement purposes.  Class Settlement Counsel also request that the Court  issue an order (i) approving the distribution of the remainder of the Net Settlement Fund to any *cy pres* recipients (to whom a *pro rata* equal share of any remainder of the Settlement Fund will go) approved by the Court, and (ii) overruling Mr. O'Malley's objection to the settlement.[4]

Furthermore, the Settlement Agreement provides that "Class Settlement Counsel will petition the Court for an award of attorneys' fees in an amount not to exceed one third of the total $11.2 million value of the Settlement Fund, exclusive of interest accumulated, along with Class Settlement Counsel's reasonable costs and expenses" and that "Class Settlement Counsel will distribute such fees, costs and expenses in a manner consistent with counsel's contribution to the benefit obtained for the Settlement Class." *See* Doc. 343-1, Settlement Agreement, p. 21. The deadline for bringing objections to the proposed Settlement Agreement has passed; however, no objections were received regarding the Settlement Agreement provisions relating to Plaintiffs' attorneys' fees.

On October 20, 2017, Class Settlement Counsel and Plaintiffs submitted their Motion for (1) Approval of Attorneys' Fees, (2) Reimbursement of Litigation Expenses, and (3) Service Awards to the Class Representatives. Docs. 373 and 374. That motion seeks (1) an award to Class Settlement Counsel of attorneys' fees in the amount of one third (1/3) of the total settlement fund ($3,733,333.33) to be distributed to Plaintiffs' counsel; (2) an award to Class

---

Birmingham, Alabama 35203, and Dowd & Dowd, P.C., 211 North Broadway, Suite 4050, St. Louis, Missouri 63102, as Class Settlement Counsel.  *See* Preliminary Approval Order, at p. 2.

[4] Class Settlement Counsel also included in its motion its list of exclusions, pursuant to the Preliminary Approval Order.  The Court accepts this submission.

Settlement Counsel and other Plaintiffs' counsel of $78,032.38 in costs and expenses; and (3) an incentive award of $5,000 to each of the named Plaintiffs in the Amended Consolidated Class Action Complaint. Again, no objections to the Motion have been received.

The Court finds that it has jurisdiction over the Action, the Parties, and all Settlement Class Members for purposes of final settlement under 28 U.S.C. § 1331 and 28 U.S.C. § 1332(d).

The Court held a Final Approval Hearing on November 20, 2017, has considered all of the presentations and submissions related to the Motion and is otherwise fully advised of all relevant facts in connection therewith, and has found good cause for entry of the following Order. Accordingly,

**IT IS HEREBY ORDERED AS FOLLOWS:**

(1)     This Order (the "Final Approval Order") hereby incorporates by reference the definitions in the Stipulation, and all terms used herein shall have the same meanings as set forth in the Stipulation.

(2)     The Court, having fully reviewed Plaintiffs' unopposed Motion, and the supporting Memorandum and Declarations filed in support thereof, determines that the Settlement appears to be the product of thorough, serious, informed, and non-collusive negotiations between experienced attorneys familiar with the legal and factual issues of this case; has no obvious deficiencies; does not improperly grant preferential treatment to the Settlement Class Representatives or segments of the Class; and appears to be fair, reasonable, and adequate within the meaning of Rule 23 of the Federal Rules of Civil Procedure, such that final approval of the Settlement should be granted;

(3)     The Court grants final class certification for settlement purposes.  The Court previously granted preliminary class certification for settlement purposes.  *See* Preliminary

Approval Order at pp. 4-5, 13. Because nothing has occurred since then to cast doubt on whether the applicable prerequisites of Rule 23 have been met, the Court finally certifies the Class for settlement purposes and appoints Class Settlement Counsel for settlement on a final basis;

(4)     The Court finds that Class Notice was compliant with Federal Rule of Civil Procedure Rule 23 and due process, and the Notice Program met the requirements of Fed. R. Civ. P. 23, comported with due process, and constituted due, adequate, and sufficient notice to all Class Members;

(5)     The objection from Mr. O'Malley is overruled because most of the damages he claims are highly individualized and cannot be addressed in a class settlement, the settlement is substantial and sufficient for a company who represented to the FTC (and which the FTC accepted) that its financial condition impaired its ability to pay more than $1,657,000 (resulting in a suspension of Avid's total settlement of $17,500,000 there), and Avid, along with organizations other than Avid, including law enforcement in the United States and Canada, attempted to identify the hacker(s) without success.  Mr. O'Malley's grievances do not rise to the level of undermining the Settlement's compliance with Rule 23.  Moreover, the settlement would fully compensate Mr. O'Malley for his paid delete and credit purchases.

(6)     The Court orders that no later than fifteen (15) calendar days after this Final Approval Order, Avid shall deposit an amount equal to ten million, seven hundred thousand dollars and no cents ($10,700,000) into the Escrow Account that was created pursuant to the Preliminary Approval Order. Payment of attorney's fees, costs and expenses and Class Representative incentive awards as set forth herein shall be made to Class Settlement Counsel within fifteen (15) days of entry of this Order, subject to Class Counsel providing their payment routing information, signed W-9's, and tax I.D. numbers.

(7)     After deductions for any attorneys' fees and costs that the Court awards, the Class Representative Service Awards, any further Administration Costs, and any other Court-approved costs, expenses, or amounts, the balance of the non-reversionary $11.2 million settlement fund will be distributed to Settlement Class Members as set out in in the proposed Claims Process set forth in Paragraph 8 of the Stipulation. To summarize that process, the Settlement Administrator, working under the supervision of Class Settlement Counsel and subject to the jurisdiction of this Court, shall continue to administer the process of receiving, reviewing, and approving or denying Settlement Class Member claims.

(8)     The Court finds that a *pro rata cy pres* distribution of the remainder of the Net Settlement Fund to the Charities jointly presented to the Court is proper here because many class members did not want to be contacted or were reluctant to submit claims, and a *cy pres* award to a Charity or Charities that will work to prevent or remedy the types of harms experienced by Settlement Class Members will confer a benefit on the Class without increasing any perceived risk of future harm to Class Members who want nothing more to do with Avid;

(9)     The Court accepts the list of exclusions/opt-outs from the settlement that was included in Section V of the Memorandum of Law In Support of Final Approval, and the Court excludes those persons from the Settlement Agreement and Settlement Class;

(10)     The Court finds that the "percentage of the fund" method is appropriate in this case and awards one third of the total settlement fund ($3,733,333.33) to Class Settlement Counsel to be distributed to Plaintiffs' counsel;

(11)     The Court awards Class Settlement Counsel $78,032.38 in costs and expenses to be distributed to Plaintiffs' counsel; and

(12)    Finally, the Court awards an incentive award of $5,000 to each of the named Plaintiffs in the Amended Consolidated Class Action Complaint.

Accordingly, the Motions [367, 373] are **GRANTED.**

## II. THE SETTLEMENT FUND

First, each Settlement Class Member will be reimbursed from the Net Settlement Fund for out-of-pocket losses stemming from the Class Member's use of AshleyMadison.com.  Such out-of-pocket losses shall consist of three components: (1) purchasing Full Delete; (2) purchasing or using credits to communicate with Engagers; and (3) reimbursing losses caused by the Data Breach.

Second, after Settlement Class Members are compensated for their out-of-pocket losses, the balance of the Net Settlement Fund will be allocated on a *pro rata* basis defined by reference to the number of Settlement Class Members who submit a Valid Claim Form and Reasonable Documentation demonstrating that his or her Personal Information was released publicly as a result of the Data Breach. In the event that this *pro rata* distribution of funds to Settlement Class Members that only have a claim for public release of information under Section 8.2.2 makes distribution economically impractical, the remaining Net Settlement Fund shall not be distributed to Class Members making these non-out-of-pocket loss claims, but rather will be donated to one or more Internal Revenue Code Section 501(c)(3) charitable digital privacy or other similar organizations chosen jointly by Class Counsel (on behalf of the Settlement Class) and Avid (a "Charity").  If the Net Settlement Fund is not exhausted by compensating for out-of-pocket losses and those whose Personal Information was released publicly, then any remainder will be donated to the Charities.

Defendants do not admit wrongdoing in the Settlement and deny the material allegations and claims asserted in the Consolidated Class Action Complaint. In exchange for the benefits conferred on Settlement Class Members by the Settlement, Settlement Class Members who do not opt out agree to release all claims that could have been asserted, or that arise out of the same transactions or occurrences as the claims against Defendants that were or could have been asserted in this Action, commensurate with the res judicata effect at the conclusion of the litigation, as described in the Settlement.

### III. THE SETTLEMENT CLASS

The Court hereby certifies, for settlement purposes only pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, a Settlement Class defined as follows:

All residents of the United States of America who used Ashley Madison during the Settlement Class Period (as defined in paragraph 2.32 of the Stipulation), including, but not limited to, all persons whose Personal Information was compromised or released publicly as a result of the Data Breach, who purchased the Paid Delete or Full Delete option on Ashley Madison on or before July 20, 2015, or who purchased credits or account upgrades on Ashley Madison or otherwise paid to use Ashley Madison (the "Class").

The following entities and individuals are excluded from the Class:

      A.     Defendants' officers, directors and employees;

      B.     Judicial officers and their immediate family members and associated court staff assigned to this case; and

      C.     All those who timely and properly excluded themselves from the Class and who were submitted to this Court in Section V (List of Exclusions) of the Motion,

including Objector O'Malley, whose objection is overruled but who will not be bound by the Settlement Agreement.

## IV. FINDINGS REGARDING THE SETTLEMENT

A settlement should be approved if the Court finds it "fair, reasonable, and adequate." *See* FED. R. CIV. P. 23(e)(2); *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999); *Van Horn v. Trickey*, 840 F.2d 604, 606 (8th Cir. 1988). "A strong public policy favors [settlement] agreements, and courts should approach them with a presumption in their favor." *Petrovic*, 200 F.3d at 1148. This policy is "particularly strong in the class action context." *In re Uponor, Inc.*, *F1807 Plumbing Fittings Prods. Liab. Litig.*, No. 11-MD-2247 ADM/JJK, 2012 WL 2512750, at *7 (D. Minn. June 29, 2012).

In the Eighth Circuit, courts consider four factors in determining whether a class action settlement is fair, reasonable, and adequate: (i) the merits of the plaintiffs' case, weighed against the terms of the settlement; (ii) the defendants' financial condition; (iii) the complexity and expense of further litigation; and (iv) the amount of opposition to the settlement. *See Wireless Tel.*, 396 F.3d at 932; *Van Horn*, 840 F.2d at 607; *Grunin v. Int'l House of Pancakes*, 513 F.2d 114,124 (8th Cir. 1975). These four factors are not exclusive; courts may also consider factors such as the arm's-length nature of the settlement negotiations, the experience and opinion of counsel on both sides, and the use of an independent mediator. *See, e.g., DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995); *Buckley v. Engle*, No. 8:07CV254, 2011 WL 2161135, at *2 (D. Neb. June 2, 2011). In considering whether a settlement should be approved, the Court does not need to resolve disputed issues and should not convert the approval hearing into a trial on the merits, as the purpose of a settlement is to avoid such a trial. See, e.g., *Wireless*

*Tel.*, 396 F.3d at 932- 33; *DeBoer,* 64 F.3d at 1178; *Charter Commc'ns, Inc. Sec. Litig.*, No. MDL 1506, 3:02-CV-1186 CAS, 2005 WL 4045741, at *5 (E.D. Mo. June 30, 2005).

The first factor, "a balancing of the strength of the plaintiff's case against the terms of the settlement," is "[t]he single most important factor." *Van Horn*, 840 F.2d at 607. Although Plaintiffs believe strongly in the merits of their case against Defendants, they also acknowledge that the outcome of the litigation was far from certain if the case had proceeded to trial, particularly given the parties' dispute over the mandatory arbitration and class action waiver provisions contained in Defendants' alleged customer account agreements, and a possible challenge to Plaintiffs' standing under *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016).

On the other side of the equation, the settlement in this case provides an $11.2 million settlement fund, with compensation for each of the significant categories of damages to the class as set forth in the Consolidated Complaint, including (1) compensation for those who spent $19.00 to have all information relating to their use of the Ashley Madison website permanently deleted (up to $500 for multiple accounts); (2) compensation for credits and other amounts spent on the website as a result of Defendants' use of "bot" or "engager" accounts (up to $500); and (3) other losses, including identity theft or other fraud, that resulted from the data breach (up to $2000). Cash benefits will be distributed on a *pro rata* basis up to a maximum of $3,500 per Class Member and remaining funds will be divided equally amongst class members injured from having personal, confidential information relating to use of the Ashley Madison website disclosed in the breach (up to $500). In the event that the pro rata distribution of funds to these class members is economically impractical, the remaining will be donated to the Charities chosen jointly by Class Counsel (on behalf of the Settlement Class) and Avid.

Moreover, should Plaintiffs and the Class proceed through further years of litigation to prevail at trial and on appeal and obtain a judgment significantly greater than $11.2 million, there remains a significant likelihood that Plaintiffs would never be able to recover that judgment given Defendants' financial condition. As previously discussed, Avid's settlement with the Federal Trade Commission (FTC) in December 2016 for $17,500,000, was partially suspended based on evidence of its inability to pay the full judgment. Moreover, there are other pending legal matters and other potential liabilities relating to the claims at issue in this case that could further reduce Defendants' ability to satisfy a judgment.

In sum, after weighing the risks of future litigation, including Defendants' arbitration motion, as well as Defendants' inability to pay a greater judgment, against the substantial benefit to the class provided in the settlement, the Court concludes that these factors weigh in favor of approving the Settlement.

The complexity and expense of class action litigation is well-recognized. *See Schmidt v. Fuller Brush Co.,* 527 F.2d 532, 535 (8th Cir.1975) ("[r]ecognizing that class actions place an enormous burden of costs and expense upon the parties ..."). Class counsel has described the complexity and expense of further litigation as follows:

> Counsel for Plaintiffs has already invested significant resources, including thousands of hours of work, into this litigation over approximately the last two years, both in the individual cases prior to consolidation and in this MDL. Garrison Declaration, ¶ 20. This includes the litigation of multiple motions, interviewing and collecting information from potential plaintiffs/class representatives, creating a Consolidated Complaint setting forth the factual and legal theories of the plaintiffs, performing written discovery concerning Defendants' Motion to Dismiss or Stay and Compel Arbitration, obtaining the deposition of the Avid's corporate designee, and responding to Defendants' Motion to Dismiss. *Id.* However, this is only the beginning should the parties continue the litigation. Should Plaintiffs prevail on the arbitration motion, Defendants will certainly file Motions to Dismiss. Should Plaintiffs prevail, the parties will then proceed with formal discovery and depositions, much of which will involve burdensome travel to a foreign country where Defendants' reside. And, as set forth above, there is little likelihood that this additional work will ever result in a better outcome than that offered by the settlement,

given Defendants' inability to satisfy a larger settlement. Under these circumstances, the complexity and expense of continuing the litigation heavily favors granting … approval of the proposed Settlement.

(Doc. No. 344 at 27.) Class counsel's views are entitled to deference, especially since the Court has found that they have significant experience in class actions and complex litigation. *See Keil v. Lopez,* 862 F.3d 685, 698 (8th Cir. 2017) (citing *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995)). As such, this factor weighs in favor of settlement approval.

Lastly, out of a class of over 2,500, only one class member submitted an objection. (Doc. No. 370.) As such, this factor likewise weighs in favor of approving the Settlement. *Keil,* 862 F.3d at 698.

The Court finds, for purposes of settlement, that the proposed Settlement Class as defined above meets the numerosity requirement of Rule 23(a)(1) such that joinder would be impractical; that there are questions of law and fact common to the Settlement Class as required by Rule 23(a)(2); that these common questions predominate over individual questions as required by Rule 23(b)(3); that the claims of the proposed Settlement Class Representatives are typical of the claims of the Class under Rule 23(a)(3).

In addition, the Court finds that the Class Settlement Counsel and Plaintiffs will fairly and adequately represent the interests of the Class under Rule 23(a)(4), have done so, and are adequate under Rule 23(g)(1) and (4), and, therefore, hereby appoints them as Class Counsel and class representatives, under Rules 23(c)(1)(B) and 23(g), to implement and complete the Settlement on behalf of the Class.

## V. NOTICE TO CLASS MEMBERS

Under Rule 23, class members must receive "the best notice that is practicable under the circumstances." Fed. R. Civ. P. 23(c)(2)(b). "The means employed must be such as one desirous

of actually informing the absentee might reasonably adopt to accomplish it." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950).  The Class received the best notice practical under the unique circumstances of this case, and the notice had the purpose of actually informing the Class. As explained in the Motion for Final Approval and at the associated hearing, direct notice to the Class was impossible in this case; and even if it were possible, direct notice had the potential to create further harm to Class Members.  Garrison Declaration, at ¶ 30. First of all, the Defendants did not have verifiable email addresses or street addresses for the Class Members. *Id.* Although AshleyMadison.com members were required to provide an email address when signing up for the website, those email addresses were never verified.  *Id.* In fact, individuals signed up using fabricated email addresses and even email addresses of other persons to avoid being identifiable to Defendants. *Id.*  As such, Defendants—and as a result, Plaintiffs— did not have reliable email addresses on file for Class Members.  *Id.* Additionally, the addresses that Defendants had related to credit card transactions were not   up to date (some Class Members' activity being from as far back at 2008), and many persons never actually purchased anything on the site, so there was no reliable contact information at all stored for them.  *Id.*

Secondly, the security and privacy concerns of the Class Members, which were memorialized in the amicus brief filed by Amici Does 1 through 3 regarding Defendants' motion for protective order (Doc. 136) and in Plaintiffs' motion for leave to proceed under pseudonyms, were and are still an issue at the settlement stage of the litigation.  Garrison Declaration, at ¶ 31. Specifically, the Amici Does 1 through 3 intimated the following concerns, which Class Members have also identified to Class Settlement Counsel:

> At the time of registration, each consumer reasonably expected that the information provided to Defendant would be kept highly confidential and secure against Hackers. Involvement on a website that facilitates extramarital affairs is a highly sensitive and confidential matter for virtually anyone engaging in such

activity. Thus, Movants and other Consumers had a legitimate expectation of privacy in their data and never intended or anticipated that their information would be made public.

Doc. 136, at p. 12.   They further stated that "[p]rior dissemination of the Stolen Data has caused incalculable damage to many Ashley Madison [c]onsumers and their families, including divorces and even suicide of some [c]onsumers." *Id.* at p. 6.   Additionally, the Court's order on the pseudonym issue found that

> the possible injury to Plaintiffs rises above the level of mere embarrassment or harm to reputation and weighs against public disclosure. Under the facts alleged, it appears this may be a case where the "injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity." *M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir. 1998). The disclosure of Plaintiffs' identities could expose their sensitive personal and financial information - information stolen from Avid when its computer systems were hacked - to public scrutiny and exacerbate the privacy violations underlying their lawsuit.

Doc. 138, pp. 6-7.   And while the Court ultimately required class representatives to use their real names because of their position as representatives of the Class, this Court found that because "class members are not typically testifying or offering evidence, they do not need to be specifically identified by name in order to be part of the litigation; they merely need to be identifiable." *Id.* at p. 8.  With respect to email addresses and street addresses maintained by Defendants, and even assuming they were 100% accurate (which they are apparently not), these addresses may include the users' business address or marital residence, and sending communications regarding AshleyMadison.com to such addresses can create additional damage to Class Members.   Garrison Declaration, at ¶ 31.   Implementation of a notice program that would cause even further harm to Class Members by sending notice to wrong email addresses (implicating a person that may never have been on the site) or to marital or work addresses would have been wholly improper because it would have created more of the very harm the case was intended to remedy in the first place.   *Id.*

For these reasons, the Notice Plan proposed in the Motion for Preliminary Approval did not use email addresses or street addresses but rather was composed of highly targeted digital banner ads, a press release, and traditional consumer magazine publication(s) designed to reach the Class Members without creating collateral harm. Garrison Declaration, at ¶ 32; *see* Doc. 344-3, Declaration of Steven Weisbrot, Esq. on Adequacy of Notice Program, dated July 13, 2017, ¶¶ 12-24 (the "Weisbrot Declaration") (explaining Notice Program details).   The Notice Plan effectuated Rule 23's notice requirements and was laid out in detail along with the reach and frequency data that delivered 75.3% reach with an average frequency of 3.04.   Garrison Declaration, at ¶ 32; *see also* Weisbrot Declaration, at ¶¶ 29-31. This Notice Plan effectively notified the Class Members and also avoided creating further harm that direct contact could create.   Garrison Declaration, at ¶ 32; *see also* Weisbrot Declaration, at ¶ 12.   The notice program was designed with the desire to actually inform class members of their rights under the Settlement.   Weisbrot Declaration, at ¶ 32.   Indeed, the Notice Plan was the best notice practicable under the circumstances.   Garrison Declaration, at ¶ 32; *see also* Weisbrot Declaration, at ¶ 32.

In addition, given the significant public interest in this case, counsel anticipated substantial media coverage of the proposed Settlement, which in fact did happen and further publicized the settlement.  *Id.*  Notably, at least one article has addressed the issue of direct notice in this case— that is, how to handle class notice in a case where class members do not want to be found.[5] This article, for instance, acknowledges that "[t]he deal contains provisions that acknowledge the

---

[5] *See* "Ashley Madison Class Accord Raises Question: How Do You Find Claimants Who Don't Want to Be Found?," The National Law Journal, *available at* http://www.nationallawjournal.com/id=1202793480144/Ashley-Madison-Class-Accord-Raises-Question-How-Do-You-Find-Claimants-Who-Dont-Want-to-Be-Found?slreturn=20170917154 906.

problems inherent in sending out notices and distributing payouts to class members in this case: Many of them gave fake email or street addresses when setting up accounts and, truth be told, they might not want notices of the deal sent to their businesses or home addresses." *Id.* This case is unique in its challenges, and the Notice Plan proposed was the best plan practical.

Here, the proposed notice program consisted of the following:  the notice plan comprised serving 11,484,000 highly targeted digital banner ads as well as a press release and publication in two consumer magazine publications (*People* and *Sports Illustrated*).  The recommended notice plan delivered approximately 75.3% reach with an average frequency of 3.04        Weisbrot Declaration, at ¶¶ 8-30.  This was a valid, thoughtful, and thorough approach to notice in light of the issues raised by direct contact with the class members.     *See, e.g., In re Google Referrer Header Privacy Litigation*, 87 F. Supp. 3d 1122, 1129 (N.D. Cal. Mar. 31, 2015) (granting final approval, where class notice plan included banner ads targeted at potential class members); *In re YAHOO MAIL Litigation*, Case 5:13-cv-4980, Dkt. No. 203, at *8-9 (N.D. Cal. Aug. 25, 2016) (granting final approval to settlement employing banner advertisements as part of class notice); *Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 334-35 (D. Mass Jan. 16, 2015) (finding banner ads as part of class settlement notice adequate in final approval order).

On August 3, 2017, the Settlement Administrator established the following website devoted to this Settlement:  http://www.WebsiteDataBreach.com.   *See* Doc. 368-4, Declaration of Brian Devery In Support of Final Approval of Settlement, dated October 17, 2017, at ¶ 10, (the "Devery Declaration").  The Settlement Website contains general information about the Settlement, allows website visitors to file a Claim online, and contains all relevant Court documents (including the Long-Form Class Notice and the Stipulation), as well as important dates and deadlines pertinent to this matter. *Id.*  The Settlement Website also contains a "Contact

Us" page whereby Class Members can contact the Settlement Administrator via email to submit additional questions or documentation regarding the Settlement. *Id.* On August 3, 2017, the Settlement Administrator established the following toll-free telephone line devoted to this Settlement: 844-474-8293. *See* Devery Declaration, at ¶ 11. The toll-free line utilizes an interactive voice response ("IVR") system to provide Class Members with responses to frequently asked questions and important information regarding the settlement. *Id.* Additionally, class members may leave a message through the toll-free number to request that a Claim form be mailed to them. *Id.* The toll-free line is accessible 24 hours a day, 7 days a week. As of October 18, 2017, the toll-free line has received 91 calls totaling 426 minutes and 58 people have requested a Claim and Long Form be mailed to them. *Id.*

On August 4, 2017, and pursuant to the Preliminary Approval Order, the Settlement Administrator commenced Class Notice. Specifically, it caused a contextually targeted programmatic mobile and desktop internet advertising campaign to commence. *See* Devery Declaration, at ¶ 6.[6] As of October 18, the banner ads have appeared on more than 42,700 websites for a total of 11,578,658 impressions. *Id.* Class Settlement Counsel, in conjunction with the Settlement Administrator, designed and released four distinct banner ads with different color and layout designs.[7] Devery Declaration, at ¶ 7. Responses to banner ads were tracked so those banner ads that received a higher response could be served more often to help maximize the effect of the banner ad campaign. *Id.* All banner ads performed almost identically, therefore each banner ad was served almost an identical amount. *Id.*

---

[6] The Settlement Administrator was advised that the notice pursuant to 28 U.S.C. §§ 1715(a) and (b), was completed by Defendant or Defendant's attorneys. Devery Declaration, at ¶ 5.

[7] Copies of the banner ads are attached as Exhibit C to the Devery Declaration. *See* Devery Declaration, at Ex. C.

| | |
|---|---|
| Ashley Madison - Banner 1 (Red) | 2,896,841 |
| Ashley Madison - Banner 2 (Light Blue) | 2,894,321 |
| Ashley Madison - Banner 3 (Black) | 2,893,793 |
| Ashley Madison - Banner 4 (Royal Blue) | 2,893,703 |

Clicking on the banner ad would cause the viewer to be taken to the Settlement Website, as further discussed below. *Id.*

The Settlement Administrator also caused the Short Form Notice to be published in *People* magazine, which has a circulation of 3,510,533 people, in the August 28, 2017 edition. Devery Declaration, at ¶ 8.  This edition was delivered to in-home subscribers on August 18, 2017, and was made available for sale to general public on August 28, 2017.[8]  *Id.*  The Settlement Administrator also caused the Short Form Notice to be published in *Sports Illustrated* magazine, which has a circulation of 3,023,197 people, in the August 28, 2017 edition. Devery Declaration, at ¶ 9.  This edition was delivered to in-home subscribers on August 23, 2017, and was made available for sale to the general public on August 28, 2017.[9]  *Id.*  Class Settlement Counsel also posted information about the settlement prominently on each of their websites and created links directing Class Members to the settlement website.

Class Members filed and can file Claim Forms by mail or via an online portal on the Settlement Website. *See* Devery Declaration, at ¶ 12. As of October 18, 2017, the Settlement Administrator has received and processed a total of 2,522 claims.  *Id.*  Whereas the deadline to submit a claim has not passed, the Settlement Administrator will continue to accept and process claims.  *Id.*  The deadline for Class Members to submit a claim is January 2, 2018.  *See* Devery Declaration, at ¶ 14. The Settlement Administrator will continue to accept and process Claim

---

[8] A copy of the publication is attached to the Devery Declaration as Exhibit A.   *See* Devery Declaration, at Ex. A.

[9] A copy of the publication is attached to the Devery Declaration as Exhibit B.   *See* Devery Declaration, at Ex. B.

Forms, reply to Class Member inquiries, and perform the other administrative duties through the deadline date. *Id.* The Settlement Administrator will also continue to maintain the Settlement Website and toll-free number pursuant to the requirements of the Stipulation, and shall keep the parties apprised of exclusion requests, objections and Claim Forms received, as well as any documentation received or postmarked after the deadline dates. *Id.*

Class Members had 60 days from the Class Notice Date in which to opt-out of or object to the settlement, which is plainly sufficient under applicable law. *See In re Zurn Pex Plumbing Products Liab. Litig.*, 08-MDL-1958 ADM/AJB, 2012 WL 5055810 at *10 (D. Minn. Oct. 18, 2012) ("The opt-out period of 45 days provided for in the Settlement is reasonable."); *Xcel Energy,* 364 F. Supp. 2d 1005 (providing 55 days between mailing notice and final approval hearing); *In re Marsh & McLennan Companies, Inc. Sec. Litig.*, 04 CIV. 8144 (CM), 2009 WL 5178546 at *23(S.D.N.Y. Dec. 23, 2009) ("…the Notice plan satisfied due process. Notice was first mailed on November 13, 2009.   Objections were due thirty days later on December 14, 2009. Courts have repeatedly found such a time period to constitute sufficient notice.").

As has been noted throughout this case, media and news outlets have written extensively about this action due to the salacious nature of Defendants' business and the nature of the information that was subject to the data breach.[10]  The media has also written about the proposed

---

[10] *See, e.g.,* Thomsen, Simon, 20 July 2015, "Extramarital affair website Ashley Madison has been hacked and attackers are threatening to leak data online," Business Insider, *available at* http://www.businessinsider.com/cheating-affair-website-ashley-madison-hacked-user-data-leaked-2015-7; "Online Cheating Site AshleyMadison Hacked," krebsonsecurity.com, 15 July 2015, *available* at http://krebsonsecurity.com/2015/07/online-cheating-site-ashleymadison-hacked; Hern, Alex. "Ashley Madison customer service in meltdown as site battles hack fallout," The Guardian, *available at* https://www.theguardian.com/technology/2015/jul/21/ashley-madison-customer-service-meltdown-hack-fallout; "Ashley Madison condemns attack as experts say hacked database is real," The Guardian, 19 August 2015, *available at* https://www.theguardian.com/technology/2015/aug/19/ashley-madisons-hacked-customer-files-posted-online-as-threatened-say-reports; Hern, Alex. "Ashley Madison hack: your questions

settlement and the notice plan used in this litigation.[11]   In fact, a search for "Ashley Madison Settlement" in Google produces links to over a hundred articles covering the settlement.[12]   This extensive and organic media coverage of the settlement has further supplemented the notice to the Class provided by the Settlement Administrator.   In total, the Notice Plan satisfied Rule 23 and due process requirements.

## VI. THE *CY PRES* DISTRIBUTION

The parties have agreed that "[i]f the amounts paid [to claimants] do not exhaust the Settlement Fund, then the remaining funds in the Settlement Fund will be donated to one or more Internal Revenue Code Section 501(c)(3) charitable digital privacy or other similar organizations

---

answered," The Guardian, *available at* https://www.theguardian.com/technology/2015/aug/20/ashley-madison-hack-your-questions-answered; "No, You Can't Hire A Hacker To Erase You From The Ashley Madison Leak," Fast Company, *available at* https://www.fastcompany.com/3050127/no-you-cant-hire-a-hacker-to-erase-you-from-the-ashley-madison-leak; "Hackers Finally Post Stolen Ashley Madison Data," WIRED, 18 August 2015, available at https://www.wired.com/2015/08/happened-hackers-posted-stolen-ashley-madison-data/; Pagliery, Jose, 20 August 2015, "Hackers expose Ashley Madison CEO's emails," CNNMoney, *available at* http://money.cnn.com/2015/08/20/technology/ashley-madison-hack-emails/index.html?sr=twmoney082015ashleymadceo4pVOD.

[11]  *See, e.g.,* Ashley Madison parent in $11.2 million settlement over data breach," CNBC, *available at* https://www.cnbc.com/2017/07/15/ashley-madison-parent-in-11-point-2-million-settlement-over-data-breach.html;   "Ashley Madison's parent company has proposed a settlement with users exposed in data breach," The Verge, *available at* https://www.theverge.com/2017/7/16/15979222/ashley-madison-ruby-corp-settlement-data-breach-cybersecurity; "Ashley Madison parent in $11.2 million settlement over data breach," Rueters, available at http://www.reuters.com/article/us-ashleymadison-settlement/ashley-madison-parent-in-11-2-million-settlement-over-data-breach-idUSKBN19Z2F0;   "Hacked Ashley Madison users getting $11.2 million settlement," CBS News, *available at* https://www.cbsnews.com/news/ashley-madison-settlement-for-hacked-users-approved-by-judge/;  "Ashley Madison will pay $11.2 million to data breach victims," Engadget, available at https://www.engadget.com/2017/07/16/ashley-madison-lawsuit-settlement/;  "Ashley Madison Data Breach Class Action Settlement," Top Class Actions, available at https://topclassactions.com/lawsuit-settlements/lawsuit-news/816025-ashley-madison-data-breach-class-action-settlement/;

[12]  *See id; see also* https://www.google.com/search?rlz=1C1EODB_enUS682US682 &biw=1707&bih=735&q=ashley+madison+settlement&oq=ashley+madison+settlement&gs_l= psy-ab.12...0.0.0.3051. 0.0.0.0.0.0.0.0.0..0.0....0...1..64.psy-ab..0.0.0....0.SjSHarJYTlQ

chosen jointly by Class Counsel (on behalf of the Settlement Class) and Avid (a "Charity")." Stipulation, at p. 17. Specifically, "[i]f the Net Settlement Fund is not exhausted by compensating for out-of-pocket losses and those whose Personal Information was released publicly, then any remainder will be donated to a Charity subject to approval of the Court." Preliminary Approval Order, p. 6.

Donating the remainder of the Net Settlement Fund in the way that is outlined in the Stipulation, the Motion for Preliminary Approval, and the Preliminary Approval Order creates a tangible benefit to the Class. A *cy pres* award to Charities that will work to prevent or remedy the types of harms experienced by Class Members will confer a benefit on the Class without increasing any risk of future harm to Class Members that want nothing more to do with Avid. *See In re Google Inc. Cookie Placement Consumer Privacy Litigation*, 2017 WL 446121 at *4 (D. Del. Feb. 2, 2017) (approving a settlement agreement when the "proposed *cy pres* contributions to the proposed recipients [was] an effective and beneficial remedy that bears a substantial nexus to the interests of the Settlement Class."). "The *cy pres* doctrine takes its name from the Norman French expression, cy pres comme possible, which means 'as near as possible.' " *Caligiuri v. Symantec Corp.*, 855 F.3d 860, 866 (8th Cir. 2017); *see also In re Airline Ticket Com'n Antitrust Litig.,* 307 F.3d 679, 682 (8th Cir. 2002). "In the class action context, it may be appropriate for a court to use cy pres principles to distribute unclaimed funds." *Id.* "In such a case, the unclaimed funds should be distributed for a purpose as near as possible to the legitimate objectives underlying the lawsuit, the interests of class members, and the interests of those similarly situated." *Id.*

It is not feasible for the remainder to go to the Class Members for a number of reasons, including the fact that Avid does not have reliable email addresses or other contact information

for the Class and because many Class Members have made it known to this Court that they do not want to be contacted.  As such, the case at hand presents unique circumstances where Class Members that should receive benefits from the Settlement are consciously choosing not to directly claim such benefits due to the perceived risk that further damage could be done in the process.   A *cy pres* distribution in this type of a scenario would confer benefits on all such Class Members without putting them at risk of further damage. "The *cy pres* remedy the settling parties here have devised bears a direct and substantial nexus to the interests of absent class members and thus properly provides for the 'next best distribution' to the class."  *C.f., Lane v. Facebook, Inc.*, 696 F.3d 811, 821 (9th Cir. 2012) (affirming the distribution of $6.5 million to a charity that worked for the "protection of identity and personal information online" where distribution to class not feasible); *In re Google Referrer Header Privacy Litig.*, 869 F.3d 737, 741–43 (9th Cir. 2017) (where distribution to class members was not feasible, affirming a $5.3 million *cy pres* award that benefitted six organizations with a record of promoting privacy protection on the Internet and that was capable of educating the class about online privacy risks).  For the reasons above, the Court orders a *pro rata cy pres* distribution of the remainder of the Net Settlement Fund to the Charities jointly presented to the Court, with each such Charity receiving an equal percent of the remainder of the Net Settlement Fund.

The following Charities shall be the beneficiaries of this distribution:  Electronic Frontier Foundation; National Consumers League; Public Justice; GirlSpring; No Bully; Berkman Klein Center for Internet & Society at Harvard University; Center for Internet Society at Stanford Law School; and Electronic Privacy Information Center (each being a "Charity," and together, comprising the "Charities").  The Court finds that a *pro rata* distribution to each of these

Charities creates a next best distribution to the Class.  A *cy pres* contribution to the Charities will be an effective and beneficial remedy that bears a substantial nexus to the interests of the Class.

## VII. FINDINGS REGARDING THE APPLICATION FOR ATTORNEYS' FEES, COSTS AND SERVICE AWARDS TO THE CLASS REPRESENTATIVES

Based on the Motion for Approval of Attorneys' Fees, the Memorandum in Support and the materials submitted therewith, the Court finds that the "percentage of the fund" method is appropriate in this case and that an award of one third of the total settlement fund ($3,733,333.33) is reasonable and appropriate given (1) the time and work required of Class Settlement Counsel; (2) the preclusion of other employment by Class Settlement Counsel due to their acceptance and intensive work on this case; (3) the contingent nature of the fee and the significant risk of not being compensated assumed by Class Settlement Counsel; (4) the significant benefit obtained by Class Settlement Counsel for the Class, including both an $11.2 million cash settlement as well as additional non-monetary relief; and (5) the experience, reputation and skill of Class Settlement Counsel.

The Court further finds that it is appropriate to reimburse plaintiffs' counsel for expenses incurred for the benefit of the Class from the class settlement fund and awards Class Settlement Counsel costs to be distributed to Plaintiffs' counsel in the amount of $78,032.38. Finally, the Court finds that it is fair, reasonable and appropriate to award each of the named Class Representatives a separate service award of $5,000 from the settlement fund. This award is reasonable in recognition of the Class Representatives' work and assistance on behalf of the Class and their willingness to litigate this action in their own names, and is reasonable and in line with awards given in similar litigation.

## VIII. OTHER PROVISIONS

Class Settlement Counsel and Defendants are authorized to take, without further Court approval, all necessary and appropriate steps to implement the Settlement including the approved Notice Program.

To "secure the just, speedy, and inexpensive determination" of this and related actions, FRCP 1, the Court also hereby stays further proceedings in related actions pending (i) Judgment, or (ii) termination of this Settlement, whichever occurs earlier.

## IX. ENTRY OF JUDGMENT AND OTHER ACTIONS

Pursuant to the Settlement, the Court hereby (i) dismisses this action with prejudice; (ii) bars and enjoins the Releasing Parties from asserting any of the Released Claims, as set forth in Section 10 of the Settlement, including during the pendency of any appeal from the Final Approval Order; (iii) releases the Released Parties from the Released Claims, as set forth in Section 10 of the Settlement; (iv) and reserves the Court's continuing and exclusive jurisdiction over Avid and all Settlement Class Members (including all objectors) to administer, supervise, construe, and enforce this Agreement in accordance with its terms.  Moreover, the Court orders that (i) the Settlement Agreement shall be the exclusive remedy for any and all Settlement Class Members; (ii) Defendants shall not be subject to liability or expense of any kind to any Settlement Class Member except as set forth in the Settlement; and (iii) Settlement Class Members shall be permanently barred from initiating, asserting, or prosecuting any and all Released Claims against Defendants in any federal or state court in the United States or any other tribunal.  All other provisions of the Settlement are binding on Avid and the Settlement Class Members.

The Court shall retain jurisdiction over the settlement and the settlement fund and directs the parties to submit a final accounting to the Court on, *inter alia*, the claims paid and amounts distributed to the Charities, **no later than Friday, February 2, 2018.**

**IT IS SO ORDERED.**

Dated this 20th day of November, 2017.

**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**